# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| **FERMIN CORTEZ, *et al.*, on behalf of themselves and all other similarly situated individuals,** | **8:08CV90** |
| **Plaintiffs,** | |
| **v.** | |
| **NEBRASKA BEEF, INC., and NEBRASKA BEEF, LTD.,** | |
| **Defendants.** | |
| | **8:08CV99** |
| **DAVID CHUOL, on behalf of himself and all other similarly situated individuals,** | |
| **Plaintiff,** | **MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR SANCTIONS** |
| **v.** | |
| **NEBRASKA BEEF, LTD.,** | |
| **Defendant.** | |

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 1

II.     BACKGROUND .................................................................................................. 3

        A.      Nebraska Beef Produced the SSOP Checklists on January 12, 2011, and
                the Cleary Sanitation Checklists on May 3, 2011 ...................................... 4

        B.      The Cleary Sanitation Checklists Are Relevant, Non-Privileged
                Documents .................................................................................................... 5

                1.     The Cleary Sanitation Checklists List Certain Of Nebraska Beef's
                Sanitation Policies, Practices, And Procedures Applicable To Class
                Members ...................................................................................................... 5

                2.     The Cleary Sanitation Checklists are relevant to Class Members'
                sanitation activities and to showing such work is legally compensable…..6

                3.     The Cleary Sanitation Checklists show that Nebraska Beef's sanitation
                policies are mandatory, and refutes its defense that they are merely
                permissive or optional ................................................................................ 8

                4.     Class Members' Cleaning And Sanitation Activities Primarily Benefit
                Nebraska Beef ............................................................................................. 9

        C.      Nebraska Beef's Willful Decision Not To Produce The Cleary Sanitation
                Checklists Is An Affront To The Discovery Rules, The Court, And
                Plaintiffs ................................................................................................... 10

                1.     Nebraska Beef failed to identify the Cleary Sanitation Checklists in its
                Rule 26(a) initial disclosures ................................................................... 10

                2.     Nebraska Beef failed to identify the Cleary Sanitation Checklists in
                Plaintiffs' First Requests for Production of Documents .......................... 10

                3.     Nebraska Beef failed to supplement its responses to Request Nos. 14
                and 16, even after receiving a subsequent letter from Plaintiffs .............. 11

        D.      Nebraska Beef Finally Disclosed The Cleary Sanitation Checklists After
                Trial Began ................................................................................................ 16

        E.      Unless They Were Fabricated, Nebraska Beef Also Willfully Concealed
                Its SSOP Checklists Until January 12-14, 2011 ...................................... 17

1.   Plaintiffs' discovery requests applicable to the Cleary Sanitation Checklists apply equally to the SSOP Checklists, and Nebraska Beef blatantly disregarded its obligations under Rules 26 and 34 by failing to produce them until January 12-14, 2011................................................... 19

2.   Nebraska Beef claims that the SSOP Checklists were used to monitor overtime compensation to USDA inspectors; assuming this is true, they are highly relevant and should have been disclosed and produced before January 12, 2011 ..................................................................................... 19

3.   Nebraska Beef should also have disclosed and produced the SSOP Checklists before January 12, 2011 because they are responsive to numerous document requests in Plaintiffs' Second Requests for Production of Documents ....................................................................... 20

F.   The Evidence Strongly Indicates That The Times Recorded In The SSOP Checklists Are Fabricated and Fraudulent ................................................. 22

1.   Two of Nebraska Beef's Vice Presidents, James Timmerman and Yasushi Yokozeki, allegedly prepared, verified and authenticated the SSOP Checklists on a daily basis, yet Mr. Timmerman lied, and denied any knowledge of the existence of the documents at his deposition ........ 22

2.   Mr. Timmerman also lied under oath at his Rule 30(b)(6) deposition when he did not disclose Mr. Yokozeki when asked to identify persons who would know whether Nebraska Beef records the time the production line starts ............................................................................................... 25

3.   In the six years that Lisa Cleary was responsible for the Sanitation Checklists, she never encountered a Sanitation Checklist that contained fields to record the production line times ................................................. 27

4.   The "search" for and eventual location of the SSOP Checklists just weeks before the January 31, 2011 trial is highly suspect........................ 29

5.   A comparison of the SSOP Checklists to Nebraska Beef's late start notices and gang time sheets shows are fraudulent ................................... 29

G.   In Summary, At Best, Nebraska Beef Willfully And In Bad Faith Violated Applicable Federal Rules of Discovery, Causing Substantial Prejudice To Plaintiffs, And At Worst, Committed Criminal Fraud And Perjury ......... 37

III.   ARGUMENT ................................................................................................. 38

A.   Nebraska Beef Willfully And In Bad Faith Violated Federal Discovery Rules ........................................................................................................ 38

ii

1.   Nebraska Beef's failure to disclose the Cleary Sanitation Checklists and SSOP Checklists in its Initial Disclosures violated Rule 26(a)(1) ..... 40

2.   Nebraska Beef's failure to disclose the Cleary Sanitation Checklists and SSOP Checklists in its pretrial disclosures violated Rule 26(a)(3) .... 41

3.   Nebraska Beef's failure to disclose the Cleary Sanitation Checklists and SSOP Checklists in response to discovery requests, and failure to supplement its document production violated Rules 26(e) and 34 .......... 43

B.   Nebraska Beef's Willful Violations Of The Federal Discovery Rules Is Without Any Substantial Justification And Is Not Harmless; Plaintiffs And The Class Have Suffered Extreme, Irreparable Prejudice ........................ 44

C.   Pursuant To Eighth Circuit Law, Nebraska Beef's Answer Should Be Stricken And Default Judgment Should Be Entered Under Rule 37(c) .... 46

1.   The Eighth Circuit has repeatedly imposed default judgments against parties whose willful or bad faith discovery violations have undermined the discovery process as a whole ............................................................ 47

2.   Under Eighth Circuit law, a default judgment is the most appropriate sanction to impose because Nebraska Beef willfully violated the discovery rules by: (1) intentionally failing to disclose the Cleary Sanitation Checklists; (2) concealing the SSOP Checklists; and (3) lying under oath ………………………………………………………………………49

D.   A Default Judgment Is Also Justified Based On The Evidence That Nebraska Beef Fabricated The Production Times On The SSOP Checklists .................................................................................................... 52

E.   Where, As Here, The Facts Show Willfulness Or Bad Faith, The District Court Need Not Consider The Propriety Of A Less Extreme Sanction ... 54

F.   In Addition To Default Judgment, The Court Should Sanction Nebraska Beef By Ordering That It Pay Plaintiffs' Attorneys' Fees And Costs Incurred As A Result Of Nebraska Beef's Systematic Discovery Abuses ...................................................................................................... 55

G.   Because Nebraska Beef's discovery violations were deliberate and wide-ranging, a default judgment is the most appropriate sanction; this Court need not consider the exclusion of Dr. Fernandez's report as a possible sanction. ................................................................................................... 59

IV.   CONCLUSION ................................................................................................... 60

iii

## TABLE OF AUTHORITIES

**Cases**

*Avionic Co. v. General Dynamics Corp.,*
   957 F.2d 555 (8th Cir. 1992) ................................................................... 47, 54

*Chambers v. NASCO, Inc.,*
   501 U.S. 32 (1991) ......................................................................................... 47

*Chrysler Corporation v. John J. Carrey,*
   186 F.3d 1021 (8th Cir. 1999) ............................................................... passim

*Collins v. Burg,*
   169 F.3d 563 (8th Cir. 1999) .................................................................... 40

*Comiskey v. JFTJ Corp.,*
   989 F.2d 1007 (8th Cir. 1993) .................................................................. 46

*Denton v. Mr. Swiss of Mo., Inc.,*
   564 F.2d 236 (8th Cir. 1977) ...................................................................... 47

*Everyday Learning Corp. v. Larson,*
   242 F.3d 815 (8th Cir. 2001) ....................................................... 40, 54, 60

*Fu v. Owens,*
   622 F.3d 880 (8th Cir. 2010) .................................................................... 41

*Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee,*
   456 U.S. 694 (1982) ...................................................................................... 46

*Keefer v. Prudential Life and Acc. Ins. Co.,*
   238 F.3d 937 (8th Cir. 2000) .................................................................... 54

*Martin v. DaimlerChrysler Corp.,*
   251 F.3d 691 (8th Cir. 2001) .............................................................. 47, 48

*Monsanto Co. v. Ralph,*
   *382 F.3d 1374 (8th Cir. 2004)* ........................................... 3, 55, 56, 57, 58

*National Hockey League v. Metropolitan Hockey Club, Inc.,*
   427 U.S. 639 (1976) ...................................................................................... 46

*Paladin Associates, Inc. v Montana Power Company,*
   328 F.3d 1145 (9th Cir. 2003) .................................................................. 55

*Pope v. Federal Express Corp.*,
   974 F.2d 982 (8th Cir. 1992) ................................................................... passim

*Societe Internationale v. Rogers*,
   357 U.S. 197 (1958)............................................................................39, 47

## Rules

9 C.F.R. §§ 416.11-416.17.................................................................. 7, 9, 13, 14

Fed. R. Civ. P. 11...............................................................................49, 56, 57

Fed. R. Civ. P. 26(a) ................................................................................ passim

Fed. R. Civ. P. 26(a)(1) ........................................................................... 40, 41

Fed. R. Civ. P. 26(a)(1)(A)(ii) ................................................................ 10, 40

Fed. R. Civ. P. 26(a)(3) ............................................................................ 15, 41

Fed. R. Civ. P. 26(e) ................................................................ 39, 43, 46, 49

Fed. R. Civ. P. 26(e)(1) ................................................................................. 43

Fed. R. Civ. P. 30(b)(6)......................................................................... 23, 51

Fed. R. Civ. P. 34 .......................................................................................... 43

Fed. R. Civ. P. 34(a) ...................................................................................... 21

Fed. R. Civ. P. 37 ..................................................................................... 3, 38

Fed. R. Civ. P. 37(b) ...................................................................................... 56

Fed. R. Civ. P. 37(b)(2)(A)(vi) ........................................................... 39, 46, 60

Fed. R. Civ. P. 37(c)(1)(C) ................................................................... 39, 46

NE Civ. R. 54.4............................................................................................. 59

## I. __INTRODUCTION__

In this Motion for Sanctions, Plaintiffs assert that Nebraska Beef, Inc's., and

Nebraska Beef, Ltd.'s (collectively "Nebraska Beef" or "Defendants") intentional, bad faith and

repeated violations of applicable discovery rules warrant the imposition of a default judgment,

along with an award of costs and attorneys' fees, pursuant to Federal Rule of Civil Procedure

37(c) ("Rule 37") or the inherent powers of the Court.

The incident that triggered the chain of events leading to the filing of this Motion was

Nebraska Beef's January 12, 2011 production of documents known as Sanitation Standard

Operation Procedures Checklists (the "SSOP Checklists").  Nebraska Beef produced the SSOP

Checklists less than three weeks before trial and well after the expiration of applicable discovery

deadlines, even though the documents were clearly requested by Plaintiffs and their production

was required by applicable discovery rules.  Consequently, the Court postponed the January 31,

2011 trial until May 2, 2011 to permit Plaintiffs time to conduct limited discovery regarding the

late-produced documents.  Plaintiffs' subsequent investigation uncovered overwhelming

evidence that Nebraska Beef has engaged in a willful and systematic abuse of the discovery

process, including:

    (1) Concealing production of the SSOP Checklists to Plaintiffs' detriment;

    (2) Lying under oath regarding the existence of the SSOP Checklists;

    (3) Fabricating critical information contained in the SSOP Checklists; and

    (4) Late-producing *another* set of previously undisclosed documents *after* the commencement of trial (the "Cleary Sanitation Checklists"), to Plaintiffs' extreme detriment.

Plaintiffs also discovered that the information contained in the SSOP Checklists and

Cleary Sanitation Checklists – specifically, a list of required sanitation activities that hourly

employees perform on a daily basis – is not only relevant, but critical to establishing Plaintiffs'

claims. Without these documents, Plaintiffs lacked access to documents which confirm that sanitation activities are required by Nebraska Beef and are integral and indispensable to employees' primary work duties. The SSOP Checklists, moreover, contain purported production line start times that are directly relevant to Plaintiffs' claim that Class Members are not paid for all of the time that they work.

When trial finally commenced on May 2, 2011, Plaintiffs were armed with substantial evidence to attack the credibility of the SSOP Checklists. However, when the SSOP Checklists were introduced during the hostile direct examination of Lisa Cleary, Ms. Cleary surprised the parties by stating that she had never seen the times listed on the documents before. Nebraska Beef, rather than own up to its discovery violations, instead opted to introduce yet *another* set of previously undisclosed documents, the Cleary Sanitation Checklists. Subsequently, Nebraska Beef's former counsel moved to withdraw from the lawsuit altogether, and for a mistrial. Ultimately, the Court had no choice but to declare a mistrial, and the Court, the jury, and Plaintiffs were forced into a *second* disruption of trial because of Nebraska Beef's egregious discovery practices.

Plaintiffs have suffered extreme prejudice as a result of Nebraska Beef's willful affront to the federal discovery rules. For one, Nebraska Beef's concealment of the SSOP Checklists and flat out denial of their existence barred Plaintiffs from conducting follow-up discovery, thereby preventing them from effectively discovering documents that were clearly relevant to their claims. Second, because the SSOP Checklists were produced so far beyond the discovery deadline, Plaintiffs were forced to spend a considerable amount of time and money conducting discovery regarding the documents, which would not have otherwise been spent had Nebraska Beef simply abided by applicable discovery rules. Third, Plaintiffs have now incurred a significant amount of fees and expenses preparing for two trial dates, in January and May 2011.

These efforts were exerted in vain, however, as a result of Nebraska Beef's deliberate and repeated abuse of the discovery process. Finally, since a mistrial was declared on May 4, 2011, Plaintiffs have devoted their resources to this comprehensive Motion for Sanctions. As described above, the time, fees, and expenses incurred by Plaintiffs in bringing this Motion were the direct result of Nebraska Beef's blatant discovery-based misconduct.

The law of the Eighth Circuit is clear. Under Fed. R. Civ. P. 37 or the Court's inherent powers, district courts may sanction an offending party who has willfully or in bad faith abused the discovery process by imposing a default judgment, along with all attorneys' fees and costs incurred by the non-offending party as a result of the offending party's intentional, discovery-based misconduct. *Monsanto Co. v. Ralph*, 382 F.3d 1374, 1376 (8th Cir. 2004). Here, Nebraska Beef has violated the rules of discovery with such an extraordinary degree of willfulness that the only appropriate consequence is for the Court to impose a default judgment against Nebraska Beef. In addition, Nebraska Beef and/or its former counsel, Lamson, Dugan and Murray, LLP, should be required to pay as a sanction, at the very least, all attorneys' fees and costs incurred by Plaintiffs as a result of Nebraska Beef's intentional, discovery-based misconduct, beginning on January 12, 2011, the date the fabricated SSOP Checklists were produced. Such a result not only serves as a just punishment for Nebraska Beef's systematic abuse of the discovery process, but, equally important, will serve to deter similar, future discovery violations.

## II. __BACKGROUND__

Plaintiffs have aggressively litigated this case for over three years and have pursued discovery in a careful and thorough manner. In the more than three years since Plaintiffs' original class action complaint was filed on March 5, 2008, Plaintiffs have deposed over 20 of Nebraska Beef's employees, defended an additional nine depositions, issued three separate sets

of interrogatories and requests for production of documents, and conducted three on-site inspections of Nebraska Beef's meat processing plant in Omaha, Nebraska.  Plaintiffs have also been mindful of the court's discovery deadlines, and have executed discovery in a manner compliant with the court's orders and with applicable discovery rules.

A.     **Nebraska Beef Produced the SSOP Checklists on January 12, 2011, and the Cleary Sanitation Checklists on May 3, 2011**

On January 12, 2011, many months after the close of discovery and less than three weeks before trial scheduled for January 31, 2011, Nebraska Beef served their Amended Responses to Plaintiffs' Second Requests for Production of Documents, Nos. 55(sic), 57, 63, and 64 ("Amended Responses"), attached as Exhibit B to the Declaration of Carolyn H. Cottrell in Support of Plaintiffs' Motion for Sanctions.[1]  The Amended Responses identified the SSOP Checklists for the first time in this litigation.  *Id.*  The surprising and late disclosure of these documents ultimately caused  a continuance of trial from January 31, 2011 to May 2, 2011, so that the parties could conduct limited discovery and supplement expert reports.  *See* Exhibit C (Case No.: 8:08CV90, Dkt No. 276).

As the Court is aware, Nebraska Beef disclosed ***another*** set of previously undisclosed SSOP Operational Sanitation Checklists (the "Cleary Sanitation Checklists") during trial on May 4, 2011.  The Cleary Sanitation Checklists were not disclosed by Nebraska Beef during discovery, even though they are responsive to Plaintiffs' document requests.

---

[1] A true and correct copy of each exhibit cited in this Memorandum is attached to the Declaration of Carolyn H. Cottrell in Support of Plaintiffs Motion for Sanctions, which itself is attached to the Index of Evidence in Support of Plaintiffs' Motion for Sanctions as Exhibit A.  In addition, each exhibit is enumerated in the Index of Evidence in Support of Plaintiffs' Motion for Sanctions.

4

**B.     The Cleary Sanitation Checklists Are Relevant, Non-Privileged Documents**

      **1.   The Cleary Sanitation Checklists List Certain Of Nebraska Beef's Sanitation Policies, Practices, And Procedures Applicable To Class Members**

The preparation and retention of the Cleary Sanitation Checklists are mandated by Nebraska Beef's Sanitation Standard Operating Procedures ("SSOP"), a program maintained by Nebraska Beef to comply with regulations of the U.S. Department of Agriculture ("USDA"). *See* Exhibit D (Transcript of Proceedings, Vol. I, May 3, 2011, at 105:8-10; 115:4-6). As part of its SSOP program, Nebraska Beef must maintain and complete the Cleary Sanitation Checklists in accordance with USDA requirements. *See* Exhibit D (Transcript of Proceedings, Vol. I, May 3, 2011, 116:17-22). The Cleary Sanitation Checklists were allegedly created as a result of "escalating regulatory actions" against Nebraska Beef by the USDA. *See* Exhibit E (Transcript of Proceedings, Vol. II, May 4, 2011, at 165:19-166:13; 167:2-3).

Specifically, Nebraska Beef uses the Cleary Sanitation Checklists, an example of which is attached as Exhibit F (Example of Cleary Sanitation Checklists for Nebraska Beef's Slaughter and Fabrication Divisions with accompanying Incident Report)., to ensure that its hourly production employees sanitize and clean themselves, their PPE and their workstations on a regular basis throughout the day. *See, e.g.* Exhibit F (Example of Cleary Sanitation Checklists for Nebraska Beef's Slaughter and Fabrication Divisions with accompanying Incident Report).. A "check" on the Cleary Sanitation Checklists denotes that a particular sanitation activity has been performed. An "I" indicates that an activity was incomplete, or that an "incident" occurred that violated sanitation and hygiene policies. The Cleary Sanitation Checklists for Nebraska Beef's Slaughter Division include the following sanitation activities, for example:

    a.   "Equipment and Contact Surfaces. (Cleaned as necessary?)"; and
    b.   "Proper sterilizing of knives, steels and hand utensils. (As often as necessary?)"; and
    c.   "Employee Hygiene/Clothing, (Observe Employees.)"; and

       d.   "SPS (Good Manufacturing Practices)"; or
       e.   "GMP (Observe Employees)".

*See, e.g.* Exhibit F (Example of Cleary Sanitation Checklists for Nebraska Beef's Slaughter and

Fabrication Divisions with accompanying Incident Report).

       The Cleary Sanitation Checklists for Nebraska Beef's Fabrication Division likewise

include the following sanitation activities:

       a.   "Equipment and Contact Surfaces"; and
       b.   "Employee Hygiene/Clothing/Glove Handling"; and
       c.   SPS (Good Manufacturing Practices)"; or
       d.   "GMP (Employees and practices) Direct Contamination".[2]

*See, e.g.* Exhibit F (Example of Cleary Sanitation Checklists for Nebraska Beef's Slaughter and

Fabrication Divisions with accompanying Incident Report).

**2.      The Cleary Sanitation Checklists are relevant to Class Members'<br>sanitation activities and to showing such work is legally compensable**

The Cleary Sanitation Checklists are directly relevant to Plaintiffs' allegation that Nebraska Beef

fails to compensate Class Members for the time they spend sanitizing themselves, their PPE and

tools, and their workstations.  They also show that employees engage in these activities.  *See, e.g.*

Exhibit F (Example of Cleary Sanitation Checklists for Nebraska Beef's Slaughter and

Fabrication Divisions with accompanying Incident Report).  Without these documents, Plaintiffs

would be hindered in presenting a complete picture of the various cleaning and sanitation

activities that employees are required to perform.

       In addition, the Cleary Sanitation Checklists are directly relevant to Plaintiffs' contention

that Class Members' sanitation activities are "integral and indispensable" to their principal work

activities and therefore are compensable.  The standards for establishing whether an activity is

---

[2] "GMP," as used in the Cleary Sanitation Checklists, means "good manufacturing practices." *See* Exhibit H (Oct. 20, 2009 Dep. of Lisa Cleary at 206:22-207:7).  GMPs are Nebraska Beef's written rules regarding personal hygiene that apply to hourly employees.  *Id.* at 208:21-209:6.

6

"integral and indispensible" are set forth in the Court's Initial Jury Instructions Nos. 19 and 23, which provide:

> To determine whether an activity is integral and indispensable, you may consider (1) whether the activity is required by the employer; (2) whether the activity is necessary to the employee's principal activities; and (3) whether the benefit of the activity inures primarily to the employer.

*See* Exhibit G (Initial Jury Instructions, Nos. 19 and 23).

The Cleary Sanitation Checklists show Nebraska Beef's emphasis on cleaning, sanitation and personal hygiene. *See, e.g.* Exhibit F (Example of Cleary Sanitation Checklists for Nebraska Beef's Slaughter and Fabrication Divisions with accompanying Incident Report).

They also confirm that these activities are required by Nebraska Beef and are necessary for the performance of Class Members' work activities, and that they inure to Nebraska Beef's benefit. *See, e.g.* Exhibit F (Example of Cleary Sanitation Checklists for Nebraska Beef's Slaughter and Fabrication Divisions with accompanying Incident Report). Accordingly, these documents are directly relevant to Plaintiffs' allegation that they must be compensated for these work activities.

Nebraska Beef, moreover, must comply with USDA regulations and maintain clean and sanitary conditions in its meat processing facility in order to stay in business. 9 C.F.R. §§ 416.11-416.17. In order for Nebraska Beef to engage in selling meat products, its employees must strictly comply with the cleaning, hygiene, and sanitation policies mandated by the USDA and, in turn, by Nebraska Beef. *Id*. The USDA requires Nebraska Beef to retain the Cleary Sanitation Checklists so that it can monitor Nebraska Beef's compliance with these regulations. *Id*. Thus, the Cleary Sanitation Checklists are also directly relevant to showing that Class Members' cleaning and sanitation activities are necessary for Nebraska Beef to stay in business. This is relevant to the integral and indispensable inquiry and whether the benefit of the activities inures primarily to Nebraska Beef.

7

**3.     The Cleary Sanitation Checklists show that Nebraska Beef's sanitation policies are mandatory, and refutes its defense that they are merely permissive or optional**

The Cleary Sanitation Checklists are also relevant to show that Nebraska Beef's policies are compulsory and must be followed by all employees.  *See* Exhibit D (Transcript of Proceedings, Vol. I, May 3, 2011, 106:17-1-7:1).  This includes Nebraska Beef's Sanitation and Personal Hygiene policy, which contains a list of written sanitation and hygiene rules.  *See* Exhibit I (Nebraska Beef Sanitation and Personal Hygiene Policy).  Indeed, violation of the rules set forth in this written policy, as well as Nebraska Beef's other rules pertinent to sanitation and hygiene, results in disciplinary action up to and including termination. *See, e.g.* Exhibit I, (Nebraska Beef Sanitation and Personal Hygiene Policy).

Specifically, Nebraska Beef requires its employees to clean and sanitize their persons, PPE and tools before commencing work on the production floor.  *See* Exhibit D (Transcript of Proceedings, Vol. I, May 3, 2011, 66:19-24).  Similarly, Nebraska Beef requires its employees to clean and sanitize their tools and equipment after they complete their work on the production line.  *See* Exhibit J (December 19, 2008 Dep. of Mario Villareal at 147:16-148:13).  The Cleary Sanitation Checklists highlight Nebraska Beef's sanitation requirements by designating when an "incident" has occurred that violates Nebraska Beef's sanitation policies and practices.  *See, e.g.* Exhibit F (Example of Cleary Sanitation Checklists for Nebraska Beef's Slaughter and Fabrication Divisions with accompanying Incident Report).  When an incident is noted in the Checklist, the production line may be halted, for example, when an employee is found to be working with a dirty apron.  *See, e.g.* Exhibit F (Example of Cleary Sanitation Checklists for Nebraska Beef's Slaughter and Fabrication Divisions with accompanying Incident Report). The production line is not restarted until the employee's equipment is replaced with clean and sanitary equipment.  *See, e.g.* Exhibit F (Example of Cleary Sanitation Checklists for Nebraska

8

Beef's Slaughter and Fabrication Divisions with accompanying Incident Report).

The Cleary Sanitation Checklists also show Nebraska Beef's requirement that its employees sanitize themselves, their PPE and tools, and workstations, throughout the production day. Nebraska Beef requires strict compliance with this policy, as evidenced by the Cleary Sanitation Checklists. In other words, the cleaning and sanitation activities are not merely "guidelines," as Lisa Cleary, Nebraska Beef's Slaughter Superintendant, testified at trial; rather, they are required work activities for which employees must be compensated. *See* Exhibit D (Transcript of Proceedings, Vol. 1, May 3, 2011 at 105:2-107:2). The Cleary Sanitation Checklists refute Ms. Cleary's testimony that the sanitation policies and practices are permissive or optional, highlighting yet another reason they are relevant to Plaintiffs' claims.

### 4. Class Members' Cleaning And Sanitation Activities Primarily Benefit Nebraska Beef

Nebraska Beef could not stay in business if it maintained a non-sanitary plant. 9 C.F.R. §§ 416.11-416.17. The Cleary Sanitation Checklists, which detail some of the sanitation activities that Class Members are required to perform, show the importance of sanitation to Nebraska Beef's bottom line. Nebraska Beef admits that sanitation is vital to its business. *See* Exhibit D (Transcript of Proceedings, Vol. I, May 3, 2011, 16:4-6; 92:1-3). Specifically, sanitation activities prevent the production of contaminated or adulterated meat, which, if sold, may cause widespread sickness and damage Nebraska Beef's brand, let alone may have serious monetary consequences. *See* Exhibit D (Transcript of Proceedings, Vol. I, May 3, 2011, 104:3-14). Because Nebraska Beef uses the Cleary Sanitation Checklists to track employees' performance of required sanitation activities, the documents support Plaintiffs' contention that the sanitation activities at issue benefit the Nebraska Beef.

9

**C.    Nebraska Beef's Willful Decision Not To Produce The Cleary Sanitation Checklists Is An Affront To The Discovery Rules, The Court, And Plaintiffs**

Plaintiffs and the Class spent large amounts of unpaid time cleaning and sanitizing themselves, their PPE and tools, and their workstations.  *See* Exhibit K (Case No.: 8:08CV90, Dkt. No. 81).  This is a significant part of Plaintiffs' claims.  Accordingly, Plaintiffs served discovery requests to obtain all relevant, non-privileged documents concerning Nebraska Beef's sanitation, cleaning and hygiene policies, practices, and procedures.  Despite the clear relevance of the Cleary Sanitation Checklists, Nebraska Beef failed to produce them.

**1.    Nebraska Beef failed to identify the Cleary Sanitation Checklists in its Rule 26(a) initial disclosures**

Federal Rule of Civil Procedure 26(a)(1)(A)(ii) provides that parties must provide "a copy — or a description by category and location — of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment."  Fed. R. Civ. P. 26(a)(1)(A)(ii).  The Court set an August 25, 2008 deadline for the parties to serve their initial disclosures.  *See* Exhibit L (Case No.: 8:80CV99, Dkt. No. 134).  Nebraska Beef's disclosures failed to make any mention of the Cleary Sanitation Checklists or the SSOP Checklists.  *See* Exhibit M (Case No.: 8:80CV99, Dkt. No. 136).  Clearly, these documents relate to Nebraska Beef's defenses in this case, and to its contention that Class Members are compensated for the time they spend performing their sanitation, cleaning, and hygiene activities since they are in pay status.

**2.    Nebraska Beef failed to identify the Cleary Sanitation Checklists in Plaintiffs' First Requests for Production of Documents**

On August 4, 2008, Plaintiffs served their first Requests for Production of Documents ("Requests for Production") on Nebraska Beef pursuant to Fed. R. Civ. P. 34 ("Rule 34").  *See*

Exhibit N  (Plaintiffs' First Set of Requests for Production of Documents).[3]  Specifically,

Request No. 14 sought:

> All documents concerning, identifying, or constituting *your policies or practices*
> *applicable to any hourly employees with respect to…(f) sanitation*….

In addition, Request No. 16 sought:

> All documents that identify *sanitation or safety procedures applicable to any*
> *hourly employee….*"

*See* Exhibit N (Plaintiffs' First Set of Requests for Production of Documents) (emphasis added).

Request Nos. 14 and 16 unequivocally request the production of all documents concerning

Nebraska Beef's sanitation policies, practices, or procedures applicable to Class Members.  The

Cleary Sanitation Checklists detail sanitation activities on their face, and, therefore, are

responsive to both Requests.  *See, e.g.* Exhibit F (Example of Cleary Sanitation Checklists for

Nebraska Beef's Slaughter and Fabrication Divisions with accompanying Incident Report).

> **3.      Nebraska Beef failed to supplement its responses to Request Nos. 14**
> **and 16, even after receiving a subsequent letter from Plaintiffs**

Nebraska Beef served its Responses to Plaintiffs' Requests for Production on

September 3, 2008, and failed to identify or produce the Cleary Sanitation Checklists or the

SSOP Checklists, even though these documents were allegedly being used every day.  *See*

Exhibit O (Defendants' Responses to Plaintiffs' Requests for Production of Documents).  In

response to Request Nos. 14 and 16, Nebraska Beef stated:  "This response will be supplemented

to the extent such documents exist."  *Id.*  The Cleary Sanitation Checklists existed on September

3, 2008.  Lisa Cleary prepared them on a regular basis during her tenure as Nebraska Beef's

HACCP Coordinator, which began in late 2002.  *See* Exhibit D (Transcript of Proceedings, Vol.

1, May 3, 2011, at 125:11-126:6).

---

[3] Plaintiffs discovery requests applied equally to Nebraska Beef, Inc. and Nebraska Beef, Ltd.

By October 28, 2008, nearly three months after Plaintiffs served their Requests for

Production, Nebraska Beef still had not supplemented its responses to Request Nos. 14 and 16.

Consequently, that day Plaintiffs sent a letter to Nebraska Beef requesting it supplement its

responses as promised.  *See* Exhibit P (October 28, 2008 Correspondence from Plaintiffs'

counsel to Nebraska Beef's former counsel).  Following its receipt of this correspondence,

Nebraska Beef still did not produce the Cleary Sanitation Checklists or the SSOP Checklists.

### 4. Nebraska Beef failed to produce SSOP documents after another specific request made on July 9, 2009

On July 9, 2009, Plaintiffs corresponded with Nebraska Beef and ***explicitly requested the***

***production of Nebraska Beef's SSOP documents***, which include the Cleary Sanitation

Checklists and SSOP Checklists.  Plaintiffs wrote:

> We have reviewed Nebraska Beef's document production and have not been able
> to identify whether your client has produced its official ***Sanitation Standard***
> ***Operating Procedure (SSOP)*** and Hazard Analysis Critical Control Points Plan
> (HACCP Plan) (and all versions during the relevant time period).  Please confirm
> whether these documents have been produced.  If they have been produced,
> provide us with bates numbers of these documents.  ***If they have not been***
> ***produced, please produce them immediately.***  These are official documents that
> must be maintained at the plant [sic] signed by the individual with overall
> authority for the plant.  ***The SSOP describes all procedures conducted daily,***
> ***before and during operations, sufficient to prevent direct contamination or***
> ***adulteration of the product…[These are] obviously relevant documents in this***
> ***case and responsive to one or more of our document requests.***

*See* Exhibit Q (July 9, 2009 Correspondence from Plaintiffs' counsel to Nebraska Beef's former

counsel) (emphasis added).  Even if Nebraska Beef claims that it did not initially understand that

Request Nos. 14 and 16 encompassed the Cleary Sanitation Checklists and SSOP Checklists –

which they clearly do – there is no doubt that Plaintiffs' July 9, 2009 letter put Nebraska Beef on

notice.

**5.     Nebraska Beef failed to produce documents relating to sanitation, cleaning, and USDA compliance after a specific request made on September 18, 2009**

On July 23, 2009, Plaintiffs deposed Julian Martinez, the head of Nebraska Beef's training and orientation program. *See* Exhibit R (July 23, 2009 Dep. of Julian Martinez). Mr. Martinez's testimony made clear that Nebraska Beef had withheld documents relating to its sanitation and cleaning policies and in compliance with USDA regulations. *See, e.g.* Exhibit R (July 23, 2009 Dep. of Julian Martinez at 239:10-14). Thus, in a letter to Nebraska Beef dated September 18, 2009, Plaintiffs stated, in pertinent part:

> Mr. Martinez indicated that the U.S.D.A. and OSHA promulgate regulations, and provide them to Nebraska Beef, regarding the PPE employees must wear, and ***the sanitation and washing procedures employees must undertake. Please produce these documents, <u>as well as any documents relating to Nebraska Beef's performance with respect to those standards</u>.*** *These documents are sought by Request Nos. 14 and 16.*

> *See* Exhibit S (September 18, 2009 Correspondence from Plaintiffs' counsel to Nebraska Beef's former counsel) (emphasis added).

As mentioned above, the Cleary Sanitation Checklists and SSOP Checklists were allegedly created as a result of "escalating regulatory actions" by the USDA against Nebraska Beef. *See* Exhibit E (Transcript of Proceedings, Vol. II, May 4, 2011, 164:25-165:23); 167:2-3; 9 C.F.R. §§ 416.11-416.17. Unquestionably, these documents "relate[e] to Nebraska Beef's performance with respect to" the USDA's sanitation standards, and are responsive to Request Nos. 14 and 16.

Following receipt of Plaintiffs' September 18, 2009 correspondence, the parties held a telephonic meet and confer on September 23, 2009 to discuss Plaintiffs' requests for documents. Thereafter, Nebraska Beef informed Plaintiffs that it "attempted to find an answer" regarding the documents it had thus far failed to produce. *See* Exhibit T (September 23, 2009 Correspondence

from Nebraska Beef's former counsel to Plaintiffs' counsel).  Nebraska Beef, however, again

failed to disclose the Cleary Sanitation Checklists or the SSOP Checklists.

On September 24, 2009, Plaintiffs wrote to Nebraska Beef confirming the substance of

the September 23, 2009 telephone conference, stating:

> *You stated that you would check with Nebraska Beef regarding each of the*
> *requests we made for documents that Mr. Martinez's deposition revealed were*
> *not produced, as follows*:
>
> Documents provided to Nebraska Beef by the USDA and OSHA regarding the
> PPE employees must wear, and the *sanitation and washing procedures*
> *employees must undertake,* *and any other documents relating to Nebraska*
> *Beef's performance with respect to those standards.*  You stated that you will
> provide Nebraska Beef's position as to whether it will produce these documents
> by September 30.

*See* Exhibit U (September 24, 2009 Correspondence from Plaintiffs' counsel to Nebraska Beef's

former counsel) (emphasis added).  Nebraska Beef responded as follows:

> …your recap is accurate though it assumes that all such documents exist.  I cannot
> say that they do and *indicated on our call that we would check with our client on*
> *whether they exist and if they are in NB's possession* and, if they do, we will
> provide you with our position on production.

*See* Exhibit V (September 24, 2009 Correspondence from Nebraska Beef's former counsel to
Plaintiffs' counsel) (emphasis added).

Again, there is no question that Nebraska Beef knew that the Cleary Sanitation Checklists

(and the SSOP Checklists, unless they were fabricated later,) existed at that time.  Nebraska

Beef's own employee, Lisa Cleary, used these documents on a *daily* basis to track hourly

employees' performance of sanitation and cleaning activities as required by the USDA.  *See*

Exhibit D (Transcript of Proceedings, Vol. 1, May 3, 2011, at 125:11-126:6); 9 C.F.R. §§

416.11-416.17.  Thus, the Cleary Sanitation Checklists and the SSOP Checklists (if they were

not fabricated later) were not all stored in some unknown offsite trailer as Nebraska Beef now

claims, but were used every day.  Regardless, Nebraska Beef continued to withhold production

of the Cleary Sanitation Checklists (and SSOP Checklists) in response to Plaintiffs'

correspondence.

**6.    Nebraska Beef failed to produce the Cleary Sanitation Checklists, which were clearly responsive to Plaintiffs' Third Requests for Production of Documents**

On September 22, 2009, Plaintiffs served their Third Requests for Production of

Documents on Nebraska Beef, including the following requests:

>   a.   Request No. 106:  "All documents that summarize, describe, or refer to the *sanitation* hourly production and support employees are required to perform on their bodies, clothes, PPE, or workstation.";
>
>   b.   Request No. 107: "All documents that summarize, describe, or refer to the *cleaning* hourly production and support employees are required to perform on their bodies, clothes, PPE, or workstation."

*See* Exhibit W (Plaintiffs Third Set of Requests for Production of Documents).  Request Nos.

106 and 107 unequivocally encompass the Cleary Sanitation Checklists (and SSOP Checklists).

Nebraska Beef responded to Plaintiffs' Third Requests for Production of Documents on

October 26, 2009, admitting that Request No. 106 was "[d]uplicative of Request No. 16."  *See*

Exhibit X (Defendants' Responses to Plaintiffs' Third Set of Requests for Production of

Documents).  Nebraska Beef, moreover, previously promised to supplement its response to

Request No. 16 "to the extent such documents exist."  *Id.*  Nevertheless, Nebraska Beef still did

not produce the Cleary Sanitation Checklists (or SSOP Checklists) in response to Request No.

106 or 107.

**7.    Nebraska Beef failed to identify the Cleary Sanitation Checklists in its pretrial disclosures in violation of Fed. R. Civ. P. 26(a)(3)**

Pursuant to Rule 26(a)(3), a party must provide to the other parties "an identification of

each document…the party expects to offer [at trial] and those it may offer if the need arises."

Fed. R. Civ. P 26(a)(3).  The parties exchanged trial exhibit lists as instructed by the Court's

Order dated April 29, 2010.  *See* Exhibits Z - AA, respectively (Case No.: 8:08CV90, Dkt. Nos.

215, 222, and 223).  The Court provided Nebraska Beef yet another opportunity to disclose the

15

Cleary Sanitation Checklists in a final, supplemental exhibit list due on March 21, 2011. *See* Exhibit C (Case No.: 8:08CV90, Dkt. No. 276).   Notably, Nebraska Beef did not disclose the Cleary Sanitation Checklists in its Rule 26(a)(3) exhibit list. *See* Exhibit AA (Case No.: 8:08CV90, Dkt. No. 223).

Of course, Nebraska Beef's twelfth hour disclosure of the SSOP Checklists caused this Court to continue the trial from January 31, 2011 to May 2, 2011. *See* Exhibit C (Case No: 8:08CV90, Dkt. No. 276).   Again, however, Nebraska Beef omitted these documents from its final, supplemental exhibit list. *See* Exhibit BB (Defendants' Supplemental List of Trial Exhibits as of March 21, 2011).

## D. Nebraska Beef Finally Disclosed The Cleary Sanitation Checklists After Trial Began

On May 4, 2011, ***over three years*** after the commencement of this lawsuit and only in response to the potential for punitive action by the Court, Nebraska Beef disclosed the existence of the Cleary Sanitation Checklists. *See* Exhibit D (Transcript of Proceedings, Vol. I, May 3, 2011, 159:3-8).   In Court that day, Nebraska Beef produced only ten months worth of these documents, even though Ms. Cleary testified that she prepared the documents for the nearly six years that she was the HACCP Coordinator (from December 2002 to August 2008). *See* Exhibit H (Oct. 20, 2009 Dep. of Lisa Cleary at 86:11-17); *See* Exhibit D (Transcript of Proceedings, Vol. I, May 3, 2011, 125:21-126:11); *See* Exhibit E (Transcript of Proceedings, Vol. II, May 4, 2011, 224:5-15; 181:3-17).

Incredibly, in light of the facts above, Nebraska Beef claimed that it did not produce the Cleary Sanitation Checklists prior to May 4, 2011 because they "were not requested." *See* Exhibit E (Transcript of Proceedings, Vol. II, May 4, 2011, 181:7-21).   Nebraska Beef further stated that "the only SSOP documents [Plaintiffs] asked for occurred in an e-mail and they asked for the plan and we gave them the plans.   That's it." *See* Exhibit E (Transcript of Proceedings,

16

Vol. II, May 4, 2011, 168:14-18).  Nebraska Beef's former counsel also acknowledged that he

had prior knowledge of the Cleary Sanitation Checklists.  *See* Exhibit E (Transcript of

Proceedings, Vol. II, May 4, 2011, 175:8-18).

Nebraska Beef's claim cannot survive scrutiny.  Plaintiffs issued at least four separate

document requests -- Request Nos. 14, 16, 106 and 107 -- that unequivocally encompass the

Cleary Sanitation Checklists.  *See* Exhibit N (Plaintiffs First Set of Requests for Production of

Documents; Plaintiffs Third Set of Requests for Production of Documents).  In addition,

Plaintiffs specifically clarified their document requests in various correspondence, including the

July 9, 2009 email to Nebraska Beef requesting not only the SSOP documents but also those

documents that "***describe[] all procedures conducted daily, before and during operations,***

***sufficient to prevent direct contamination or adulteration of the product***.  *See* Exhibit Q (July

9, 2009 Correspondence from Plaintiffs' Counsel to Nebraska Beef's former counsel) (emphasis

added).  Similarly, Plaintiffs' correspondence dated September 18, 2009 requested all documents

relating to Nebraska Beef's performance with respect to USDA sanitation and cleaning

standards.  *See* Exhibit S (September 18, 2009 Correspondence from Plaintiffs' Counsel to

Nebraska Beef's former counsel).  The Cleary Sanitation Checklists, allegedly created as a

specific result of "escalating regulatory actions" by the USDA, are precisely the set of

documents requested.  *See* Exhibit E (Transcript of Proceedings, Vol. II, May 4, 2011, 164:25-

165:23; 167:2-3).

  **E. Unless They Were Fabricated, Nebraska Beef Also Willfully Concealed Its
    SSOP Checklists Until January 12-14, 2011**

The Court is familiar with the SSOP Checklists.  They are nearly identical to the Cleary

Sanitation Checklists.  The one significant distinction is that the SSOP Checklists also contain

"fields" in which Nebraska Beef purportedly recorded the times at which first and last stun (in

17

the Slaughter Division), and first and last index (in the Fabrication Division) take place.  *See, e.g.*

Exhibit CC (SSOP Checklist 2815 (March 4, 2004); SSOP Checklist 0254 (June 30, 2010)).

Prior to the disclosure of the SSOP Checklists on January 12-14, 2011, Nebraska Beef's

expert, Dr. Jeffrey Fernandez, had submitted an expert report in which he identified a number of

so-called "allowances" that Nebraska Beef allegedly provided to its employees for time spent

donning, doffing, and performing related work activities at issue in this case.  *See* Exhibit DD

(Expert Report of Dr. Jeffrey Fernandez, Nov. 13, 2009); *see also* Exhibit EE (Case No.:

8:08CV90, Dkt. No. 289).  His opinions regarding allowances were based solely on information

he received from Nebraska Beef and its counsel.  ***Stated differently, Nebraska Beef produced no***

***documents during this litigation that corroborated Dr. Fernandez's "opinions" or established***

***a factual basis for any of these so-called "allowances."***  *See* Exhibit EE (Case No.: 8:08CV90,

Dkt. No. 289).

Following the late disclosure of the SSOP Checklists, Dr. Fernandez produced a new

expert opinion in his February 14, 2011 Supplemental Report in which he analyzed the times

listed on the SSOP checklists.[4]  Specifically, Dr. Fernandez concluded that the production line

times shown on the SSOP Checklists "show[] a greater amount of paid time than was reflected in

my calculation of allowances."  *See* Exhibit FF (Supplemental Expert Report of Dr. Jeffrey

Fernandez).  Nebraska Beef and Dr. Fernandez thus rely heavily on the SSOP Checklists to

support their argument that hourly production employees are in fact compensated for the time

they spend performing the work  activities at issue.  *See* Exhibit GG (Transcript of Trial

Proceedings, May 3, 2011, 80:19-25; 81:15-19).

---

[4] Dr. Fernandez's reliance on the SSOP Checklists is highly suspect, as are his conclusions.  As
set forth below, in addition to the fact that Nebraska Beef concealed the SSOP Checklists until
January 12-14, 2011, overwhelming evidence demonstrates that the production line times
recorded on the SSOP Checklists were fabricated by Nebraska Beef.

These documents were clearly both relevant and responsive to Plaintiffs' requests, yet, as with the Cleary Sanitations Checklists, were not produced during discovery.

**1.    Plaintiffs' discovery requests applicable to the Cleary Sanitation Checklists apply equally to the SSOP Checklists, and Nebraska Beef blatantly disregarded its obligations under Rules 26 and 34 by failing to produce them until January 12-14, 2011**

The SSOP Checklists are virtually identical to the Cleary Sanitation Checklists with respect to the daily monitoring and documenting of hourly employees' compliance with Nebraska Beef's cleaning, sanitation and hygiene policies.  *See, e.g.,* Exhibit CC (SSOP 2815 (March 4, 2004), SSOP 0254 (June 30, 2010); Exhibit X (Example of Cleary Sanitation Checklists for Nebraska Beef's Slaughter and Fabrication Divisions with accompanying Incident Report).  Thus, Plaintiffs' Document Request Nos. 14, 16, 106, and 107, and subsequent correspondence apply to the SSOP Checklists for the same reasons they apply to the Cleary Sanitation Checklists.  All facts set forth above in Sections II(B-F) are thus incorporated by reference herein.

**2.    Nebraska Beef claims that the SSOP Checklists were used to monitor overtime compensation to USDA inspectors; assuming this is true, they are highly relevant and should have been disclosed and produced before January 12, 2011**

At trial, Nebraska Beef's former counsel stated that the production times were recorded on the SSOP Checklists so that Nebraska Beef could avoid paying overtime to the USDA inspectors who inspected Nebraska Beef's production floor.  *See* Exhibit E (Transcript of Proceedings, Vol. II, May 4, 2011, 167:2-7).  If this is accurate, then the SSOP Checklists should have been identified at the outset of this case and disclosed during discovery (in addition to all of the reasons stated above), as they are also directly relevant to Plaintiffs' allegation that Nebraska Beef does not pay its workers for all the hours they work.  Documents maintained by Nebraska

Beef to monitor workers' hours for the purpose of avoiding overtime compensation are unquestionably relevant to the issues in this case.

> **3.      Nebraska Beef should also have disclosed and produced the SSOP Checklists before January 12, 2011 because they are responsive to numerous document requests in Plaintiffs' Second Requests for Production of Documents**

Unlike the Cleary Sanitation Checklists, the SSOP Checklists purport to document the times for first and last stun and first and last index.  For this reason, they are also responsive to numerous additional discovery requests propounded much earlier by Plaintiffs.  Specifically, Plaintiffs Second Requests for Production of Documents ("Second Requests for Production"), served on March 30, 2009, contained requests for any documents summarizing, describing, or reflecting the production times, including:

> Request No. 55: "All documents that summarize, describe or reflect the ***start time each day for the production line on the kill/slaughter floor*** at your Omaha, NE facility."
>
> Request No. 56: "All documents that summarize, describe, or reflect the ***stop time each day for the production line on the kill/slaughter floor*** at your Omaha, NE facility."
>
> Request No. 57: "All documents that summarize, describe or reflect the ***start time each day for the production line on the fabrication floor*** at your Omaha. NE facility."
>
> Request No. 58: "All documents that summarize, describe or reflect the ***stop time each day for the production line on the fabrication floor*** at your Omaha. NE facility."
>
> Request No. 63: "All documents describing or reflecting **the *time each day when the first head of cattle is knocked*** and placed on the production line at your Omaha, NE facility."
>
> Request No. 64: "All documents describing or reflecting the ***time of day when the last head of cattle is knocked***. At your Omaha, NE facility."

*See* Exhibit HH (Plaintiffs' Second Set of Requests for Production of Documents) (emphasis added).  The SSOP Checklists are unquestionably responsive to these requests.

Pursuant to Rule 34(a), Nebraska Beef's responses to Plaintiffs' Second Requests for Production were due on May 4, 2009.  Fed. R. Civ. P. 34(a).  Nebraska Beef, however, ***ignored*** Plaintiffs' Second Requests for Production.  As of July 9, 2009, over three months after Plaintiffs' Second Set of Requests for Production was served, Nebraska Beef had yet to issue ***any response whatsoever***.  Accordingly, on July 9, 2009, Plaintiffs wrote to Nebraska Beef and requested that the Company respond, without objections, to Plaintiffs' Second Requests for Production by July 15, 2009.  *See* Exhibit Q (July 9, 2009 Correspondence from Plaintiffs' counsel to Nebraska Beef's former counsel).  Plaintiffs' July 9, 2009 correspondence also requested that Nebraska Beef produce its official SSOP, along with all versions of these documents used during the time period relevant to this lawsuit.  *Id.*

By September 18, 2009, Nebraska Beef still had not responded to the Second Requests for Production or to Plaintiffs' July 9, 2009 correspondence.  Therefore, Plaintiffs' September 18, 2009 letter, discussed *infra* in Section I(F)(5), again requested that the Company respond.  *See* Exhibit S (September 18, 2009 Correspondence from Plaintiffs' counsel to Nebraska Beef's former counsel).  Of course, Nebraska Beef did not produce the SSOP Checklists until January 12-14, 2011, even though it now asserts that it maintained them throughout the Class Period.  *See* Exhibit E (Transcript of Proceedings, Vol. II, May 4, 2011, 181:7-21).

Even worse, Nebraska Beef finally responded to Plaintiffs' Second Requests for Production on October 5, 2009, ***over six months after they were served***, without a stipulation of the parties or Court approval.  *See* Exhibit II (Defendants' Responses to Plaintiffs' Second Set of Requests for Production of Documents).  With respect to Request Nos. 55-58 and 63-64, Nebraska Beef stated that: "***No such documents exist***."  *Id*.  However, at the time Nebraska Beef issued its responses to Requests Nos. 55-58 and 63-64, ***it allegedly had been recording the times at which first and last stun and first and last index took place for over five years***.  Moreover,

the documents were ultimately produced, albeit after the discovery deadline had lapsed, on January 12-14, 2011, in direct response to Request Nos. 55(sic), 57, 63, and 64.  *See* Exhibit B (Defendants' Amended Responses to Plaintiffs' Second Request for Production of Documents). Thus, Nebraska Beef's prior representation that "[n]o such documents exist" in response to Request Nos. 55-58 and 63-64 was simply not true (unless no such documents existed at that time and they were fabricated later).

It was not until January 12, 2011, over 21 months after Plaintiffs served their Second Requests for Production and long after discovery ended, that Nebraska Beef served its Amended Response to Plaintiffs' Second Requests for Production of Documents ("Amended Response"), Nos. 55 (sic), 57, 63, and 64.  *Id*.  In response to Request Nos. 55(sic), 57, 63, and 64, Nebraska Beef produced the SSOP Checklists.  *Id*.  Nebraska Beef's apparent justification for the belated production is that the documents were only "recently discovered" in early January 2011.  *Id*. However, as set forth below, Nebraska Beef was well aware of the SSOP Checklists long before January 2011.  Furthermore, overwhelming evidence suggests that Nebraska Beef concealed the documents from Plaintiffs all along, or that they fabricated them.

> **F.     The Evidence Strongly Indicates That The Times Recorded In The SSOP Checklists Are Fabricated and Fraudulent[5]**
>
>> **1.     Two of Nebraska Beef's Vice Presidents, James Timmerman and Yasushi Yokozeki, allegedly prepared, verified and authenticated the SSOP Checklists on a daily basis, yet Mr. Timmerman lied, and denied any knowledge of the existence of the documents at his deposition**

Nebraska Beef's Vice President, Yasushi Yokozeki, allegedly prepared the SSOP Checklists on a daily basis.  *See* Exhibit JJ (March 31, 2011 Dep. of Yasushi Yokozeki at 24:16-

---

[5] The SSOP Checklists only exist from March 2004, which also happens to be the start of the class period, to shortly before Nebraska Beef produced the SSOP Checklists in January 2011. *See* Exhibit JJ (March 31, 2011 Dep. of Yasushi Yokozeki at 27:8-28:10).  In light of the other evidence, this is strong indicia of fraud.

23).  Mr. Yokozeki, purportedly observed Nebraska Beef's hourly employees each day in both the Slaughter and Fabrication Departments to ensure that they performed the sanitation and personal hygiene activities listed on the SSOP Checklists.  *See* Exhibit JJ (March 31, 2011 Dep. of Yasushi Yokozeki at 70:4-71:23).  A "checked" box on the SSOP Checklists purportedly indicates that a sanitation activity had been completed.  *See, e.g.* Exhibit CC (SSOP Checklist 2815 (March 4, 2004); SSOP Checklist 0254 (June 30, 2010)).

Mr. Yokozeki also purportedly recorded the times in the "Time Initial Stun," and "Time Last Stun"; and "Time First Carcass Indexed to Production" and "Time Last Carcass Indexed to Production" fields.  *See* Exhibit JJ (March 31, 2011 Dep. of Yasushi Yokozeki at 33:3-34:9).  According to Mr. Yokozeki, he observes and records the first stun "from the catwalk, so the people don't see me."  *See* Exhibit JJ (March 31, 2011 Dep. of Yasushi Yokozeki at 89:5-9).   He then "verified" the documents by signing his initials in the "Verification:" field.  *See* Exhibit D (Transcript of Proceedings, Vol. I, May 3, 2011, 116:17-22).

After Mr. Yokozeki executed and verified the SSOP Checklists, James Timmerman, Nebraska Beef's Vice President of Administration (and the son of the primary owner of Nebraska Beef), allegedly would "authenticate" them.  *See* Exhibit JJ (March 31, 2011 Dep. of Yasushi Yokozeki at 25:8-26:10).  Mr. Timmerman purportedly "authenticated" the documents by reviewing them to ensure that they were "properly filled" and by signing his name in the "Record Authenticated By:" field.  *See* Exhibit JJ (March 31, 2011 Dep. of Yasushi Yokozeki at 25:8-26:10).  Once the documents were authenticated, Mr. Yokozeki would store them in his office, and then ultimately give them to Mr. Timmerman.  *See* Exhibit JJ (March 31, 2011 Dep. of Yasushi Yokozeki at 25:3-26:15; 46:13-22).

Mr. Timmerman was designated by Nebraska Beef pursuant to Fed. R. Civ. P. 30(b)(6) as its "person most knowledgeable" to give testimony on behalf of the Company concerning its

preservation of documents and information relevant to this case.  Therefore, his deposition testimony is binding on Nebraska Beef.  *See* Exhibit KK (January 29, 2009 Dep. of James Timmerman at 16:7-16).  Mr. Timmerman, moreover, was Nebraska Beef's designated representative in charge of gathering documents requested by Plaintiffs in discovery.  *See* Exhibit LL (May 20, 2009 Dep. of Mario Villareal at 7:16-8:2); *See* Exhibit X (December 19, 2008 Dep. of Mario Villareal at 152:18-153:2); *See* Exhibit MM (March 30, 2011 Dep. of Mario Villareal at 32:20-25).  He was also the Company's designated representative at trial in May 2011, showing up each day (before the declaration of mistrial) to represent Nebraska Beef at trial.

According to the SSOP Checklists, Mr. Timmerman authenticated the documents on a daily basis for a period spanning over six years – most of the Class Period.  *See, e.g.,* Exhibit CC (SSOP 2815 (March 4, 2004), SSOP 0254 (June 30, 2010)).  In other words, he allegedly signed the SSOP Checklists after reviewing them ***every single day***.  *See* Exhibit JJ (March 31, 2011 Dep. of Yasushi Yokozeki at 25:8-26:10).  Mr. Timmerman would have observed these production time fields on the SSOP Checklists nearly every work day for approximately six years.  *See, e.g.*, Exhibit CC (SSOP 2815 (March 4, 2004), SSOP 0254 (June 30, 2010)).  These fields are located ***less than an inch*** from where Mr. Timmerman signed the SSOP Checklists.

Nevertheless, Mr. Timmerman testified on January 29, 2009 at his Rule 30(b)(6) deposition ***that he was unaware of any documents that reflect when the production line starts***.[6] He testified:

> Q.  And is there some way that Nebraska Beef records the time that the line starts?
> A.  Not that I know of.

---

[6] The production lines start with the first stun in Slaughter and the first index in Fabrication.  *See* Exhibit H (October 20, 2009 Dep. of Lisa Cleary at 107:25-108:4); *see* Exhibit NN (March 12, 2009 Dep. of Tony Joy at 40:18-24).

24

*See* Exhibit KK (January 29, 2009 Dep. of James Timmerman at 137:24-138:1).

Likewise, Mr. Timmerman falsely testified at his Rule 30(b)(6) deposition that Nebraska Beef does not record the times when the last carcass comes down the line in the Slaughter division (*i.e.*, last stun) or when the last piece of meat comes down the line in the Fabrication division (*i.e.*, last index):

> Q.     Is there any way that Nebraska Beef records the time that the last -- either -- carcass goes through the kill floor?  Let's start with that.
> A.     No.
> Q.     Okay.  Does Nebraska Beef record the time when the last piece of meat or cut of meat comes down the fabrication line?
> A.     No.

*See* Exhibit KK (January 29, 2009 Dep. of James Timmerman at 145:2-9).

In light of the SSOP Checklists, which Mr. Timmerman reviewed and authenticated for over six years, *see, e.g.*, Exhibit CC (SSOP 2815 (March 4, 2004), SSOP 0254 (June 30, 2010)), it is clear that his deposition testimony was false.  Mr. Timmerman's testimony is even more disturbing given that he allegedly authenticated the SSOP Checklists **on each of the two days that his two depositions took place** – January 29, 2009 and October 14, 2009 – plus the days before each of his depositions – January 28, 2009 and October 13, 2009.  *See* Exhibit OO (SSOP 0502, 0272 (January 29, 2009); SSOP 0437, 0667 (October 14, 2009); SSOP 0501, 0271 (January 28, 2009); SSOP 0436, 0666 (October 13, 2009)).

> **2.     Mr. Timmerman also lied under oath at his Rule 30(b)(6) deposition when he did not disclose Mr. Yokozeki when asked to identify persons who would know whether Nebraska Beef records the time the production line starts**

During the January 29, 2009 Rule 30(b)(6) deposition, Plaintiffs asked Mr. Timmerman to identify persons who would know whether Nebraska Beef records production line start times. Instead of testifying that the SSOP Checklists contain the purported production line start time,

25

Mr. Timmerman stated that Tony Joy, Mario Villareal, and **Lisa Cleary** would be more likely to know if Nebraska Beef recorded this critical information:

> Q.      And is there some way that Nebraska Beef records the time that the line starts?
> A.      Not that I know of.
> Q.      Who would know that?
> A.      Either Mr. Joy -- Tony, Mario or Lisa.

*See* Exhibit KK (January 29, 2009 Dep. of James Timmerman at 137:24-138:1).  Mr. Timmerman again committed perjury by not disclosing the person who signed off on these documents every day, Yasushi Yokozeki, even though Mr. Timmerman knew that Mr. Yokozeki worked closely with the documents.[7]  *See* Exhibit JJ (March 31, 2011 Dep. of Yasushi Yokozeki at 25:3-26:15; 46:13-22).  This, of course, assumes that the SSOP Checklists were not fabricated later, after his deposition.

Compounding his lies, Mr. Timmerman denied any knowledge of Nebraska Beef's rules regarding employee hygiene.  He testified:

> Q.      What are Nebraska Beef's rules regarding employee hygiene?
> A.      I do not know.
> Q.      Okay.  You've never seen any policies about that?
> A.      I have not.

*See* Exhibit PP (October 14, 2009 Dep. of James Timmerman at 106:2-6).

The SSOP Checklists purport to list various Nebraska Beef policies and practices regarding employee hygiene and sanitation.  Mr. Timmerman, who purportedly reviewed and

---

[7] Curiously, Mr. Timmerman also failed to disclose Dolese Tippery, Nebraska Beef's Office Manager in the Accounting Department.  Ms. Tippery allegedly received the production times from the SSOP Checklists for bookkeeping purposes, and was therefore aware that Nebraska Beef purportedly recorded such information.  *See* Exhibit JJ (March 31, 2011 Dep. of Yasushi Yokozeki at 36:6-38:20).  Moreover, Ms. Tippery authenticated SSOP Checklists on the days in which Mr. Timmerman did not.  *See* Exhibit A (Declaration of Carolyn H. Cottrell in Support of Plaintiffs' Motion for Sanctions ("Cottrell Declaration")), ¶8.

authenticated them each day, should have been aware of this fact, and his testimony denying

such knowledge cannot be believed.

Finally, despite his role as the executive charged with the responsibility of gathering

documents requested by Plaintiffs in this case, Mr. Timmerman failed to turn over the SSOP

Checklists (until January 12-14, 2011), documents that, according to Mr. Yokozeki's testimony,

he possessed.  *See* Exhibit JJ (March 31, 2011 Dep. of Yasushi Yokozeki at 25:3-26:15; 46:13-

22).

> **3.     In the six years that Lisa Cleary was responsible for the Sanitation Checklists, she never encountered a Sanitation Checklist that contained fields to record the production line times**

Lisa Cleary is a senior member of the Nebraska Beef management team and an owner of

the plant.  *See* Exhibit D (Transcript of Proceedings, Vol. I, May 3, 2011, 5:13-17).  She has held

the position of Superintendant of Nebraska Beef's Slaughter Division since August 2008.  *See*

Exhibit D (Transcript of Proceedings, Vol. I, May 3, 2011, 6:12-14).  Before that, Ms. Cleary

served as Nebraska Beef's Hazard Analysis Critical Control Point (HACCP) Coordinator for

nearly six years, from December 2002 to August 2008.  *See* Exhibit H (October 20, 2009 Dep. of

Lisa Cleary at 13:8-11; 86:11-17); s*ee* Exhibit D (Transcript of Proceedings, Vol. I, May 3, 2011,

125:21-24).

In her capacity as HACCP Coordinator, Ms. Cleary reviewed, verified, and signed

documents similar to the Cleary Sanitation Checklists on a regular basis.  *See* Exhibit D

(Transcript of Proceedings, Vol. I, May 3, 2011, 159:3-8).  The Cleary Sanitation Checklists are

virtually identical to the SSOP Checklists, however, in her nearly six years working with the

Sanitation Checklists, Ms. Cleary never once encountered one containing the fields "Time Initial

Stun," and "Time Last Stun," or "Time First Carcass Indexed to Production" and "Time Last

Carcass Indexed to Production."  *See* Exhibit D (Transcript of Proceedings, Vol. I, May 3, 2011,

27

158:9-159:2).

When Plaintiffs requested to depose Ms. Cleary concerning the SSOP Checklists produced on January 12-14, 2011, Nebraska Beef's former counsel denied her "involvement in the SSOP process." *See* Exhibit QQ (March 24, 2011 Correspondence from Defendants' former counsel to Plaintiffs' counsel). Presumably, this was to keep Plaintiffs from uncovering the fact that Ms. Cleary never saw the SSOP Checklists upon which Nebraska Beef's entire defense is based.

Specifically, after the SSOP Checklists were produced on January 12-14, 2011, Plaintiffs immediately requested Ms. Cleary's deposition. *Id.* Despite Ms. Cleary's indisputable familiarity and experience working with Sanitation Checklists (as evidenced by her testimony at trial, s*ee* Exhibit D (Transcript of Proceedings, Vol. I, May 3, 2011, 159:3-8)), Nebraska Beef's counsel refused to make her available for deposition, instead suggesting "to have Ms. Cleary offer a declaration regarding her lack of involvement with regard to the SSOP process." *See* Exhibit QQ (March 24, 2011 Correspondence from Defendants' former counsel to Plaintiffs' counsel). Undoubtedly, based on her trial testimony, with which the Court is familiar, Ms. Cleary would have provided testimony at deposition similar to that provided at trial. She would have testified that while she saw SSOP Checklists all the time in her role as HACCP Coordinator, she had never seen SSOP Checklists containing fields documenting first and last stun and first and last index. *See* Exhibit D (Transcript of Proceedings, Vol. I, May 3, 2011, 159:9-21). While Nebraska Beef's former counsel attempted to avoid such testimony, the astonishing fact that ***the Superintendant of Nebraska Beef's Slaughter Division had never seen the very documents upon which Nebraska Beef's entire defense is based*** was ultimately uncovered during the second day of trial, which had already been delayed by Nebraska Beef when it produced the SSOP Checklists on January 12, 2011.

28

4. **The "search" for and eventual location of the SSOP Checklists just weeks before the January 31, 2011 trial is highly suspect**

Mario Villareal, Nebraska Beef's former Slaughter Superintendant, now in charge of "Special Projects," was tasked with gathering documents responsive to Plaintiffs' Requests Nos. 63 and 64, seeking the production of all documents reflecting the time of day when the first or last head of cattle is knocked. When he received this assignment, Mr. Villareal admittedly knew that the SSOP Checklists existed. *See* Exhibit MM (March 30, 2011 Dep. of Mario Villareal at 33:1-6; 54:6-55:22).

Nevertheless, according to Mr. Villareal, the very first efforts undertaken by Nebraska Beef to locate the SSOP Checklists did not occur *until January 2011, three weeks before trial*. *See* Exhibit MM (March 30, 2011 Dep. of Mario Villareal at 39:2-9).[8] Mr. Villareal allegedly located the SSOP Checklists in a "trailer" located near the Nebraska Beef facility. *See* Exhibit MM (March 30, 2011 Dep. of Mario Villareal at 43:7-25). Mr. Timmerman and Mr. Yokozeki apparently were unaware that the documents were stored nearby the facility. Upon "finding" the SSOP Checklists, Mr. Villareal delivered them to Mr. Timmerman, who purportedly turned the documents over to Nebraska Beef's former counsel. *See* Exhibit MM (March 30, 2011 Dep. of Mario Villareal at 44:15-45:5).

5. **A comparison of the SSOP Checklists to Nebraska Beef's late start notices and gang time sheets shows are fraudulent**

---

[8] Specifically, Nebraska Beef alleges that at a Nebraska Beef management meeting in early 2011, Ms. Tippery, Nebraska Beef's Office Manager, purportedly announced that she transferred the time information from the SSOP Checklists to a calendar for her use in "bookkeeping." *See* Exhibit MM (March 30, 2011 Dep. of Mario Villareal at 11:18-14:18); *See* Exhibit B (Defendants' Amended Responses to Plaintiffs' Second Requests for Production). Only after this purported announcement did a search for the documents allegedly ensue. *See* Exhibit MM (March 30, 2011 Dep. of Mario Villareal at 40:18-41:6). It has never been revealed to what "bookkeeping" Ms. Tippery was referring, and, not surprisingly, Plaintiffs never received from Nebraska Beef Ms. Tippery's calendar entries.

Nebraska Beef posts "late start notices" when a shift is going to start later than usual.  *See* Exhibit RR (March 11, 2009 Dep. of Jennifer McElroy at 109:8-11).  These notices apply on a plant-wide basis to both the Slaughter and Fabrication divisions.  *See* Exhibit RR (March 11, 2009 Dep. of Jennifer McElroy at 109:8-17).

Nebraska Beef's gang time sheets conform with the late start notices.  Specifically, when a shift begins, for example, one hour late, then the "start time" on the gang time sheets will reflect that one-hour-late start.  However, as set forth below, the first stun and first index times documented in the SSOP Checklists (i.e., those allegedly eye-witnessed by Mr. Yokozeki and authenticated by Mr. Timmerman) are inconsistent with the "late start notices" and the gang time sheets that properly reflect the late start times.  In other words, the SSOP Checklists on the days when production started late reflect that the first stun and first index occurred ***well before the hourly employees even arrived to work.***

More specifically, on almost every day that the plant started production late from 2005 through 2008, as documented in the "late start notices" and corresponding gang time sheets produced by Nebraska Beef, the times for first stun and first index on the SSOP Checklists fail to reflect the late start.  On each of those days, where corresponding gang time sheets for the day were also produced, the first stun and first index times on the SSOP Checklists inaccurately reflect a standard workday without a late start.  The only explanation for this glaring discrepancy is that the SSOP Checklists were fabricated and are fraudulent.

The following, *See* Exhibit SS (Comparison of Late Start Notices and Gang Time Sheets to SSOP Checklists) is a synopsis of the relevant late start time posted in the "late start notice," the corresponding gang time start time, and the SSOP checklist reflecting time of first stun or first index:

- A late start notice on November 15, 2005 alerted employees that there would be a one-hour late start in the Slaughter department on November 16, 2005.  The gang

30

time sheets for November 16, 2005 reflected this late start; employees in the knocking department whose gang typically starts at 6:30 a.m. were given a 7:30 a.m. gang time start on November 16, 2005.  However, according to the SSOP Checklist filled out and signed on November 16, 2005 by Mr. Timmerman and Mr. Yokoseki, the initial stun in the Slaughter division on November 16, 2005 occurred at 6:39 a.m., long before the employees even arrived for work.

| November 16, 2005 | | |
|---|---|---|
| Late Start Time | Gang Time Start (Knocking) | SSOP Checklist First Stun Time |
| 7:30 a.m. | 7:30 a.m. | 6:39 a.m. |

- A late start notice on November 28, 2005 alerted employees that there would be a one-hour late start in the Slaughter department on November 29, 2005.  The gang time sheets for November 29, 2005 reflected this late start; employees in the knocking department whose gang time typically starts at 6:30 a.m. were given a 7:30 a.m. gang time start on November 29, 2005.  However, according to the SSOP Checklist filled out and signed on November 29, 2005 by Mr. Timmerman and Mr. Yokoseki, the initial stun in the Slaughter division on November 29, 2005 occurred at 6:40 a.m., long before the employees even arrived for work.

| November 28, 2005 | | |
|---|---|---|
| Late Start Time | Gang Time Start (Knocking) | SSOP Checklist First Stun Time |
| 7:30 a.m. | 7:30 a.m. | 6:40 a.m. |

- A late start notice on December 1, 2005 alerted employees that there would be a two-hour late start in the Slaughter department on December 2, 2005.  The gang time sheets for December 2, 2005 reflected this late start; employees in the knocking department whose gang time typically starts at 6:30 a.m. were given an 8:30 a.m. gang time start on December 2, 2005.  However, according to the SSOP Checklist filled out and signed on December 2, 2005 by Mr. Timmerman and Mr. Yokoseki, the initial stun in the Slaughter division on December 2, 2005 occurred at 6:38 a.m., long before the employees even arrived for work.

| December 2, 2005 | | |
|---|---|---|
| Late Start Time | Gang Time Start (Knocking) | SSOP Checklist First Stun Time |
| 8:30 a.m. | 8:30 a.m. | 6:38 a.m. |

- A late start notice on December 21, 2005 alerted employees that there would be a one-hour late start in the Slaughter department on December 22, 2005.  The gang time sheets for December 22, 2005 reflected this late start; employees in the knocking department whose gang time typically starts at 6:30 a.m. were given a 7:30 a.m. gang time start on December 22, 2005.  However, according to the SSOP Checklist filled out and signed on December 22, 2005 by Mr. Timmerman and Mr. Yokoseki, the

initial stun in the Slaughter division on December 22, 2005 occurred at 6:43 a.m., long before the employees even arrived for work.

| December 22, 2005 | | |
|---|---|---|
| Late Start Time | Gang Time Start (Knocking) | SSOP Checklist First Stun Time |
| 7:30 a.m. | 7:30 a.m. | 6:43 a.m. |

- A late start notice on December 22, 2005 alerted employees that there would be a one-hour late start in the Slaughter department on December 23, 2005. The gang time sheets for December 23, 2005 reflected this late start; employees in the knocking department whose gang time typically starts at 6:30 a.m. were given a 7:30 a.m. gang time start on December 23, 2005. However, according to the SSOP Checklist filled out and signed on December 23, 2005 by Mr. Timmerman and Mr. Yokoseki, the initial stun in the Slaughter division on December 23, 2005 occurred at 6:44 a.m., long before the employees even arrived for work.

| December 23, 2005 | | |
|---|---|---|
| Late Start Time | Gang Time Start (Knocking) | SSOP Checklist First Stun Time |
| 7:30 a.m. | 7:30 a.m. | 6:44 a.m. |

- A late start notice on October 4, 2006 alerted employees that there would be a one-hour late start in the Slaughter department on October 5, 2006. The gang time sheets for October 5, 2006 reflected this late start; employees in the knocking department whose gang time typically starts at 6:30 a.m. were given a 7:30 a.m. gang time start on October 5, 2006. However, according to the SSOP Checklist filled out and signed on October 5, 2006 by Mr. Timmerman and Mr. Yokoseki, the initial stun in the Slaughter division on October 5, 2006 occurred at 6:38 a.m., long before the employees even arrived for work.

| October 5, 2006 | | |
|---|---|---|
| Late Start Time | Gang Time Start (Knocking) | SSOP Checklist First Stun Time |
| 7:30 a.m. | 7:30 a.m. | 6:38 a.m. |

- A late start notice on October 5, 2006 alerted employees that there would be a one-hour late start in the Slaughter department on October 6, 2006. The gang time sheets for October 6, 2006 reflected this late start; employees in the knocking department whose gang time typically starts at 6:30 a.m. were given a 7:30 a.m. gang time start on October 6, 2006. However, according to the SSOP Checklist filled out and signed on October 6, 2006 by Mr. Timmerman and Mr. Yokoseki, the initial stun in the Slaughter division on October 6, 2006 occurred at 6:43 a.m., long before the employees even arrived for work.

| October 6, 2006 |
|---|

32

| Late Start Time | Gang Time Start (Knocking) | SSOP Checklist First Stun Time |
|---|---|---|
| 7:30 a.m. | 7:30 a.m. | 6:43 a.m. |

- A late start notice on November 1, 2006 alerted employees that there would be a one-hour late start in the Slaughter department on November 2, 2006.  The gang time sheets for November 2, 2006 reflected this late start; employees in the knocking department whose gang time typically starts at 6:30 a.m. were given a 7:30 a.m. gang time start on November 2, 2006.  However, according to the SSOP Checklist filled out and signed on November 2, 2006 by Mr. Timmerman and Mr. Yokoseki, the initial stun in the Slaughter division on November 2, 2006 occurred at 6:39 a.m., long before the employees even arrived for work.

| November 2, 2006 | | |
|---|---|---|
| Late Start Time | Gang Time Start (Knocking) | SSOP Checklist First Stun Time |
| 7:30 a.m. | 7:30 a.m. | 6:39 a.m. |

- A late start notice on December 19, 2006 alerted employees that there would be a one-hour late start in the Slaughter department on December 20, 2006.  The gang time sheets for December 20, 2006 reflected this late start; employees in the knocking department whose gang time typically starts at 6:30 a.m. were given a 7:30 a.m. gang time start on December 20, 2006.  However, according to the SSOP Checklist filled out and signed on December 20, 2006 by Mr. Timmerman and Mr. Yokoseki, the initial stun in the Slaughter division on December 20, 2006 occurred at 6:39 a.m., long before the employees even arrived for work.

| December 20, 2006 | | |
|---|---|---|
| Late Start Time | Gang Time Start (Knocking) | SSOP Checklist First Stun Time |
| 7:30 a.m. | 7:30 a.m. | 6:39 a.m. |

- A late start notice on December 20, 2006 alerted employees that there would be a one-hour late start in the Slaughter department on December 21, 2006.  The gang time sheets for December 21, 2006 reflected this late start; employees in the knocking department whose gang time typically starts at 6:30 a.m. were given a 7:30 a.m. gang time start on December 21, 2006.  However, according to the SSOP Checklist filled out and signed on December 21, 2006 by Mr. Timmerman and Mr. Yokoseki, the initial stun in the Slaughter division on December 21, 2006 occurred at 6:41 a.m., long before the employees even arrived for work.

| December 21, 2006 | | |
|---|---|---|
| Late Start Time | Gang Time Start (Knocking) | SSOP Checklist First Stun Time |
| 7:30 a.m. | 7:30 a.m. | 6:41 a.m. |

- A late start notice on December 27, 2006 alerted employees that there would be a one-hour late start in the Slaughter department on December 28, 2006. The gang time sheets for December 28, 2006 reflected this late start; employees in the knocking department whose gang time typically starts at 6:30 a.m. were given a 7:30 a.m. gang time start on December 28, 2006. However, according to the SSOP Checklist filled out and signed on December 28, 2006 by Ms. Tippery, the initial stun in the Slaughter division on December 28, 2006 occurred at 6:39 a.m., long before the employees even arrived for work.

| December 28, 2006 | | |
|---|---|---|
| Late Start Time | Gang Time Start (Knocking) | SSOP Checklist First Stun Time |
| 7:30 a.m. | 7:30 a.m. | 6:39 a.m. |

- A late start notice on December 28, 2006 alerted employees that there would be a one-hour late start in the Slaughter department on December 29, 2006. The gang time sheets for December 29, 2006 reflected this late start; employees in the knocking department whose gang time typically starts at 6:30 a.m. were given a 7:30 a.m. gang time start on December 29, 2006. However, according to the SSOP Checklist filled out and signed on December 29, 2006 by Ms. Tippery, the initial stun in the Slaughter division on December 29, 2006 occurred at 6:44 a.m., long before the employees even arrived for work.

| December 29, 2006 | | |
|---|---|---|
| Late Start Time | Gang Time Start (Knocking) | SSOP Checklist First Stun Time |
| 7:30 a.m. | 7:30 a.m. | 6:44 a.m. |

- A late start notice on December 29, 2006 alerted employees that there would be a one-hour late start in the Slaughter department on December 30, 2006. The gang time sheets for December 30, 2006 reflected this late start; employees in the knocking department whose gang time typically starts at 6:30 a.m. were given a 7:30 a.m. gang time start on December 30, 2006. However, according to the SSOP Checklist filled out and signed on December 30, 2006 by Ms. Tippery, the initial stun in the Slaughter division on December 30, 2006 occurred at 6:41 a.m., long before the employees even arrived for work.

| December 30, 2006 | | |
|---|---|---|
| Late Start Time | Gang Time Start (Knocking) | SSOP Checklist First Stun Time |
| 7:30 a.m. | 7:30 a.m. | 6:41 a.m. |

- A late start notice on July 16, 2007 alerted employees that there would be a two-hour late start in the Slaughter department on July 17, 2007.  The gang time sheets for July 17, 2007 reflected this late start; employees in the knocking department whose gang time typically starts at 6:30 a.m. were given an 8:30 a.m. gang time start on July 17, 2007.  However, according to the SSOP Checklist filled out and signed on July 17, 2007 by Mr. Timmerman and Mr. Yokoseki, the initial stun in the Slaughter division on July 17, 2007 occurred at 6:41 a.m., long before the employees even arrived for work.

| July 17, 2007 | | |
|---|---|---|
| Late Start Time | Gang Time Start (Knocking) | SSOP Checklist First Stun Time |
| 8:30 a.m. | 8:30 a.m. | 6:41 a.m. |

- A late start notice on April 23, 2008 alerted employees that there would be a one-hour late start in the Fabrication department on April 24, 2008.  The gang time sheets for April 24, 2008 reflected this late start; employees in the pre-fab chain department whose gang time typically starts at 5:45 a.m. were given a 6:45 a.m. gang time start on April 24, 2008.  However, according to the SSOP Checklist filled out and signed on April 24, 2008 by Mr. Timmerman and Mr. Yokoseki, the initial index in the Fabrication division on April 24, 2008 occurred at 6:00 a.m., long before the employees even arrived for work.

| April 24, 2008 | | |
|---|---|---|
| Late Start Time | Gang Time Start (Pre-Fab Chain) | SSOP Checklist First Index Time |
| 6:45 a.m. | 6:45 a.m. | 6:00 a.m. |

- A late start notice on June 3, 2008 alerted employees that there would be a one-hour late start in the Slaughter department on June 4, 2008.  The gang time sheets for June 4, 2008 reflected this late start; employees in the knocking department whose gang time typically starts at 6:30 a.m. were given a 7:30 a.m. gang time start on June 4, 2008.  However, according to the SSOP Checklist filled out and signed on June 4, 2008 by Ms. Tippery, the initial stun in the Slaughter division on June 4, 2008 occurred at 6:42 a.m., long before the employees even arrived for work.

| June 4, 2008 | | |
|---|---|---|
| Late Start Time | Gang Time Start (Knocking) | SSOP Checklist First Stun Time |
| 7:30 a.m. | 7:30 a.m. | 6:42 a.m. |

- A late start notice on June 17, 2008 alerted employees that there would be a two-hour late start in the Fabrication department on June 18, 2008.  The gang time sheets for June 18, 2008 reflected this late start; employees in the pre-fab chain department whose gang time typically starts at 5:45 a.m. were given a 7:45 a.m. gang time start on June 18, 2008.  However, according to the SSOP Checklist filled out and signed

35

on June 18, 2008 by Ms. Tippery, the initial index in the Fabrication division on June 18, 2008 occurred at 6:00 a.m., long before the employees even arrived for work.

| June 18, 2008 | | |
|---|---|---|
| Late Start Time | Gang Time Start (Pre-Fab Chain) | SSOP Checklist First Index Time |
| 7:45 a.m. | 7:45 a.m. | 6:00 a.m. |

In sum, on days in which the production line started later than usual, the SSOP Checklists fail to account for the later start times, and it appears that both Mr. Timmerman and Mr. Yokoseki "authenticated" production line times that they knew without question to be inaccurate. The documents reflect first stun times that *occur when employees are not even working at the plant*. This is not only strong indicia that the times in the SSOP Checklists are fabricated, it is determinative proof that the documents are completely unreliable. Of course, any further evidence, which relies on these documents, such as Dr. Fernandez's supplemental report, are similarly unreliable and inadmissible as a result.

**6.**   **Further proof of fraud is the fact that no SSOP Checklist reflects "incidents" involving a violation of a sanitation policy, in contrast with the Cleary Sanitation Checklists, which are replete with such "incidents" and were not produced by Nebraska Beef**

Noticeably absent from the over 3,000 pages of SSOP Checklists is *any* reference to an "incident" occurring during the daily monitoring of hourly employees. *See* Exhibit A (Cottrell Declaration, ¶12). In stark contrast, the Cleary Sanitation Checklists are replete with references to "incidents." *See* Exhibit A (Cottrell Declaration, ¶12). Additionally, when an "incident" occurred, the Cleary Sanitation Checklists contain documentation reflecting how Nebraska Beef resolved the issue. *See, e.g.,* Exhibit F (Example of Cleary Sanitation Checklists for Nebraska Beef's Slaughter and Fabrication Divisions with accompanying Incident Report).. There is no such documentation associated with the SSOP Checklists, since apparently no "incidents" occurred during Vice President Timmerman's and Vice President Yokoseki's watch.

36

**G.      In Summary, At Best, Nebraska Beef Willfully And In Bad Faith Violated Applicable Federal Rules of Discovery, Causing Substantial Prejudice To Plaintiffs, And At Worst, Committed Criminal Fraud And Perjury**

As set forth in detail above, Nebraska Beef willfully and in bad faith violated the Federal

Rules of Civil Procedure concerning discovery.  Specifically, with respect to the Cleary

Sanitation Checklists:

1.      Nebraska Beef was aware that the relevant, non-privileged documents existed, but intentionally failed to disclose them in response to applicable document requests, including Request Nos. 14, 16, 106, and 107, as well as clarifying correspondence;

2.      Nebraska Beef had opportunities to disclose the documents not only in response to discovery requests, but also in its initial disclosures, pretrial disclosures and exhibit lists, but consciously chose to withhold them in violation of the discovery rules; and

3.      Nebraska Beef did not produce these documents until May 4, 2011, and only produced them in an attempt to protect itself from the potential for punitive action by the Court.

Regarding the SSOP Checklists:

1.      For over six years from March 2004 to June 2010, *i.e.*, ***during the course of this litigation***, Nebraska Beef purportedly recorded the times at which first and last stun and first and last index took place on a daily basis.  It strains credibility and is frankly inconceivable for Nebraska Beef to suggest that they were only discovered in January 2011.  In actuality, Nebraska Beef either knew the SSOP Checklists existed throughout the discovery process, and deliberately concealed them from Plaintiffs in violation of applicable discovery rules, or fabricated them (or both);

2.      Further evidence of concealment includes Mr. Timmerman undisputedly lying under oath about the existence of the SSOP Checklists.  Mr. Timmerman allegedly worked with these documents nearly every day.  Further, when Plaintiffs asked to depose Lisa Cleary regarding the documents, Nebraska Beef's former counsel told Plaintiffs that Ms. Cleary had no knowledge of the "SSOP process";

3.      The documents should have been produced in 2008 in response to Plaintiffs' Request Nos. 14 and 16, because like the Cleary Sanitation Checklists, the SSOP Checklists reflect sanitation activities applicable to hourly employees.  The documents also were concealed in violation of the

37

rules of discovery, because they should have been identified in Nebraska Beef's initial disclosures, pre-trial disclosures and exhibit lists; and

4.     Finally, overwhelming evidence suggests that the production-line times recorded on the SSOP Checklists were fabricated by Nebraska Beef. When compared to Nebraska Beef's late-start notices and corresponding gang time sheets, the times recorded on the SSOP Checklists for first stun and first index are inaccurate.  The only logical explanation for this discrepancy is that the times were manufactured by Nebraska Beef.

As set forth below, Eighth Circuit law makes clear that Nebraska Beef's willful, bad faith, and repeated violations of the discovery process warrants the issuance of terminating sanctions under Rule 37.

## III.   ARGUMENT

### A.    Nebraska Beef Willfully And In Bad Faith Violated Federal Discovery Rules

Plaintiffs bring this motion for sanctions pursuant to Fed. R. Civ. P. 37.  Rule 37(c) provides for the imposition of sanctions when a party fails to disclose discoverable information or fails to supplement previously issued discovery responses.  Fed. R. Civ. P. 37(c).  Rule 37(c) states, in pertinent part:

> (1) *Failure to Disclose or Supplement*. If a party fails to provide information … as required by Rule 26(a) or 26(e), the party is not allowed to use that information … to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.  In addition to or instead of this sanction, the court, on motion after giving an opportunity to be heard:
>
> (A)     may order payment of the reasonable expenses, including attorney's fees, caused by the failure;
> (B)     may inform the jury of the party's failure; and
> (C)     may impose other appropriate sanctions, including any of the orders listing in Rule 37(b)(2)(A)(i)-(vi).

Fed. R. Civ. P. 37(c)(1).

The various sanctions under Rule 37(b)(2)(A)(i)-(vi) allow courts to, in relevant part:

> (ii)  … prohibit[] the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters of evidence; …
> (iii) strik[e] pleadings in whole or in part; …
> (vi) render[] a default judgment against the disobedient party; ….

38

Fed. R. Civ. P. 37(b)(2)(A).

Thus, in order for this Court to sanction Nebraska Beef under Rule 37, Plaintiffs must prove that Nebraska Beef violated Rule 26(a) or (e) and that such violation was not substantially justified and is not harmless. Fed. R. Civ. P. 37(c). Because Plaintiffs seek the entry of a default judgment against Nebraska Beef, they must also prove that Nebraska Beef's discovery violations were willful or in bad faith. *Societe Internationale v. Rogers*, 357 U.S. 197, 212 (1958).

Overwhelming evidence establishes that Nebraska Beef willfully violated Rule 26(a) and Rule 26(e). The Cleary Sanitation Checklists were in Nebraska Beef's possession, custody, and control throughout the discovery process, yet Nebraska Beef admits that it deliberately chose not to produce them. *See* Exhibit E (Transcript of Proceedings, Vol. II, May 4, 2011, 181:7-21). Nebraska Beef's admittedly intentional non-disclosure of the Cleary Sanitation Checklists is a blatant violation of Rules 26(a) and 26(e). The evidence also shows that Nebraska Beef allegedly prepared, authenticated, and verified the SSOP Checklists on a daily basis between 2004 and 2010 and intentionally concealed these documents from Plaintiffs in discovery and/or fabricated them. There is no doubt that Nebraska Beef's concealment of the SSOP Checklists was an unlawful breach of its duties to produce discoverable documents under Rules 26(a) and 26(e). Nebraska Beef's belated production of the SSOP Checklists does not remedy its willful concealment of the documents throughout the discovery process. This is particularly true given that Nebraska Beef's representatives lied under oath about the existence of the documents, and the evidence establishes that they were fabricated. Cumulatively, and especially considering the enormous prejudice Nebraska Beef's conduct has imposed on Plaintiffs and the Class, Nebraska Beef's misconduct amounts to a willful and bad faith violation of applicable discovery rules.

Plaintiffs respectfully request that this Court, pursuant to Rules 37(b)(2)(A)(vi) and 37(c)(1)(C), punish Nebraska Beef's flagrant affront to the discovery process, and just as

importantly, deter similar future malfeasance by others, by striking Nebraska Beef's Answer and imposing a default judgment.

### 1.     Nebraska Beef's failure to disclose the Cleary Sanitation Checklists and SSOP Checklists in its Initial Disclosures violated Rule 26(a)(1)

Nebraska Beef violated Rule 26(a)(1) when it failed to identify the Cleary Sanitation Checklists and SSOP Checklists in its initial disclosures filed on August 25, 2008.  *See* Exhibit M (Case No: 8:08CV99, Dkt. No. 136).  Federal Rule of Civil Procedure 26(a)(1)(A)(ii) provides that parties must provide "a copy — or a description by category and location — of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment."  Fed. R. Civ. P. 26(a)(1)(A)(ii).  Courts do not hesitate to impose sanctions when a party fails to comply with Rule 26(a)(1).  *See, e.g., Everyday Learning Corp. v. Larson*, 242 F.3d 815, 818 (8th Cir. 2001); *Collins v. Burg*, 169 F.3d 563, 565 (8th Cir. 1999).

As set forth in the Statement of Facts above, Nebraska Beef used the Cleary Sanitation Checklists to monitor Class Members' performance and compliance with Nebraska Beef's sanitation policies, practices, and procedures.  *See* Exhibit JJ (March 31, 2011 Dep. of Yasushi Yokozeki at 70:4-71:23).  The documents plainly relate to Nebraska Beef's defenses in this case and specifically to its contention that Class Members perform their sanitation, cleaning and hygiene activities while in pay status.  *See* Exhibit D (Transcript of Trial Proceedings, May 3, 2011, 80:19-25; 81:15-19).  Accordingly, Nebraska Beef was required to identify the Cleary Sanitation Checklists under Rule 26(a)(1).

The same analysis applies to the SSOP Checklists, which constitutes Nebraska Beef's strongest claimed defense in this case.  Nebraska Beef asserts that the production line times on the SSOP Checklists show that hourly employees are paid for their donning, doffing and related

40

activities.  *See* Exhibit FF (Supplemental Expert Report of Dr. Jeffrey Fernandez).[9]

Accordingly, Nebraska Beef was required to identify the SSOP Checklists under Rule 26(a)(1).

>    **2.    Nebraska Beef's failure to disclose the Cleary Sanitation Checklists and SSOP Checklists in its pretrial disclosures violated Rule 26(a)(3)**

Nebraska Beef's willful nondisclosure of the Cleary Sanitation Checklists and SSOP

Checklists also violated Rule 26(a)(3) governing pretrial disclosures.  Rule 26(a)(3) requires a

party to provide to the other parties "an identification of each document" that the "party expects

to offer and … may offer if the need arises."  Fed. R. Civ. P. 26(a)(3).  In other words, under

Rule 26(a)(3), parties must timely disclose those documents they expect to offer or may offer at

trial, and a failure to do so has consequences.  *See, e.g., Fu v. Owens,* 622 F.3d 880, 883-884 (8th

Cir. 2010).

The parties exchanged trial exhibit lists as instructed by this Court's Order dated April

29, 2010.  *See* Exhibits Y - AA, respectively (Case No.: 8:08CV90, Dkt. Nos. 215, 222 and 223).

Nebraska Beef failed to disclose both the Cleary Sanitation Checklists and the SSOP Checklists

in its Rule 26(a)(3) exhibit list.  *See* Exhibit AA (Case No.: 8:08CV90, Dkt. No. 223).

In an Order dated January 19, 2011, the Court gave Nebraska Beef an additional

opportunity to disclose these documents in a final, supplemental exhibit list to be submitted on

March 21, 2011.  *See* Exhibit C (Case No.: 8:08CV90, Dkt. No. 276).  Although Nebraska Beef

included the SSOP Checklists in this final exhibit list, because they were disclosed on January

12-14, 2011 and delayed the previously scheduled trial, it still omitted the Cleary Sanitation

---

[9] As set forth in the Statement of Facts, there is no merit to Nebraska Beef's assertion that these documents were only "recently discovered" in early January 2011 and thus could not have been produced on August 25, 2008 or thereafter.  *See* Exhibit B (Defendants' Amended Responses to Plaintiffs' Second Request for Production of Documents).  Nebraska Beef allegedly prepared, verified, and authenticated the SSOP Checklists *on a daily basis* between March 4, 2004 and June 30, 2010, *including on the very day that it submitted its initial disclosures*.  *See* Exhibit TT (SSOP 0886, SSOP 1145 (August 25, 2008)).

Checklists.  *See* Exhibit BB (Defendants' Supplemental List of Trial Exhibits as of March 21, 2011).

Both sets of documents should have been included in Nebraska Beef's Rule 26(a)(3) disclosures from the outset.  The Cleary Sanitation Checklists show that employees constantly sanitize during their shifts, and Nebraska Beef will use them to support its argument that, because employees constantly clean and sanitize, very little paid time, if any, is needed to complete pre- and post-shift sanitation activities.  *See* Exhibit GG (Transcript of Trial Proceedings, May 3, 2011, 80:19-25; 81:15-19).  The amount of uncompensated time that employees spend on sanitizing activities goes to the heart of Plaintiffs' case, and because the Cleary Sanitation Checklists are being used to refute that claim, they should have been disclosed in Nebraska Beef's Rule 26(a)(3) pretrial disclosures.

With respect to the SSOP Checklists, Nebraska Beef disclosed them on January 12-14, 2011 because, according to Nebraska Beef, they support its defense that hourly employees are paid for the time they spend working, including their donning, doffing and related activities.  *See* Exhibit FF (Supplemental Expert Report of Dr. Jeffrey Fernandez).  Because the documents are being offered for its defense, Nebraska Beef was required to identify them in its pretrial disclosures pursuant to Rule 26(a)(3).  These documents were allegedly being utilized by Vice Presidents Timmerman and Yokozeki when Nebraska Beef served its exhibit list as part of its pretrial disclosures on May 11, 2010.  *See* Exhibit JJ (March 31, 2011 Dep. of Yasushi Yokozeki at 46:13-24); *see* Exhibit UU (SSOP 0091, SSOP 0217 (May 11, 2010)).  In sum, the SSOP Checklists were readily available to Nebraska Beef throughout the discovery process, and because Nebraska Beef's main defense depends on the production times contained in the documents, they should have been identified in Nebraska Beef's Rule 26(a)(3) disclosures.

**3.  Nebraska Beef's failure to disclose the Cleary Sanitation Checklists and SSOP Checklists in response to discovery requests, and failure to supplement its document production violated Rules 26(e) and 34**

Nebraska Beef also breached its duties under Rules 26(e) and 34 by intentionally withholding and concealing the Cleary Sanitation Checklists, and by failing to supplement its previously issued discovery responses.  Rule 26(e) provides that "[a] party who has made a disclosure under Rule 26(a) – or who has responded to a[]…request for production… must supplement or correct its disclosure or response:

> (A)    in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing;….

Fed. R. Civ. P. 26(e)(1).  Nebraska Beef's decision not to produce the Cleary Sanitation Checklists was a blatant and willful violation of Rule 26(e).  *See* Exhibit E (Transcript of Proceedings, Vol. II, May 4, 2011, 181:7-21).

As an initial matter, and as demonstrated in the Statement of Facts above, there is no doubt that the Cleary Sanitation Checklists are relevant, non-privileged documents responsive to Request Nos. 14 and 16.  As set forth in the Statement of Facts, the documents were clearly requested and should have been produced.  Despite the obvious applicability of Request Nos. 14 and 16, Nebraska Beef did not produce them and instead stated that it would supplement its responses to Request Nos. 14 and 16 "to the extent such documents exist."  *See* Exhibit O (Defendants' Responses to Plaintiffs' Requests for Production of Documents).  Plaintiffs met and conferred with Nebraska Beef on numerous occasions both in writing and in telephone conferences and requested proper supplementation under Rule 26(e).  *See supra* at section II(C).  Ultimately, Nebraska Beef never produced the Cleary Sanitation Checklists, and its decision to conceal these documents is a flagrant and intentional violation of Rule 26(e).

43

The same analysis applies to the SSOP Checklists.  Nebraska Beef's concealment of the SSOP Checklists until January 12-14, 2011, nearly two and a half years after Plaintiffs' initial Requests for Production were served, is an obvious violation of Rule 26(e).  In addition, because the SSOP Checklists, unlike the Cleary Sanitation Checklists, contain the purported times at which first and last stun and first and last index took place, other of Plaintiffs' document requests were applicable to them as well.  Specifically, Request Nos. 55-58 and 63-64, which, to paraphrase, request all documents reflecting production line times for Nebraska Beef's Slaughter and Fabrication Divisions, plainly encompassed the SSOP Checklists.  *See* Exhibit HH (Plaintiffs' Second Set of Requests for Production of Documents).  Indeed, by producing the SSOP Checklists in its Amended Responses, Nebraska Beef ***admitted*** that the SSOP Checklists were responsive to Requests 55(sic), 57, 63, 64.  *See* Exhibit B (Defendants' Amended Responses to Plaintiffs' Second Request for Production of Documents).

### B.    Nebraska Beef's Willful Violations Of The Federal Discovery Rules Is Without Any Substantial Justification And Is Not Harmless; Plaintiffs And The Class Have Suffered Extreme, Irreparable Prejudice

Nebraska Beef's violation of Rule 26(e) precludes it from using the Cleary Sanitation Checklists and SSOP Checklists "to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c).  Nebraska Beef's willful nondisclosure of the Cleary Sanitation Checklists is not excused by "substantial justification."  Indeed, the only "justification" offered by Nebraska Beef is its assertion that the documents "were not requested."  *See* Exhibit E (Transcript of Proceedings, Vol. II, May 4, 2011, 181:7-21).  As set forth above, this is not true.  *See supra* at section II(C).  Thus, Nebraska Beef's intentional concealment of the documents was not substantially justified.

In addition, Nebraska Beef's deliberate non-disclosure of the Cleary Sanitation Checklists has harmed Plaintiffs and resulted in extreme prejudice to Plaintiffs and the Class.

First, the Cleary Sanitation Checklists provide strong evidentiary support for Plaintiffs' crucial assertions that Nebraska Beef does not compensate its hourly production employees for all the time they spend performing required sanitation, cleaning and hygiene activities and that such activities are integral and indispensable to the performance of their primary work duties. Nebraska Beef's failure to produce these documents prejudiced Plaintiffs by requiring them to prove these assertions without the aid of significant, relevant, and clearly discoverable evidence. *See Chrysler Corporation v. John J. Carrey*, 186 F.3d 1016, 1021 (8th Cir. 1999) (where the offending party's abuse of the discovery process is systematic, the prejudice to the moving party goes beyond the added time and resources expended in discovery, because the moving party is forced to go to trial lacking evidence it would have possessed but for the offending party's deceit).

Likewise, Nebraska Beef's concealment of the SSOP Checklists until January 12-14, 2011 was similarly not substantially justified and caused extreme harm to Plaintiffs. Nebraska Beef admits that the SSOP Checklists are responsive to Request Nos. 55(sic), 57, 63, and 64. The "justification" that Nebraska Beef offers for its late production of the SSOP Checklists is that the documents were only "recently discovered" in January 2011. *See* Exhibit B (Defendants' Amended Responses to Plaintiffs' Second Request for Production of Documents). As set forth above, this argument is meritless and dishonest.

Furthermore, Nebraska Beef's belated disclosure of the SSOP Checklists has caused ***two*** delays in trial (Case No. 8:08CV90, Dkt. Nos. 276 and 331). The direct result of these delays is that Plaintiffs have been forced to incur ***at least*** an additional five months of attorneys' fees and litigation expenses from January 12, 2011 to the present that would otherwise have been avoided.

Equally important, the unjustifiable concealment of the SSOP Checklists deprived Plaintiffs of access to documents that are not only discoverable, but upon which Nebraska Beef's

entire case is based.  Indeed, Nebraska Beef's Time Study expert, Dr. Fernandez, relies on the documents to "show[] a greater amount of paid time than was reflected in my calculation of allowances."  *See* Exhibit FF (Supplemental Expert Report of Dr. Jeffrey Fernandez).  For these reasons, among others, Nebraska Beef's concealment of the SSOP Checklists has caused substantial prejudice to Plaintiffs.

### C. Pursuant To Eighth Circuit Law, Nebraska Beef's Answer Should Be Stricken And Default Judgment Should Be Entered Against It Under Rule 37(c)

As established above, Nebraska Beef has violated Rules 26(a) and 26(e) in a manner that was neither substantially justified nor harmless.  It is therefore subject to sanctions under Rule 37(c).  In selecting which sanctions to impose, this Court "is not constrained to impose the least onerous discovery sanction available, but may exercise its discretion to choose the most appropriate sanction under the circumstances."  *Chrysler*, 186 F.3d at 1022.  The Court's selection of sanctions need only be "just."  *Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 707 (1982) (affirming the imposition of sanctions under Rule 37(b)(2)(A)); *Comiskey v. JFTJ Corp.*, 989 F.2d 1007, 1009 (8th Cir. 1993).  Discovery sanctions are imposed "not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent."  *Chrysler,* 186 F.3d at 1022 (citing *National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 643 (1976)).

In the instant case, the most appropriate sanction to impose against Nebraska Beef is a default judgment.  Rule 37(b)(2)(A)(vi), in this case by way of Rule 37(c)(1)(C), "grants a district court the authority to enter a default judgment against a party who abuses the discovery process."  *Chrysler*, 186 F.3d at 1022 (quoting *Comiskey*, 989 F.2d at 1009).  Outside of Rule 37, the "inherent power of the court" also permits the issuance of a default judgment or dismissal

where "a litigant's conduct abuses the judicial process.…"  *Pope v. Federal Express Corp.*, 974 F.2d 982, 984 (8th Cir. 1992) *vacated and remanded on other grounds* (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 33 (1991)).  Although the remedy of default should be used only when the "failure to comply has been due to…willfulness, bad faith, or any fault of petitioners," *Societe Internationale*, 357 U.S. at 212, Nebraska Beef has violated the rules of discovery with such an extraordinary degree of willfulness that the imposition of a default judgment is warranted.

**1.    The Eighth Circuit has repeatedly imposed default judgments against parties whose willful or bad faith discovery violations have undermined the discovery process as a whole**

The well-settled practice of the Eighth Circuit is to issue default judgments when an offending party engages in willful or bad faith discovery violations.  *See, e.g., Chrysler*, 186 F.3d at 1021; *Martin v. DaimlerChrysler Corp.*, 251 F.3d 691, 694 (8th Cir. 2001); *Pope*, 974 F.2d at 984; *Monsanto*, 382 F.3d at 1379; *Denton v. Mr. Swiss of Mo., Inc.*, 564 F.2d 236, 241 (8th Cir. 1977); *Avionic Co. v. General Dynamics Corp.,* 957 F.2d 555, 558-559 (8th Cir. 1992).

In *Chrysler*, for example, the Eighth Circuit affirmed a district court's sanction of striking the defendants' answer and entering judgment for the plaintiff when, after four days of trial, the defendants introduced a number of documents not previously produced in over two years of pretrial litigation.  *Chrysler*, 186 F.3d at 1021.  After reviewing the interrogatories, requests for production of documents and corresponding responses, the district court determined that many of the late-produced documents were in fact responsive to the plaintiff's discovery requests.  *Id.* at 1020-1021.  The court noted that "…striking a party's pleadings under Rule 37 is within the range of appropriate sanctions when a party . . . engage[es] in a pattern of deceit by presenting false and misleading answers and testimony under oath in order to prevent their opponent from fairly presenting its case."  *Id.* at 1022.  Consequently, the district court struck the defendants'

47

answer, resulting in a default judgment for the plaintiff.  The district court specifically found that:

> [Defendants] repeatedly lied during the discovery process denying the existence of conversations and documents which had in fact occurred and did exist.  This is far more egregious than simple foot-dragging or even making unfounded challenges to discovery requests.  The defendants' flat denials that conversations had occurred and that documents existed precluded any follow-up discovery and thus denied [plaintiff] the ability to conduct effective discovery.  And, as these statements were made under oath, they are a direct affront to the court.

*Id.* at 1021.

Because the sanction was imposed in the middle of trial, moreover, the court deemed a monetary penalty insufficient because "it could have done nothing to remedy the lack of integrity in the case being presented to the jury…. a lesser sanction would not remedy the wrong that has been done to the litigation process before us."  *Id.*  Indeed, the district court imposed a default judgment, rather than some alternative sanction, because the defendants' willful, discovery-based misconduct caused the court to lose "faith in the adversary system being conducted according to the rules….[and] in the discovery rules being followed in this case."  *Id.*

Likewise, in *Martin v. DaimlerChrysler Corp.*, the Eighth Circuit affirmed the district court's decision to issue sanctions dismissing plaintiff's claims without prejudice and entering a judgment for defendant where the plaintiff had "willfully withheld information directly responsive to [defendant's] interrogatory and deposition questions concerning prior treatment by mental health care providers" and "failed to disclose her lawsuits against her former employer."  *Martin*, 251 F.3d at 694.  Where, as in *Martin*, a party engages in a pattern of deceit by presenting false and misleading testimony under oath, the Eighth Circuit recognizes that it is within the range of appropriate sanctions to strike a party's pleadings without prejudice, thereby resulting in default judgment.  *Martin*, 251 F.3d at 694 (citing *Chrysler*, 186 F.3d at 1020).

Furthermore, in *Pope v. Federal Express*, the plaintiff presented a document allegedly

48

written by one of defendant's employees as evidence to support her claim of sexual harassment. *See* 974 F.2d at 983.  The district court determined that the document was fabricated and concluded that the plaintiff lied during her deposition when she said the original document had been left on her desk.  *Id.*  As a result, the court found that the plaintiff knew that the document was manufactured and produced it with the intent to mislead the court.  *Id.*  The district court's conclusions led the court to impose Rule 11[10] sanctions against the plaintiff and to dismiss her complaint under the "inherent power of the court."  *Id.* at 983-984.  On appeal, the Eighth Circuit affirmed.  *Id.* at 984.

> **2.    Under Eighth Circuit law, a default judgment is the most appropriate sanction to impose because Nebraska Beef willfully violated the discovery rules by: (1) intentionally failing to disclose the Cleary Sanitation Checklists; (2) concealing the SSOP Checklists; and (3) lying under oath**

Like in the cases cited above, Nebraska Beef's extraordinary and intentional violations of the Federal Rules governing discovery warrant the imposition of a default judgment.  First, Nebraska Beef made a conscious decision not to disclose the Cleary Sanitation Checklists despite the issuance of multiple applicable document requests and Nebraska Beef's obligations under Rules 26(a) and 26(e).  Nebraska Beef's apparent justification for this intentional non-disclosure is its baseless claim that the documents "were not requested."  *See* Exhibit E (Transcript of Proceedings, Vol. II, May 4, 2011, 181:7-21).

---

[10] As *Pope* makes clear, a court may dismiss the claims of a party who, in violation of Rule 11, knowingly presents to the court and relies upon a demonstrably false document.  *Pope*, 974 F.2d at 983-984.  Like the offending party in *Pope*, Nebraska Beef has knowingly and deliberately manufactured documents – the SSOP Checklists – and produced them with the intent to mislead Plaintiffs and the Court.  This sort of willful misconduct is a clear abuse of the judicial process. *Id.* at 984.  Consequently, as an alternative to moving for sanctions under Rule 37 or the Court's inherent powers, Plaintiffs move for the imposition of a default judgment and an award of attorneys' fees and costs under Rule 11(c).

Nebraska Beef's production of the Cleary Sanitation Checklists on May 4, 2011, two days into trial, is precisely like the late production of documents in *Chrysler*, a case in which the Eighth Circuit affirmed the district court's decision to impose a default judgment against the defendants who, four days into trial, introduced for the first time a collection of documents that had been requested in discovery. *Chrysler*, 186 F.3d at 1019-1021. When coupled with the fact that the *Chrysler* defendants "repeatedly lied" under oath during discovery regarding the existence of the documents, defendants discovery violations were taken as an "affront to the court," thus justifying the imposition of default judgment against them. *Id.* at 1021. Here, like the offending party in *Chrysler,* Nebraska Beef belatedly introduced a large set of documents at trial that were "clearly responsive" to multiple discovery requests, yet nevertheless had not been previously produced. In light of *Chrysler*, Nebraska Beef's intentional nondisclosure of the Cleary Sanitation Checklists, especially when coupled with Nebraska Beef's other willful discovery violations, is an affront to this Court that requires the issuance of a default judgment.

Second, Nebraska Beef also willfully concealed the SSOP Checklists. The SSOP Checklists, like the Cleary Sanitation Checklists, should have been produced in response to applicable discovery requests and also should have been disclosed pursuant to Rules 26(a) and 26(e). In addition, the SSOP Checklists were not, as Nebraska Beef suggests, "recently discovered" in early January 2011. *See* Exhibit B (Defendants' Amended Responses to Plaintiffs' Second Request for Production of Documents). Nebraska Beef's willful concealment and eventual twelfth hour production of the SSOP Checklists is also similar to the late production in *Chrysler*. Although Nebraska Beef produced the SSOP Checklists on January 12-14, 2011, in both cases the defendants waited far too long to introduce a set of documents that unquestionably should have been produced in discovery. Moreover, *Chrysler* establishes that the willful late production of documents, when accompanied by other bad faith discovery violations

50

such as perjury, is sufficient to necessitate the imposition of a default judgment.

Third, Nebraska Beef's Vice President, Rule 30(b)(6) witness, and trial representative James Timmerman, unequivocally lied under oath about the existence of the SSOP Checklists. Mr. Timmerman purportedly authenticated the SSOP Checklists on a daily basis between March 2004 and June 2010. *See* Exhibit JJ (March 31, 2011 Dep. of Yasushi Yokozeki at 25:8-26:10). When asked about the documents at his deposition, however, Mr. Timmerman flatly denied any knowledge of their existence. *See* Exhibit KK (January 29, 2009 Dep. of James Timmerman at 137:24-138:1; 145:2-9).

The Eighth Circuit's decision in *Chrysler* makes clear that Mr. Timmerman's perjurious statements regarding the SSOP Checklists amount to a bad faith violation of discovery rules, sufficient to require the issuance of a default judgment. In *Chrysler*, the defendants lied under oath regarding the existence of late-disclosed documents. *Chrysler*, 186 F.3d at 1021. These false statements under oath, coupled with the defendants' unjustifiably belated disclosure of documents requested in discovery, led the district court to impose a default judgment under Rule 37, which was affirmed by the Eighth Circuit. *Id.* Here, like the defendants in *Chrysler*, Mr. Timmerman, lied under oath regarding the existence of the intentionally concealed and late-disclosed SSOP Checklists. *See* Exhibit KK (January 29, 2009 Dep. of James Timmerman at 137:24-138:1; 145:2-9); *see also supra* at section II(F).  Mr. Timmerman also perjured himself when he failed to disclose Vice President Yasushi Yokozeki as an individual who would know whether Nebraska Beef maintained records containing production times. *See* Exhibit KK (January 29, 2009 Dep. of James Timmerman at 137:24-138:1); *see also supra* at section II(F). Given Mr. Timmerman's status as Nebraska Beef's "person most knowledgeable" under Fed. R. Civ. P. 30(b)(6) to give testimony on behalf of the Company concerning its preservation of documents and information relevant to this case, his perjurious testimony is even more egregious

than that made by the defendants in *Chrysler*, and binds Nebraska Beef.

Nebraska Beef's intentional, discovery-based misconduct is also comparable to the facts in *Martin*. In that case, the Eighth Circuit affirmed the issuance of a default judgment against a plaintiff who had "willfully withheld information directly responsive to [defendant's] interrogatory and deposition questions concerning prior treatment by mental health care providers" and "failed to disclose her lawsuits against her former employer." *Martin*, 251 F.3d at 693-694. Here, similarly, Mr. Timmerman lied under oath regarding his knowledge of the SSOP Checklists at deposition, and Nebraska Beef failed to produce or even identify the documents when faced with clearly applicable document requests. *See* Exhibit KK (January 29, 2009 Dep. of James Timmerman at 137:24-138:1; 145:2-9).

### D.  A Default Judgment Is Also Justified Based On The Evidence That Nebraska Beef Fabricated The Production Times On The SSOP Checklists

It is well-settled in the Eighth Circuit that the fabrication of documents rises to the level of a "willful or bad faith" discovery violation. For example, in *Pope*, the Eighth Circuit affirmed the district court's dismissal of the plaintiff's case under its inherent power to impose sanctions where the plaintiff had manufactured evidence and perjured testimony "in an attempt to enhance the case through fraudulent conduct." *Pope*, 974 F.2d at 984. The Eighth Circuit quoted the district court in concluding that plaintiff had "acted in bad faith and with improper purpose in a manner which jeopardizes the integrity of the judicial system." *Id.* Here too, the offending party, Nebraska Beef, has manufactured evidence, the SSOP Checklists, in an attempt to strengthen its case. Under *Pope*, Nebraska Beef's fabrication of the production line times on the SSOP Checklists constitutes a willful and deliberate abuse of "the integrity of the judicial system." The fact that Nebraska Beef provided the fraudulent times to an expert who then rendered expert opinions and an expert report in accordance with Rule 26 only exacerbates the seriousness of Defendants' conduct. *See* Exhibit FF (Supplemental Expert Report of Dr. Jeffrey

52

Fernandez).

As set forth above, in fabricating the SSOP Checklists, Nebraska Beef apparently neglected to compare the manufactured times to those in other documents produced in this case. Thus, the first index and first stun times recorded on the SSOP Checklists are markedly inconsistent with the start times recorded on not one, but *two* other documents produced by Nebraska Beef in this case: the late start notices and the gang time sheets that correspond to the late start notices. The start times recorded on the SSOP Checklists for days on which the production line started late reflect that the first stun and first index *occurred well before the hourly employees even arrived on the production floor*. *See* Exhibit UU (Comparison of Late Start Notices and Gang Time Sheets to SSOP Checklists). The only explanation for this incredible inaccuracy is that the production line times on the SSOP Checklists were manufactured. Indicia that the SSOP Checklists were fabricated includes the following:

- James Timmerman, who authenticated the SSOP Checklists on a daily basis for over six years, lied about the existence of the documents at his deposition. *See* Exhibit KK (January 29, 2009 Dep. of James Timmerman at 137:24-138:1; 145:2-9);

- Lisa Cleary, in her capacity as Nebraska Beef's HACCP Coordinator, reviewed and signed documents similar to the Cleary Sanitation Checklists and SSOP Checklists on a regular basis, yet never encountered a document that recorded the times at which first and last index and first and last stun took place. *See* Exhibit D (Transcript of Proceedings, Vol. 1, May 3, 2011, at 125:11-126:6). When Plaintiffs requested to depose Ms. Cleary with respect to the SSOP Checklists, Nebraska Beef's former counsel denied her "involvement in the SSOP process." *See* Exhibit QQ (March 24, 2011 Correspondence from Defendants' former counsel to Plaintiffs' counsel);

- The alleged first time that Nebraska Beef "searched" for the SSOP Checklists was in January 2011, even though Nebraska Beef maintained and completed the documents for over six years. *See* Exhibit MM (March 30, 2011 Dep. of Mario Villareal at 39:2-9). Given that the documents were required by the USDA and used by Nebraska Beef on a daily basis, it strains credibility and is inconceivable for Nebraska Beef to suggest that they were only discovered in January 2011. In actuality, Nebraska Beef either knew the SSOP Checklists existed throughout the discovery process, and deliberately concealed them

53

from Plaintiffs in violation of applicable discovery rules, or fabricated them (or both);

- It so happens that Nebraska Beef maintained the SSOP Checklists from March 2004 to June 2010, *i.e.*, ***during the course of this litigation***.  *See, e.g.,* Exhibit CC (SSOP 2815 (March 4, 2004), SSOP 0254 (June 30, 2010)).

- In the over six years it allegedly maintained SSOP Checklists, Nebraska Beef did not once record an "incident" documenting a violation of the Company's sanitation policies or practices.  *See* Exhibit A (Cottrell Declaration, ¶12).  By contrast, Nebraska Beef produced 10 months worth of the Cleary Sanitation Checklists and the documents contained *91 total incidents* across the Fabrication and Slaughter Divisions.  *See* Exhibit A (Cottrell Declaration, ¶12).

### E. Where, As Here, The Facts Show Willfulness Or Bad Faith, The District Court Need Not Consider The Propriety Of A Less Extreme Sanction

Because Nebraska Beef violated Rules 26(a) and 26(e) in a manner rising to the level of willfulness or bad faith, this Court need not consider the potential applicability of sanctions less severe than a default judgment.  *Everyday Learning*, 242 F.3d at 817-818; *see also Avionic Co.*, 957 F.2d at 558.  Generally, before imposing sanctions under Rule 37, courts will, in fairness, consider whether a lesser sanction is available or appropriate.  *Keefer v. Prudential Life and Acc. Ins. Co.* 238 F.3d 937, 941 (8th Cir. 2000).  However, where, as here, the facts show that the offending party acted with willfulness or bad faith, it is well-settled that "the district court need not investigate the propriety of a less extreme sanction."  *Everyday Learning*, 242 F.3d at 817-818.

In *Everyday Learning*, the Eighth Circuit upheld a district court decision imposing a Rule 37 default judgment on a defendant for discovery abuses and pretrial order violations.  *Id.*  One argument made by the defendant on appeal was that the district court abused its discretion by not imposing a less extreme sanction.  *Id.* at 817.  The Eighth Circuit rejected this argument, finding that the district court was not required to consider the imposition of less severe sanctions because defendant's discovery violations were willful and "went to the core of the trial preparation

54

process." *Id.* at 818.  The same reasoning applies here.  Because Nebraska Beef's discovery violations were willful and in bad faith, the Court should impose a default judgment without considering the applicability of less extreme sanctions.

> **F.      In Addition To Default Judgment, The Court Should Sanction Nebraska Beef By Ordering That It Pay Plaintiffs' Attorneys' Fees And Costs Incurred As A Result Of Nebraska Beef's Systematic Discovery Abuses**

In addition to imposing a default judgment against Nebraska Beef, this Court should also enter an order requiring Nebraska Beef or its former counsel, Lamson, Dugan and Murray, LLP, to pay as a sanction all attorneys' fees and costs incurred by Plaintiffs as a result of Nebraska Beef's bad faith discovery violations.  The taxing of attorneys' fees and costs is an appropriate sanction regardless of whether a default judgment is entered.

Under their inherent powers, district courts may sanction an offending party who has acted in bad faith by requiring it to pay any litigation expenses incurred by the non-offending party as a result of the offending party's bad faith misconduct.  *Chambers*, 501 U.S. at 35.  In addition, courts may sanction an offending party under Rule 37 by ordering the payment of reasonable expenses, including attorneys' fees, caused by the failure.  Fed. R. Civ. P. 37(c).  While bad faith is required for the imposition of monetary sanctions under the courts' inherent powers, *Chambers*, 501. U.S. at 35, such a showing is not required for courts to impose the sanction of costs under Rule 37.  *See* Fed. R. Civ. P. 37; *see also Paladin Associates, Inc. v Montana Power Company*, 328 F.3d 1145, 1164 (9th Cir. 2003); (affirming the district court's issuance of costs as a sanction under Rule 37(c) for failure to timely designate an expert witness).  However, where, as here, the offending party acts willfully or in bad faith, courts will not hesitate to impose *both* a default judgment and monetary sanctions to effectuate Rule 37's purposes of punishment and deterrence.  *See Monsanto*, 382 F.3d at 1376.

In *Monsanto*, for example, the district court relied on Rule 37(b)[11] in striking the

defendant's pleadings and imposing monetary sanctions (costs) on the defendant where it had

intentionally abused the discovery process by violating court orders and repeatedly lying under

oath to conceal his misconduct.  *Id.* at 1376-1379.  The Eighth Circuit affirmed, citing the district

court's conclusion that it had "no confidence that we will ever know the truth in this case and

that whenever given the chance to tell the truth, the defendants have consistently chosen

dishonesty."  *Id.* at 1382 (internal quotations omitted); *see also id,* at 1379 (quoting the district

court to say "[plaintiff], like the Court, will never have any comfort that it knows the truth and

that it can properly prepare this case for trial . . . . The integrity of this Court and our judicial

system has been undermined by almost every aspect of the [defendant's] conduct in this case").

Likewise, in *Chambers*, the U.S. Supreme Court affirmed a decision sanctioning a bad

faith offending party under the Court's inherent powers by requiring it to pay a fee and cost

award of close to $1,000,000.  *Chambers*, 501 U.S. at 35.  The Court noted that the offending

party was sanctioned for "…the fraud he perpetrated on the court and the bad faith he displayed

toward both [the non-offending party] and the court throughout the litigation."  *Chambers*, 501

U.S. at 34.

Moreover, in *Pope v. Federal Express Corp.* ("*Federal Express*"), 49 F.3d 1327, 1328

(8th Cir. 1995),[12] the Eighth Circuit affirmed a district court's issuance of attorneys' fees under

---

[11] Although Plaintiffs bring this Motion under Rule 37(c), and *Monsanto* imposes the sanction of attorneys' fees under Rule 37(b), this is a distinction without a meaningful difference.  Rules 37(c) and 37(b) both provide for the imposition of attorneys' fees and, under both provisions, district courts have the discretion to determine if such a sanction is appropriate under the circumstances.  Thus, the analysis courts undertake to sanction a party with the payment of attorneys' fees is the same irrespective of whether attorneys' fees are imposed under Rule 37(b) or 37(c).

[12] In *Pope*, *see infra* at p. 44, the Eighth Circuit affirmed the district court's Rule 11 dismissal of plaintiff's case where plaintiff had manufactured evidence and perjured testimony "in an attempt to enhance the case through fraudulent conduct," but vacated and remanded the sanction of

Rule 11 where the plaintiff egregiously abused the discovery process in a manner that jeopardized the integrity of the judicial system as a whole. *Federal Express*, 49 F.3d at 1328.

Here, this Court should follow *Monsanto* and *Chambers* and sanction Nebraska Beef by imposing a default judgment along with attorneys' fees and costs under Rule 37 or this Court's inherent powers. Nebraska Beef's willful discovery abuses, which include lying under oath and the fabrication of critical documents, are just as egregious as the misconduct in *Monsanto*.

In addition, Nebraska Beef's flagrant abuse of the discovery process prejudiced Plaintiffs by requiring them "to take costly steps to uncover facts that [Nebraska Beef] was obligated to provide voluntarily." *Monsanto*, 382 F.3d at 1382. Had Nebraska Beef simply abided by the well-articulated rules of discovery, this lawsuit would have been tried on January 31, 2011 (Case No: 8:08CV90, Dkt. No. 253). Instead, Nebraska Beef's deliberate violations of the discovery process have caused trial to be postponed twice and a mistrial to be declared (Case No: 8:08CV90, Dkt. Nos. 253 and 276), wasting jurors' time, the Court's time, and the time and money incurred by Plaintiffs' counsel in preparing for *two* trials and yet a third trial if a default is not granted.

The adage "time is money" applies in lawsuits, and while Nebraska Beef's willful misconduct certainly warrants the issuance of a default judgment against it, *Chrysler*, 186 F.3d at 1021, attorneys' fees and costs should also be awarded to Plaintiffs to recompense them for the nearly five months of additional time and expenses they have incurred because of Nebraska Beef's willful and systematic abuse of the discovery process. As *Monsanto* and *Chambers* make clear, Nebraska Beef should be required to compensate Plaintiffs for all costs they incurred "as a

---

attorneys' fees in light of recent developments in applicable case law. *Id.* at 984-985. On remand, the district court reissued attorneys' fee sanctions against the plaintiff, and, in *Federal Express*, the Eighth Circuit affirmed the district court's imposition of attorneys' fees on appeal *Federal Express*, 49 F.3d at 1328.

result of" Nebraska Beef's intentional violations of applicable discovery rules. *Monsanto*, 382 F.3d at 1379. Specifically, Nebraska Beef should be required to pay, at the very least: (1) all attorneys' fees and costs incurred by Plaintiffs beginning on January 12, 2011 which would have been unnecessary but for Nebraska Beef's prolonged concealment of the documents; (2) all attorneys' fees and costs incurred by Plaintiffs in preparation for the parties' May 2, 2011 trial, which was declared a mistrial as a direct result of Nebraska Beef's willful discovery violations; and (3) all attorneys' fees and costs Plaintiffs have incurred since a mistrial was declared on May 4, 2011, flowing directly from Nebraska Beef's abuse of the discovery process.

More specifically, Nebraska Beef should be required to compensate Plaintiffs for the costs and attorneys' fees they incurred in performing the following activities, among others, which were incurred in vain as a result of Nebraska Beef's willful abuse of the discovery process:

- All costs and fees incurred by Plaintiffs and stemming from Plaintiffs' discovery regarding the SSOP Checklists, including, but not limited to: the January 2011 depositions of Mario Villareal and Yasushi Yokozeki; the on-site plant inspection of Nebraska Beef's meat processing plant, including travelling to and from Omaha, Nebraska; the Supplemental Report of Dr. Kenneth Mericle; and the substantial amount of time and effort exerted by Plaintiffs to review and analyze the SSOP Checklists and the documents associated with them, such as the Supplemental Expert Report of Dr. Fernandez;

- All costs and fees accrued by Plaintiffs in the process of preparing for trial on May 2, 2011, including, but not limited to: issuing trial subpoenas, communicating with Class members, communicating with and interviewing witness Class members, drafting, revising, and rehearsing witness exams, drafting, revising, and rehearsing an opening statement, reviewing and analyzing deposition testimony, retaining a jury consultant and graphics consultant, conducting ongoing conversation with co-counsel regarding trial strategy, and traveling to Omaha, Nebraska;

- All costs and fees incurred at trial between the time period May 2-5, 2011, including but not limited to: conducting voir dire, empanelling the jury, delivering opening statements, conducting the direct examination of Lisa Cleary, preparing witness examinations, communicating with co-counsel regarding trial strategy, and travelling from Omaha, Nebraska;

58

- All costs and fees incurred since a mistrial was declared on May 4, 2011 as a result of Nebraska Beef's discovery violations, including, but not limited to: researching, drafting, and revising this Motion for Sanctions; reviewing and analyzing the Cleary Sanitation Checklists and trial transcripts, and communicating with Nebraska Beef's new counsel.

In accordance with Nebraska Civil Rule ("NECivR") 54.4, Plaintiffs' counsel has attached a summary of its attorneys' fees and costs to the Declaration of Carolyn H. Cottrell, submitted herewith. *See* Exhibit A (Cottrell Declaration, ¶15-20). If the Court desires an itemized statement of fees and costs, Plaintiffs respectfully request permission to provide this information *in camera*, as such statements necessarily contain privileged information. The total attorneys' fees and costs incurred by Plaintiffs as a direct result of Nebraska Beef's deliberate and systematic abuse of the discovery process total $1,675,558.98. *See* Exhibit A (Cottrell Declaration, ¶15-20). If the Court is inclined to grant Plaintiffs' request for attorneys' fees, Plaintiffs will file a formal fee motion pursuant to NECivR 54.

> **G. Because Nebraska Beef's discovery violations were deliberate and wide-ranging, a default judgment is the most appropriate sanction; this Court need not consider the exclusion of Dr. Fernandez's report as a possible sanction.**

As set forth above, Nebraska Beef has violated Rule 37(c) because it has willfully and in bad faith violated Rule 26(a) or 26(e) and because it will be unable to show that such violations were substantially justified or harmless. In fact, as discussed above, Plaintiffs have suffered substantial prejudice stemming from Nebraska Beef's calculated, egregious, and repeated violations of the discovery process. Accordingly, Rule 37(c) expressly precludes Nebraska Beef from using the Cleary Sanitation Checklists and the SSOP Checklists "…to supply evidence on a motion, at a hearing, or at a trial…." Fed. R. Civ. P. 37(c)(1). Moreover, because the Cleary Sanitation Checklists and the SSOP Checklists will be barred from use at trial, Dr. Fernandez's Supplemental Report, which substantially relies on the contents of the SSOP Checklists, may

also be precluded from use at trial under Rule 37(c)(1).  Supplemental Expert Report of Dr. Jeffrey Fernandez.

However, exclusion of the SSOP Checklists, Cleary Sanitation Checklists, and Dr. Fernandez's Supplemental Report does not suffice as an appropriate sanction in this instance and, in fact, need not even be considered.  *See Everyday Learning*, 242 F.3d at 817-818 (where the facts show that the offending party acted with willfulness or bad faith, it is well-settled that "the district court need not investigate the propriety of a less extreme sanction").  As discussed above, the law of the Eighth Circuit is clear that the sort of repeated, willful, and bad faith discovery violations undertaken by Nebraska Beef warrant the issuance of a default judgment under Rule 37(b)(2)(A)(vi), by way of Rule 37(c)(1)(C).  Nebraska Beef's intentional misconduct amounts to an abuse of the judicial process.  A default judgment, accompanied by the imposition of attorneys' fees and costs, is the only sanction that will serve to punish Nebraska Beef and deter similar, future wrongdoing.

**IV.      CONCLUSION**

For the reasons stated herein, Plaintiffs respectfully request that the Court, under Rule 37(c) or its inherent powers, sanction Nebraska Beef by imposing a default judgment against it and by entering an order requiring Nebraska Beef and/or its former counsel, Lamson, Dugan and Murray, LLP, to pay as a sanction all attorneys' fees and costs incurred by Plaintiffs since January 12, 2011 as a result of its calculated affront to the discovery process.  Nebraska Beef's willful, bad faith, and repeated discovery violations resulted in substantial prejudice to Plaintiffs, and have wasted the time and money of the previously empaneled jury, the Court, and Plaintiffs. The only just remedy for Nebraska Beef's misconduct is the one requested herein, which will not only punish Nebraska Beef for its deliberate abuse of the discovery process, but will also serve

the greater purpose of deterring similar, future misconduct.


Dated: June 6, 2011                    Respectfully submitted,


                                        s/  Carolyn H. Cottrell
                                       Carolyn H. Cottrell (*pro hac vice*)
                                       Todd M. Schneider (*pro hac vice*)
                                       Michael D. Thomas (*pro hac vice*)
                                       SCHNEIDER WALLACE
                                       COTTRELL BRAYTON KONECKY LLP
                                       180 Montgomery Street, Suite 2000
                                       San Francisco, California 94104
                                       Tel: (415) 421-7100
                                       Fax: (415) 421-7105
                                       tschneider@schneiderwallace.com
                                       ccottrell@schneiderwallace.com
                                       mthomas@schneiderwallace.com


                                       Shanon J. Carson (*pro hac vice*)
                                       Russell D. Henkin (*pro hac vice*)
                                       Ellen T. Noteware (*pro hac vice*)
                                       Sarah R. Schalman-Bergen (*pro hac vice*)
                                       BERGER & MONTAGUE, P.C.
                                       1622 Locust Street
                                       Philadelphia, Pennsylvania 19103
                                       Tel: (215) 875-4656
                                       Fax: (215) 875-4604
                                       scarson@bm.net
                                       rhenkin@bm.net
                                       enoteware@bm.net
                                       sschalman-bergen@bm.net


                                       Philip A. Downey (*pro hac vice*)
                                       THE DOWNEY LAW FIRM LLC
                                       P.O. Box 736
                                       Unionville, Pennsylvania 19375
                                       Tel: (610) 324-2848
                                       Fax: (610) 347-1073
                                       downeyjustice@gmail.com


                                       Christopher P. Welsh (NE Bar No. 22279)
                                       James R. Welsh (NE Bar No. 14459)
                                       WELSH & WELSH, P.C., L.L.O.
                                       9290 W. Dodge Road
                                       100 The Mark

Omaha, Nebraska 68114
Tel: (402) 384-8160
Fax: (402) 384-8211
cwelsh@welsh-law.com
jwelsh@welsh-law.com

Attorneys for Plaintiffs and the Class

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on June 6, 2011, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system, which will send notification of such filing

to the following:

| | |
|---|---|
| James M. Bausch | jbausch@clinewilliams.com |
| Trenten P. Bausch | tbausch@clinewilliams.com |
| Shanon J. Carson | scarson@bm.net |
| Sarah R. Schalman-Bergen | sschalman-bergen@bm.net |
| Carolyn H. Cottrell | ccottrell@schneiderwallace.com |
| Philip A. Downey | downeyjustice@gmail.com |
| Michael Hamilton | mhamilton@provosthumphrey.com |
| John C. Hewitt | jhewitt@clinewilliams.com |
| Brian P. McCafferty | cafstar@aol.com |
| Ellen T. Noteware | enoteware@bm.net |
| Todd M. Schneider | tschneider@schneiderwallace.com |
| Michael D. Thomas | mthomas@schneiderwallace.com |
| Christopher W. Welsh | cwelsh@welsh-law.com |
| James R. Welsh | jwelsh@welsh-law.com |

Dated: June 6, 2011

 s/  Carolyn H. Cottrell
Carolyn H. Cottrell
Cal. Bar No. 166977
SCHNEIDER WALLACE
COTTRELL BRAYTON KONECKY LLP
180 Montgomery Street, Suite 2000
San Francisco, California 94104-4207
Tel: (415) 421-7100
Fax: (415) 421-7105
ccottrell@schneiderwallace.com

1