THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| FERMIN CORTEZ, et al., | ) | CASE NO. 8:08-CV00090 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| NEBRASKA BEEF, INC. and, | ) | |
| NEBRASKA BEEF, LTD., | ) | |
| | ) | |
| Defendants. | ) | |
| —————————————— | ) | |
| | ) | |
| DAVID CHUOL, et al., | ) | CASE NO. 8:08-CV00099 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| NEBRASKA BEEF, LTD., | ) | |
| | ) | |
| Defendant. | ) | |

---

**LAMSON, DUGAN and MURRAY, LLP'S BRIEF IN OPPOSITION TO
PLAINTIFFS' MOTION FOR SANCTIONS**

---

PREPARED & SUBMITTED BY:

William M. Lamson, Jr., #12374
William R. Settles, #19879
Brian J. Brislen, #22226
LAMSON, DUGAN and MURRAY, LLP
10306 Regency Parkway Drive
Omaha, NE 68114-3743
Telephone: (402) 397-7300
Telefax: (402) 397-7824
wlamson@ldmlaw.com
wsettles@ldmlaw.com
bbrislenldmlaw.com

> *"It ain't what you don't know that gets you into trouble. It's what you know for sure that just ain't so."*
>
> -Mark Twain

## INTRODUCTION

Plaintiffs accuse Nebraska Beef, Inc. and Nebraska Beef, Ltd. (collectively referred to as "Nebraska Beef"), and their former counsel, Lamson, Dugan and Murray, LLP ("LDM") of fabricating evidence, presenting perjured testimony, and willfully violating their discovery obligations. They seek the draconian remedy of default judgment against Nebraska Beef and monetary sanctions of nearly $1.7 million against both Nebraska Beef and LDM. In so doing, they present a record of half-truths, misrepresentations, and calculated omissions. By misrepresenting the record in this way, Plaintiffs' counsel skillfully weave an alternate reality in which Nebraska Beef is populated by liars and perjurers and LDM is complicit in a fraud perpetrated upon the Court and the innocent Plaintiffs. This brief will correct that record, and demonstrate that Plaintiffs are not entitled to the sanctions they seek. LDM writes separately because Plaintiffs seek sanctions against both Nebraska Beef and LDM.

## STATEMENT OF FACTS

Plaintiffs' recitation of facts confuses and misleads in a number of ways. Foremost among these is the misuse of the term "SSOP" to conflate different categories of documents in order to create the appearance that Plaintiffs' discovery requests sought more than they actually did. To correct this confusion, the relevant documents will be described in detail before the procedural history is reviewed. Finally, Plaintiffs' most significant misstatements of the record will be corrected.

### A.     <u>Description Of Documents In Question.</u>

There has been much confusion in this case over terminology. All parties bear some responsibility for this confusion. The controversy the Plaintiffs' have presented touches upon

three categories of documents:  1) the SSOP Program or Plan, 2) the May Documents, and 3) the January Documents.  These categories must be differentiated.

### 1.    SSOP Program.

"SSOP" stands for Sanitation Standard Operating Procedure.  The term "SSOP" generally refers to the SSOP *Program,* which is the overall program developed and followed by Nebraska Beef to ensure food safety and compliance with U.S. Department of Agriculture ("USDA") regulations.  9 C.F.R. pt. 416.11)  The SSOP Program[1] is the written document that sets forth Nebraska Beef's policies and procedures regarding sanitation.  It is found in Defendants' Index of Evidence as an attachment to the Declaration of Brian J. Brislen.  (Def. Index[2], Ex. 4, att. B) A copy of the SSOP Program was hand-delivered to counsel for the Plaintiffs on October 15, 2009.  (Def. Index, Ex. 4 at ¶ 9)

### 2.    May Documents.

The SSOP Program requires Nebraska Beef to fill out and maintain a number of different documents.  (Def. Index, Ex. 4, att. B at pp. 4-10) One of these is a Sanitation Standard Operating Procedure Operational Sanitation Checklist. *Id.*  USDA Food Safety and Inspection Service ("FSIS") regulations also require that these documents be kept and made available to FSIS for a period of six months.  9 C.F.R. pt. 416.16(c).  These documents are filled out each day for both the slaughter and fabrication divisions.  (Def. Index, Ex. 9 at ¶ 4; Ex. 10 at ¶¶ 6-7)  They are part of Nebraska Beef's compliance with its SSOP Program.  An example of this document was marked as Trial Exhibit 859 during a hearing on May 4, 2011. (Def. Index, Ex. 1, att. B at 184:4-8)  Another example is attached to the Declaration of Kenneth Bell as Attachment A.

---

[1] Alternatively referred to as the SSOP Plan.

[2] For citation purposes, the Plaintiffs' Index of Evidence (Doc # 339) is referred to as "Pl. Index."  Defendants' Index of Evidence (Doc # 348-350) is referred to as "Def. Index."

(Def. Index, Ex. 10, att. A) Plaintiffs refer to these documents as the "Cleary Documents" in their Brief. This is misleading, however, because Ms. Cleary did not participate in filling out these documents. For purposes of this brief, these documents are referred to as the May Documents, because they were brought to Court on May 4, 2011.

Quality Control personnel in both fabrication and slaughter are responsible for filling out the May Documents. (Def. Index, Ex. 9 at ¶¶ 3-4; E10 at ¶ 7) The purpose of the documents is to monitor compliance with the SSOP Program, and to record "incidents" where Quality Control personnel observe variations from Nebraska Beef's SSOP Program. *Id.* The May Documents do not set forth any policy or procedure regarding sanitation or describe any required sanitation practice. They simply document the observations of Quality Control personnel.

The existence of the May Documents was disclosed to the Plaintiffs in several ways. First, the SSOP Program identifies the records that are to be kept to document deviations from the SSOP. (*See,* Def. Index, Ex. 4, att. B at pp. 4-10) These include the May Documents, which are referred to in the SSOP Program as the "SSOP Operational Checklist" no fewer than 16 times. *Id.* Other documents identified and referred to in the SSOP Program include the SSOP Pre-Operational Walk Thru Sheets, the SSOP Pre-Operational Log and the SSOP Operational Checklist for Moisture and Leaks. *Id.* Plaintiffs presumably read the 10-page SSOP Program, and, in fact, marked it as an exhibit in the deposition of Ken Bell. (Def. Index, Ex. 1, att. G at p. 3) Despite this, Plaintiffs never requested copies of any document identified in the SSOP Program. Most importantly, the Plaintiffs never requested copies of the May Documents despite having full knowledge of their existence no later than October 15, 2009.

The testimony of multiple witnesses also disclosed the existence of the May Documents to the Plaintiffs. Plaintiffs deposed Kenneth Bell, the person in charge of the SSOP Program for Nebraska Beef, on October 15, 2009. (Def. Index, Ex. 1, att. G at 1) In his testimony, Mr. Bell

3

described how Quality Control personnel observe hourly personnel and document variations from the SSOP Plan on an "SSOP Incident Report." (Def. Index, Ex. 1, att. G at 140:9-145:22) Plaintiffs deposed Lisa Cleary on October 20, 2009. (Def. Index., Ex. 1, att. H at 1) Ms. Cleary testified that, during her tenure as HACCP Coordinator, she reviewed all of the paperwork prepared by Quality Control personnel, including "logs and such" that were filled out every day. (Def. Index, Ex. 1, att. H at 86:20-87:16) In addition, Plaintiffs deposed Mario Villareal on March 30, 2011. (Def. Index, Ex. 1, att. E at 1) Mr. Villareal made it very clear that Nebraska Beef records and maintains multiple kinds of documents as part of the SSOP Program. (Def. Index, Ex. 1, att. E at 28:21-29:5; 59:24-60:8)

Finally, federal regulations explicitly require that Nebraska Beef produce and maintain the May Documents. 9 C.F.R. pt. 416.16(c). Plaintiffs' counsel were aware of these regulations. (*See,* Pl. Index, Ex. Q) Despite Plaintiffs' actual knowledge of the existence of the May Documents, obtained through the SSOP Program itself, through the testimony of multiple witnesses, and through publicly available federal regulations, Plaintiffs never sought their production.

### 3.    January Documents.

In 2003, Nebraska Beef was subject to a series of escalating regulatory actions by the USDA. (Pl. Index, Ex. E at 165:22-166:13; Def. Index, Ex. 14 at ¶ 6 and att. A) This Court is undoubtedly aware of these events, as counsel for Nebraska Beef were in the Court's chambers seeking a temporary restraining order against the USDA at approximately 11:00 p.m. on January 14, 2003. Plaintiffs are also aware of these events. In fact, they attached a copy of Nebraska Beef's application for temporary restraining order against the USDA to their Trial Brief. (Doc. # 318, Ex. 3) The controversy between Nebraska Beef and the USDA involved, in part, USDA FSIS inspectors inappropriately spending time at the Nebraska Beef facility beyond their base

4

shift. (Def. Index, Ex. 6 at ¶¶ 19-24; Ex. 14 at ¶¶ 6-7) These events were the subject of a separate lawsuit against the individual inspectors. (Def. Index, Ex. 13 at ¶ 15)

During this time period, and in order to respond to the issues with the USDA, Nebraska Beef's HACCP consultant, Lou Gast, recommended that Nebraska Beef begin recording the time of the first and last stun[3] in the Slaughter division, and the first and last index[4] in the Fabrication division. (Def. Index, Ex. 14 at ¶ 8 and att. A) Mr. Gast modified a document similar to the May Documents (i.e., an SSOP Operational Checklist) by adding a field at the bottom to record the first and last stun in the Slaughter division and the first and last index in the Fabrication division. *Id.*

Mr. Gast also recommended that a member of Nebraska Beef's senior management be tasked with recording this information. (Def. Index, Ex. 14 at ¶ 9 and att. A) Nebraska Beef Vice President Yasushi Yokozeki was asked to perform this task, and he did so using the template created by Mr. Gast. (Def. Index, Ex. 6 at ¶¶ 5, 19, 24) Mr. Yokozeki usually observed the first and last stuns of the day in the Slaughter division from a catwalk above the knocking station or from the "blood pit." (Def. Index, Ex. 6 at ¶ 9; Ex. 1, att. E at 54:2-54:25) Other witnesses observed Mr. Yokozeki in these areas at the time of the first and last stun. (Def. Index, Ex. 1, att. E at 54:17-55:22; Ex. 9 at ¶10) Mr. Yokozeki typically observed the first and last indexes of the day in the Fabrication division while standing in the "A" cooler, where he had an unobstructed view of the indexing station. (Def. Index, Ex. 6 at ¶ 13) Again, another witness corroborates that Mr. Yokozeki was present at this location at the times of the first and last index. (Def. Index, Ex. 22 at ¶ 4)

---

[3]   The first "stun" – alternately referred to as the first "knock" – is the time the first animal of the day is rendered unconscious by the person positioned at the knocking station. (Def. Index, Ex. 6 at ¶ 7)

[4]   The first "index" – alternately referred to as the first "push" – is the time the first side of hanging carcass is pulled from the stationary rail in the cooler onto the moving pre-fabrication chain. (Def. Index, Ex. 6 at ¶ 11)

In 2008, Nebraska Beef hired Emile Randazzo as its Vice President, Director of Regulatory Affairs. (Def. Index, Ex. 13 at ¶ 10)  Mr. Randazzo was formerly employed by the USDA as an FSIS Food Inspector, FSIS Consumer Safety Inspector, FSIS Enforcement, Investigations, and Analysis Officer, FSIS Deputy District Manager for the Des Moines District, and interim FSIS District Manager for the Des Moines District.  (Def. Index, Ex. 13 at ¶ 4)  Mr. Randazzo would frequently observe Mr. Yokozeki on the Slaughter and Fabrication floors filling out documents.  (Def. Index, Ex. 13 at ¶ 17)  In approximately 2009, Mr. Randazzo asked Mr. Yokozeki what he was doing and Mr. Yokozeki showed Mr. Randazzo the form he had been completing.  *Id.*  Mr. Randazzo understood the document to relate to Nebraska Beef's concern about unnecessary USDA inspection overtime.  *Id.*  In mid-2010, Mr. Randazzo again spoke with Mr. Yokozeki about the documents, and told Mr. Yokozeki that he no longer needed to fill them out.  (Def. Index, Ex. 13 at ¶ 19)  Mr. Yokozeki stopped filling out the documents in June of 2010.  (Def. Index, Ex. 6 at ¶ 34)

Sometime in early 2011, Nebraska Beef had a management meeting to discuss different aspects of the company.  (Def. Index, Ex. 1, att. E at 12:24-13:15)  The subject of document production relating to this lawsuit was among those discussed.  In that context, Nebraska Beef's Office Manager, Dolese Tippery, mentioned that she had documents that might be responsive to one or more of Plaintiffs' discovery requests.  (Def. Index, Ex. 1, att. E at 12:12-13:15)  She left the room and retrieved some calendars.  *Id.*  Apparently, during the period of time that Mr. Yokozeki was recording the first stun/index and last stun/index times, Ms. Tippery obtained that information from Mr. Yokozeki on a daily basis and contemporaneously wrote it down on a desktop flip calendar.  (Def. Index, Ex. 8 at ¶ 11)

On January 12, 2011, William Lamson advised Plaintiffs' counsel via e-mail that some new documents had been brought to LDM's attention and described the nature of the documents.

6

(Def. Index, Ex. 4, att. D)  Mr. Lamson advised Plaintiffs' counsel that LDM "believe[d] *the*

*information contained at the bottom of these checklists* may be responsive to Request Nos.

55(sic), 57, 63 and 64."  (Def. Index, Ex. 4, att. D)(emphasis added)  The information at the

bottom of the form was the first index/stun and last index/stun times Mr. Yokozeki was

recording.  (*See,* Def. Index, Ex. 6, atts. A and B)  Mr. Lamson also provided Nebraska Beef's

Amended Responses to these discovery requests with the January 12, 2011 e-mail.  Nebraska

Beef's Responses were amended to provide:

> Defendants have recently discovered the existence of documents which may be
> responsive to this request.  See attached form SSOP Operational Sanitation
> Checklists for the Fabrication and Slaughter Divisions at NE Beef.  In addition,
> certain information from each checklist is transferred to a calendar by NE Beef's
> office manager, Dolese Tippery for her use in bookkeeping.  Copies of the
> available documents will be produced to Plaintiffs upon request.

(Def. Index, Ex. 4, att. D)

LDM disclosed the existence of these documents as soon as their existence was known to

LDM, and before LDM had obtained or reviewed the documents themselves.  (Def. Index, Ex. 4,

att. D)  The parties exchanged a series of increasingly contentious e-mails over the next few

days. (Def. Index, Ex. 4, atts. E, F, G, H, I)  During these exchanges, LDM explained at length

that the start and stop of gang time were not tied to the first stun/index and last stun/index times

recorded by Mr. Yokozeki and that "the times recorded on the gang sheet do not reflect the times

the production activities are being started or stopped."  (Def. Index, Ex. 4, att. H)  Counsel for

the Plaintiffs refused to accept these statements of fact, and instead raised allegations of

subornation of perjury and ethical violations by LDM.  (Def. Index, Ex. 4, att. I)

Nebraska Beef completed its production of these documents for the time period March

2004 through June 2010 via electronic drop box on January 14, 2011.  (Def. Index, Ex. 4, att. J)

The produced documents begin on March 4, 2004 because that is the start of the limitations

period for the Class, not because no documents exist prior to that date.  All other daily

documents produced by Nebraska Beef were similarly limited to this time period. (Def. Index, Ex. 5 at ¶ 13) These include payroll spreadsheets, check registers and gang time sheets. *Id.* The produced documents end in June of 2010, because that is when Mr. Randazzo advised Mr. Yokozeki that he no longer needed to record the information. (Def. Index, Ex. 6 at ¶ 34; Ex. 13 at ¶ 19)

Plaintiffs refer to these documents as "SSOP Checklists" in their brief. Although Mr. Gast modified an SSOP Operational Checklist to create the template for these documents, the documents Mr. Yokozeki filled out are *not* part of Nebraska Beef's SSOP Program. **Long cite** In order to be accurate and avoid confusion, LDM refers to these documents as the January Documents in this brief.

**B.    Discovery and Trial**

On January 18, 2011, in response to the production of the January Documents, Plaintiffs made an oral motion for continuance, or, in the alternative, to exclude evidence. (Doc. #276) The Court granted Plaintiffs' motion for continuance, continued the trial until May 2, 2011, and gave the parties additional time to amend their expert designations and conduct additional discovery. *Id.* The Court did not exclude the January Documents, and the Plaintiffs eventually listed the January Documents as exhibits on their final exhibit list. (Doc. # 325 at Ex. 475; Def. Index, Ex. 1, att. A at 50:1-56:7)

Plaintiffs deposed two witnesses regarding the January Documents: Mario Villareal on March 30, 2011 and Mr. Yokozeki the following day. (Def. Index, Ex. 1, att. E at 1, att. C at 1) Plaintiffs initially requested the deposition of Lisa Cleary as well. (Def. Index, Ex. 2 at ¶ 16) However, Mr. Lamson advised Plaintiffs' counsel that Ms. Cleary had no knowledge of the January Documents, and suggested that she could provide a declaration to that effect. (Def. Index, Ex. 2 at ¶ 17) Plaintiffs' counsel made no further request for Ms. Cleary's deposition. *Id.*

8

Neither Mr. Lamson nor anyone else ever "refused" to make Ms. Cleary available for deposition, as Plaintiffs contend.  (Plaintiffs' Brief, at p. 28; Def. Index, Ex. 2 at ¶ ¶ 16-19)  Although Plaintiffs make much of what they contend are "discrepancies" between the January Documents and gang time sheets (and late start notices), they did not ask either Mr. Yokozeki or Mr. Villareal to explain any such discrepancies.

After the revised close of discovery, and the passing of the deposition deadline established by the Court, Plaintiffs requested the deposition of Ms. Tippery.  (Def. Index, Ex. 2 at ¶ 16)  This request was declined as untimely.  *Id.*  Had Plaintiffs made a timely request for Ms. Tippery's deposition, LDM would have consented to the deposition.  *Id.*  On a related note, Nebraska Beef identified Ms. Tippery's calendars in their January 12, 2011 Amended Responses to Requests for Production Nos. 55(sic), 57, 63 and 64.  (Def. Index, Ex. 4, att. D)  Mr. Lamson had numerous conversations with Plaintiffs' counsel about the availability of Ms. Tippery's documents for inspection and copying.  (Def. Index, Ex. 2 at ¶ 20)  Plaintiffs never came to LDM to inspect or copy the documents.  *Id.*  At one point prior to trial, Carolyn Cottrell sent an e-mail indicating that she was going to send a copy service to pick up the calendars for copying.  *Id.*  No copy service ever came to LDM to pick up the documents.  *Id.*  On the first day of trial, prior to voir dire, Ms. Cottrell again asked about the production of Ms. Tippery's calendars.  *Id.*  Mr. Lamson again indicated that the calendars were at LDM and available for inspection and copying.  *Id.*  Plaintiffs again did not inspect or copy the documents.  Now, in another example of a misleading half-truth, Plaintiffs state that, "not surprisingly, Plaintiffs never received from Nebraska Beef Ms. Tippery's calendar entries." (Plaintiffs' Brief, at p. 29, n. 8)  The only reason the Plaintiffs do not have copies of Ms. Tippery's calendars is their own failure to inspect and copy the documents.

Trial began on May 2, 2011. Plaintiffs called Lisa Cleary as their first witness on May 3, 2011. Ms. Cleary is currently the superintendent of the Slaughter division of Nebraska Beef. (Def. Index, Ex. 9 at ¶ 2) From 2002 until August of 2008, she served as HACCP coordinator for Nebraska Beef. *Id.* In her position as HACCP coordinator, Ms. Cleary reviewed and initialed the May Documents for the slaughter division. (Def. Index, Ex. 9 at ¶¶ 3-4) She had no involvement with the January Documents. (Def. Index, Ex. 9 at ¶ 8) When shown a copy of one of the January Documents, Ms. Cleary testified that she had seen similar documents but that the documents she had seen did not record the first stun and last stun. (Def. Index, Ex. 1, att. A at 52:18-21; 119:1-5; 125:11-16; 158:9-159:13) Ms. Cleary was referring to having seen the May Documents, which served as the template for the January Documents. (Def. Index, Ex. 9 at ¶ 6; Ex. 14 at ¶ 8 and att. A) Given that she had no involvement with the January Documents, Ms. Cleary's testimony was not at all surprising.

Plaintiffs' counsel also asked Ms. Cleary to review a gang time sheet for May 24, 2006 (Trial Exhibit 26) and compare the start of gang time to the first stun time recorded on the January Document for that same date (Trial Exhibit 475). (Def. Index, Ex. 1, att. A at 116:9-119:19) Ms. Cleary again testified that she did not know what the January document was used for, but she was not concerned by the apparent discrepancy between the two times. (Def. Index, Ex. 1, att. A at 118:1-119:14) This exchange was Plaintiffs attempt to spring the trap they had been preparing from the moment the January Documents were produced. As discussed at length below, this misguided effort led directly to the mistrial in this case.

After Ms. Cleary testified that she had never seen the January Documents before, Plaintiffs' counsel immediately raised the specter of perjury. (Def. Index, Ex. 1, att. A at 148:12-13) The parties and the Court then questioned Ms. Cleary outside the presence of the jury. Ms. Cleary testified in response to these questions that she had seen documents "similar to" the

10

January Documents, that the documents she had seen did not record first and last stun times, that her signature did not appear on Trial Exhibit 475, and that she did not know why Mr. Yokozeki or Mr. Timmerman had signed Trial Exhibit 475. (Def. Index, Ex. 1, att. A at 158:6-161:6)  At the conclusion of its questioning, the Court advised Nebraska Beef that it "had a problem" and recessed the Court for the day. (Def. Index, Ex. 1, att. A at 161:7-8)

The following morning, Nebraska Beef explained the false impression that had been created by Plaintiffs' allegation of perjury.  Mr. Lamson explained that Ms. Cleary had been referring to the May Documents, and presented originals of the May Documents to the Court. (Def. Index, Ex. 1, att. B at 165:18-168:18)  He explained the origin of the January Documents, and described the difference between the May Documents and the January Documents.  *Id.*  Mr. Lamson also presented the Court with a letter from Mr. Gast's partner, John Miller.[5]  (Def. Index, Ex. 1, att. B at 165:11-13)  This was marked as Trial Exhibit 858, and is attached to the Declaration of John Miller. (Def. Index, Ex. 14, att. A)  Mr. Miller further explained the origin of the January Documents, and that the May Documents were used as a template for the January Documents.  *Id.*  This explanation seemed to allay the Court's concerns about the impression left by Ms. Cleary's testimony.  (Def. Index, Ex. 1, att. B at 174:13-15)("And based on the letter that you've presented me here today, I think that it generally explains her perception....")

Unfortunately, the Court had already referred the matter to the United States Attorney. The Court advised the parties:

> Mr. Lamson, before I let you do your response, I think I owe it to disclose to both of you that today I contacted the U.S. Attorney to do an investigation of this matter.  If, in fact, these documents are falsified and they were digitalized and then sent to San Francisco and then entered into evidence in this court, that's wire fraud.  And so I intend to advise each and every witness that testifies about these documents of their Fifth Amendment rights because there is an active investigation by the U.S. Attorney concerning this right now, okay?

---

[5] Mr. Gast is deceased.  Mr. Miller was present when Mr. Gast advised Nebraska Beef to record first stun/index and last stun/index times on an SSOP Operational Checklist that had been modified by Mr. Gast.  (Def. Index, Ex. 14 at ¶¶ 5, 8)

11

(Def. Index, Ex. 1, att. B at 171:20-172:5)

Following this admonition, the Court discussed possible course of action, including

permitting discovery or continuing the trial.  (Def. Index, Ex. 1, att. B at 176:5-179:12)  Mr.

Schneider argued during this discussion that the January Documents were fabricated, and that

LDM knew or should have known of this deception:

> I've got documents that show demonstratively that what's in the [January
> Documents] is false.  I think counsel should have known at the least that what's in
> there was false.  Our investigation comparing the documents in this case to those
> documents shows that it's false….  That counsel knew what he was – or should
> have known that what they were proffering those documents for was not what
> they said.

(Def. Index, Ex. 1, att. B at 177:11-178:1)

The Court recessed until 1:00 p.m., at which time the issue of Nebraska Beef's responses

to discovery was to be addressed.  (Def. Index, Ex. 1, att. B at 199:23-200:11)  During this

recess, Mr. Lamson contacted LDM's managing partner, William Johnson, to discuss the

potential conflict of interest created by the Court's referral to the U.S. Attorney.  (Def. Index, Ex.

2 at ¶ 11; Ex. 3 at ¶3)  Mr. Johnson, in turn, contacted Nebraska's Counsel on Discipline, Dennis

Carlson.  (Def. Index, Ex. 3 at ¶ 5)  Mr. Johnson explained to Mr. Carlson that the Court had

contacted the U.S. Attorney about an investigation into the issue of document fabrication and the

commission of possible wire fraud because the allegedly falsified documents were sent from

Omaha to San Francisco.  (Def. Index, Ex. 3 at ¶ 3, 5)  Mr. Johnson further advised Mr. Carlson

that LDM personnel were responsible for transmitting those documents from Omaha to San

Francisco, and that Plaintiffs' counsel had asserted that LDM knew or should have known that

the documents were fabricated.  *Id.*  Mr. Carlson told Mr. Johnson that he believed that a

potential conflict existed, and that LDM would likely need to withdraw from the case.  (Def.

Index, Ex. 3 at ¶ 6)  Mr. Johnson performed some additional research and concluded that a

nonwaivable conflict of interest existed.  (Def. Index, Ex. 3 at ¶ 8)  Mr. Johnson recommended to

Mr. Lamson that a motion to withdraw be made.  *Id.*

    When the Court reconvened the afternoon of May 4, 2011, Mr. Lamson immediately

made a motion for mistrial and motion for LDM to withdraw from the case.  (Def. Index, Ex. 1,

att. B at 200:21-201:23)  The Court granted the motion to withdraw, and was left with no choice

but to grant the motion for mistrial.  (Def. Index, Ex. 1, att. B at 222:9-10)

    **C.      Significant Misstatements Of The Record.**

    Plaintiffs' description of the facts of this case bears little resemblance to the evidence.

Cataloguing and correcting every misstatement of fact in Plaintiffs' brief is a task beyond the

scope of this brief.  However, several very significant errors must be addressed, as they form the

foundation upon which Plaintiffs' argument is built.  They are summarized below, and dealt with

at more length in the argument section of this brief:

    **1.      The origin of the May Documents.**

    Plaintiffs state repeatedly that the May Documents "were allegedly created as a result of

'escalating regulatory actions' against Nebraska Beef by the USDA."  (Plaintiffs' Brief, at pp.

5,13,17  They do so in an attempt to support their argument that they requested the May

Documents in a September 18, 2009 letter concerning documents provided by the USDA and

OSHA. (Plaintiffs' Brief, at pp. 13, 17)  In fact, it was the January Documents that were

produced in response to escalating regulatory action by the USDA.  (Def. Index, Ex. 1, att. B at

165:22-167:22; Ex. 14 at ¶¶ 6-8 and att. A)

    **2.      Nebraska Beef's response to Plaintiffs' Third Request for Production
            of Documents.**

    Plaintiffs' correctly note that they served a third set of Requests for Production of

Documents upon Nebraska Beef on September 22, 2009. (Plaintiffs' Brief, at p. 15)  However,

they misleadingly state that Nebraska Beef responded by "admitting that Request No. 106 was

'duplicative of Request No. 16.'" *Id.* In fact, Nebraska Beef responded to this set of requests for production by objecting to the requests as out of time. (Def. Index, Ex. 4 at ¶ 17; Ex. 5 at ¶ 4) This fact is completely omitted from Plaintiffs' brief, as is the fact that Plaintiffs took no action to discuss or challenge these objections. *Id.*

### 3.   Plaintiffs' July 9, 2009 correspondence to Nebraska Beef.

Plaintiffs argue that, on July 9, 2009, they "***explicitly requested the production of Nebraska Beef's SSOP documents,*** which include the [May Documents] and the [January Documents]." (Plaintiffs' Brief, at p. 12)(emphasis in original)  This statement is false. It is based upon sleight of hand regarding the term "SSOP documents," as well as a deliberate omission from the July 9, 2009 letter.

As noted above, while the initial confusion regarding terminology is the fault of both parties, its persistence is not. The term SSOP refers to the SSOP *Program,* not all of the documents referred to within the SSOP Program. (Def. Index, Ex. 4 at ¶ 6; Ex. 5 at ¶ 6; Ex. 10 at ¶¶ 5-6; Ex. 4 att. B)  The SSOP Program *was* produced on October 15, 2009. (Def. Index, Ex. 4 at ¶ 9)  This document identified multiple other documents that were not produced, including the May Documents. (Def. Index, Ex. 4, att. B at pp. 4-10)  It does not identify the January documents, because these documents are not part of the SSOP Program. (Def. Index, Ex. 6 at ¶¶ 24, 35; Ex. 7 at ¶ 19; Ex. 13 at ¶ 18)  Plaintiffs did not object that the production of the SSOP Program was an inadequate or incomplete response to their July 9, 2009 letter or any other discovery request.  Plaintiffs now seek to transform a request for the SSOP Program itself into a request for every document that in any way relates to the SSOP Program, and even into a request for the January Documents, which are not part of the SSOP Program.

14

The actual text of the July 9, 2009 correspondence dispels any doubt that Plaintiffs were requesting only the SSOP Program itself.  Plaintiffs quote this correspondence, in part, as follows:

> The SSOP describes all procedures conducted daily, before and during operations, sufficient to prevent direct contamination or adulteration of the product...*[These are]* obviously relevant documents in this case and responsive to one or more of our document requests.

(Plaintiffs' Brief, at p. 12)(brackets in original, emphasis added)

The actual text of the July 9, 2009 correspondence describes the SSOP Program and the HACCP Plan, and makes clear that the Plaintiffs are requesting *those two documents*:

> The SSOP describes all procedures conducted daily, before and during operations, sufficient to prevent direct contamination or adulteration of the product.  The HACCP Plan must cover each product produced by that establishment whenever a hazard analysis reveals one or more food safety hazards that are reasonably likely to occur.  *Both* are obviously relevant documents in this case and responsive to one or more of our document requests.

(Pl Index, Ex. Q)(emphasis added)

This correspondence clearly requested two documents, and both documents were produced.

### 4.    Lisa Cleary's "surprise" testimony.

Plaintiffs contend that, during trial, Ms. Cleary "surprised the parties by stating that she had never seen the times listed in the [January Documents] before."  (Plaintiffs' Brief, at p. 2) This testimony was, however, completely unsurprising.  Ms. Cleary, in her position as HACCP coordinator, had no involvement with the January Documents and would have had no reason to see them.  The January Documents are not part of the SSOP Program, are not kept to comply with USDA regulations and are not documents that Ms. Cleary would ever have seen.  Nebraska

Beef informed Plaintiffs' counsel that Ms. Cleary had no knowledge of the January Documents.[6] (Def. Index, Ex. 2 at ¶ 17)  Plaintiffs' counsel should not have been surprised that Ms. Cleary so testified.

### 5.    The meaning of "start time."

Plaintiffs state that "[t]he production lines start with the first stun in Slaughter and the first index in Fabrication." (Plaintiffs' Brief, at p. 24, n.6)  This statement is unequivocally false, and Plaintiffs' entire perjury argument flows from this basic misrepresentation. (*See* Plaintiffs' Brief, at pp. 22-27)  The time the production line starts and the time of the first stun and first index are two completely separate times.  (Def. Index, Ex. 7 at ¶¶ 12-18; Ex. 8 at ¶¶ 14-17; Ex. 13 at ¶ 20; Ex. 22 at ¶¶ 8, 10, 11)

Plaintiffs cite to two sources for their flawed proposition.  (Plaintiffs' Brief, at p. 24, n.6) The first is the deposition of Lisa Cleary, in which Plaintiffs' counsel defines for her that "6:35 is when the production line starts." (Pl. Index, Ex. H at 107:25-108:4)  This is the only time that Plaintiffs' counsel defined this term in this way.  Ms. Cleary interpreted the question to ask when the production *process* begins, not when the mechanical production line is turned on and begins moving.  (Def. Index, Ex. 9 at ¶ 14)  The production line, or chain, is turned on before the first stun in order to make sure the chain is operating properly before the start of production.  *Id.,* at ¶ 15.  The start of the line and the start of production are two distinct events.  *Id.,* at ¶ 14.

Plaintiffs also direct the Court to the deposition of Tony Joy as support for the proposition that the start of the production line occurs with the First knock/index. (Plaintiffs' Brief, at p. 24, n.6)  However, the questions and answers that immediately precede the testimony cited by the Plaintiffs make it clear that Plaintiffs' counsel was asking about the mechanical

---

[6]     Here, Nebraska Beef's counsel bears some responsibility for misusing terminology.  Although Mr. Lamson refers in his email to the January Documents as "SSOP," they are not, in fact SSOP Documents.  The point being conveyed was that Lisa Cleary had no involvement with the January Documents, and that point is entirely true.  The terminology "SSOP" was used as shorthand to refer to the January Documents, as they were patterned after the May Documents, i.e., the SSOP Operational Checklists.

operation of the production chain. That is, the questions referred to the time the production chain started moving:

> Q. But I would imagine, for example, that when you – when you have the cooler, the belt starts at a certain time. Is that right? Things are hung on the belt and the belt –
>
> A. Chain.
>
> Q. Or the chain, right. And at some point it starts moving?
>
> A. Uh-huh.
>
> Q. Is there some sort of recordation in the machinery itself that says when it started moving today?
>
> A. No.
>
> Q. Is there anybody who records when it started moving today, not – not from the machine, but just records it?
>
> A. No. I – We have a six o'clock – you know, the first carcass is indexed at six o'clock. That's where it starts, right there, but there's no – when we turn that chain on, there's nothing that's documented what time the chain has started.

(Pl. Index, Ex. NN at 40:8-24)

Nothing in this language supports Plaintiffs' assertion that the production lines start with the first stun/index. It establishes precisely the opposite: the production lines start at one time and the first stun/index occurs at a later time. Plaintiffs have treated two completely different concepts as interchangeable in order to argue that they asked a witness about one concept when the witness understood them to be asking about another.

Most importantly, the witness who Plaintiffs now accuse of perjury, James Timmerman, quite reasonably understood that he was being asked about the time the production line started moving. (Def. Index, Ex. 7 at ¶¶ 7-18) He truthfully testified that Nebraska Beef does not record this time.

## ARGUMENT

Plaintiffs seek sanctions against Nebraska Beef and LDM under Fed. R. Civ. P. 37 and the inherent authority of the Court. They claim that Nebraska Beef violated Rule 26(a) by failing to identify the January and May Documents in their mandatory and pre-trial disclosures and violated Rule 26(e) by failing to provide the May Documents in response to Plaintiffs' Request for Production Nos. 14 and 16. They invoke Rule 37 as the basis for sanctions for these claimed violations. They further appeal to the Court to use its inherent authority to sanction Nebraska Beef and LDM for offering perjured testimony and fabricated documents. The first section of this Argument will demonstrate that Plaintiffs are not entitled to Rule 37 sanctions. The next will explode the myth of the fabricated documents. The final section of this Argument will answer Plaintiffs' request for sanctions against LDM.

### I.

### PLAINTIFFS ARE NOT ENTITLED TO SANCTIONS UNDER RULE 37

Plaintiffs invoke Fed. R. Civ. P. 37(c) as the first basis for sanctions against Nebraska Beef and LDM.[7] Rule 37(c) empowers a court to impose sanctions where a party "fails to provide information or identify a witness as required by Rule 26(a) or (e)…unless the failure was substantially justified or was harmless." Fed. Civ. P. 37(c). Plaintiffs must therefore first establish that Nebraska Beef or LDM violated Rule 26(a) or (e). If this showing is successfully made, then the Court must determine whether the failure to comply was substantially justified or harmless. *Id.* Substantial justification exists "where there is an issue about which reasonable people could differ on whether a party was bound to respond to a discovery request." *Miller v. Kellogg USA, Inc.,* 8:04CV500, 2006 U.S. Dist. LEXIS 10686 (Feb. 27, 2006)(Bataillon, CJ).

---

[7] It should be noted that, because Nebraska Beef never violated a discovery order, sanctions under the more commonly invoked Rule 37(a) are unavailable to the Plaintiffs. Plaintiffs therefore seek to expand the boundaries of Rules 26(a)(1) and (3) beyond any reasonable construction in order to bring themselves into the purview of Rule 37(c).

A default judgment may be granted under Rule 37 only where the moving party has established the willfulness, bad faith, or fault of the non-moving party by clear and convincing evidence. *Chrysler Corp. v. Carey,* 186 F.3d 1016, 1022 (8th Cir. 1999); *Comisky v. JFTJ Corp.,* 939 F.2d 1007, 1009 (8th Cir. 1993). Plaintiffs fall well short of this showing.

Although Plaintiffs treat the May and January Documents as interchangeable for purposes of their Rule 37 sanctions argument, this only confuses the analysis. Very different arguments apply to the two sets of documents. The first stun/index and last stun/index times on the January Documents *were* responsive to certain of Plaintiffs' Requests for Production. That is why LDM produced them as soon as they were discovered. The Court cured any error in their late production by continuing the trial and permitting the parties to conduct additional discovery and update their experts' reports. The May Documents, on the other hand, *were not* responsive to any of Plaintiffs' discovery requests (or correspondence) and neither Nebraska Beef nor LDM were obligated to produce them under Rule 26(e). Finally, the failure to produce the May Documents was both substantially justified and harmless.

### A.   The Production of the January Documents Was Dealt With in January and the Court Cured any Harm From Their Late Disclosure

Plaintiffs spend considerable time attempting to prove that the January Documents were responsive to one or more of their discovery requests. (Plaintiffs' Brief, at pp. 17-21, 40-43) LDM has never disputed this. In fact, Mr. Lamson acknowledged on January 14, 2011 that the first stun/index and last stun/index information contained in the January Documents was responsive to Request Nos. 63 and 64 and "may also be relevant to your Request Nos. 55(sic) and 57." (Def. Index, Ex. 4, att. I) That is precisely why the documents were produced as soon as they were discovered. Plaintiffs cannot allege a failure to supplement discovery responses and just ignore that the discovery responses were supplemented.

Further, Plaintiffs have not been harmed by the late disclosure of the January Documents. A failure to comply with Rule 26 "is harmless when there is no prejudice to the party entitled to disclosure." *Thurber v. Nebraska*, 4:06CV3174, 2008 U.S. Dist. LEXIS 28721 (D. Neb., Mar. 7, 2008)(Smith Camp, J). "Prejudice exists if the failure to make discovery impairs the opponent's ability to determine the factual merits of the party's claim." *Avionic Co. v. General Dynamics Corp.*, 957 F.2d 555, 559 (8th Cir. 1992). Plaintiffs can show no such harm.

Shortly after the January Documents were disclosed, Plaintiffs sought to have them excluded as a discovery sanction. (Doc. # 276) The Court declined to exclude the documents, and chose instead to cure any harm caused by their late disclosure. *Id.* The Court continued the trial and permitted the Parties to engage in further discovery and supplement their expert reports regarding the January Documents. *Id.* Plaintiffs deposed two witnesses regarding the January Documents, and could have deposed as many other witnesses as they felt reasonably necessary within the time period prescribed by the Court. Plaintiffs have not been hindered in any way in the investigation of the factual merits of their claim.

It should be noted that Plaintiffs greatly overstate the harm they claim to have suffered as a result of the late disclosure of the January Documents. For example, they seek compensation for all costs and fees associated with discovery concerning the January Documents, including "the on-site plant inspection of Nebraska Beef's meat processing plant, including travelling to and from Omaha, Nebraska; the supplemental report of Dr. Kenneth Mericle; and the substantial amount of time and effort exerted by Plaintiffs to review and analyze the [January Documents]." (Plaintiffs' Brief, at p. 58) However, Plaintiffs cannot credibly contend that they would not have spent "considerable time" analyzing the January Documents had they been produced earlier in the litigation. Also, Plaintiffs fail to advise the Court that they did not provide the January Documents to Dr. Mericle until April of 2011, *after* the Court's deadline for supplementing

expert reports and completing additional discovery regarding the January Documents. (Def. Index, Ex. 1, att. K at 12:7-14) They also fail to note that they did not ask Dr. Mericle to analyze the January Documents, and neither his on-site inspection nor his supplemental report was in any way based upon the January Documents. (Def. Index, Ex. 1, att. K at 50:24-51:6) Plaintiffs again tell half the story in order to create the false impression of a grievous harm.

Nebraska Beef and LDM met the obligations imposed upon them by Rule 26 with respect to the January Documents, and any failure to do so in a timely manner was harmless. Sanctions under Rule 37(c) are not warranted.

## B. Nebraska Beef Was Under No Obligation to Produce the May Documents During Discovery

Plaintiffs argue that Nebraska Beef was required to produce the May Documents by Rule 26(a)(1) and (3), and Rule 26(e). Neither of these arguments has merit. Moreover, the failure to produce the May Documents before trial was harmless because Plaintiffs were well aware of their existence and they do not relate to any fact at issue in the litigation.

### 1. Rule 26(a) does not apply to documents or witnesses a party does not intend to use to support its claims or defenses

Rule 26(a)(1) requires a party to litigation to provide to the other parties "a copy – or a description by category and location – of all documents, electronically stored information, and tangible things that the disclosing party has in his possession, custody, or control *and may use to support its claims or defenses,* unless the use would be solely for impeachment." Fed. R. Civ. P. 26(a)(1)(A)(ii)(emphasis added). However, "[a] party is no longer obligated to disclose witnesses or documents, whether favorable or unfavorable, that it does not intend to use." Fed. R. Civ. P. 26 Advisory Committee's Notes to 2000 Amendments. A disclosing party "is not required to produce every document that may be relevant to the underlying case as part of the

21

initial disclosures." *Farmers Co-op Co. v. Bartlett Grain Co., L.P.,* 4:09CV3252, 2011 U.S. Dist. Lexis 13437, *15-16 (D. Neb., Feb. 10, 2011)(Zwart, MJ).

Nebraska Beef was under no obligation to produce the May Documents in its mandatory Rule 26 disclosures for the simple reason that it had – and has – no intention to use them to support its claims or defenses.  The information contained in the May Documents is not relevant to any fact at issue in this litigation.  Nebraska Beef has never disputed that it requires its employees to perform sanitation activities, that it has an SSOP Program in place that sets forth its sanitation requirements, that it monitors sanitation and documents variations from the SSOP Program on SSOP Operational Checklists and Incident Reports, or that employees are subject to discipline, up to and including termination, if they violate Nebraska Beef's sanitation requirements.  (*See,* Pl. Index, Ex. D at 16:4-6; 92:1-6; 104:3-23; 106:21-107:2; Def. Index, Ex. 1, att. G at 135:5-12; 139:19-140:8)  The May Documents add nothing to these undisputed facts. They were brought to Court on May 4, 2011, for the sole purpose of explaining the false impression Plaintiffs' counsel had created about the January Documents.  Because neither Nebraska Beef nor LDM had any intention to use the May Documents, Rule 26(a) did not require that they be disclosed.

The same analysis applies to Plaintiffs argument based upon Rule 26(a)(3).  That rule requires that a party to litigation, at least 30 days prior to trial, provide to the other parties "information about the evidence that it may present at trial other than solely for impeachment." Fed. R. Evid. 26(a)(3).  This information includes "an identification of each document or other exhibit, including summaries of other evidence – separately identifying those items the party expects to offer and those it may offer if the need arises."  Fed. R. Evid. 26(a)(3)(A)(iii).  The May Documents were not documents that Nebraska Beef ever believed that it would or may

offer at trial.  Rule 26(a)(3) does not impose a burden to disclose documents that a party has no intention to use at trial.

### 2. The May Documents are not responsive to Plaintiffs' Requests for Production Nos. 14 and 16

Plaintiffs' argue that Nebraska Beef's failure to produce the May Documents in response to Plaintiffs' Request for Production Nos. 14 and 16, or to supplement its responses to those requests with the May Documents, violated Fed. R. Civ. P. 34 and 26(e).  Rule 26(e) requires a party who has made a disclosure under Rule 26(a), or who has responded to a request for production, to supplement or correct its disclosure or response "if the party learns that in some material respect the disclosure or response is incomplete or incorrect...." Fed. R. Civ. P. 26(e)(1)(A).  However, the Rule does not require supplementation or correction where additional or corrective information has "otherwise been made known to the other parties during the discovery process or in writing." *Id.*  The May Documents are not responsive to these requests, and Nebraska Beef was under no duty to supplement its discovery responses.

Plaintiffs Requests for Production No. 14 sought "[a]ll documents concerning, identifying or constituting your policies or procedures with respect to...(f) sanitation...." (Pl. Index., Ex. N at p. 7)  Plaintiffs Request for Production No. 16 sought "documents that identify sanitation or safety procedures applicable to any hourly employee." *Id.*  The May Documents are not "policies or procedures" with respect to sanitation, nor are they documents that identify sanitation procedures.  They are simply checklists where Quality Control personnel record their daily observations and document deviations from the SSOP Plan.

LDM believed in good faith that these document requests sought sanitation policies or practices.  (Def. Index, Ex. 4 at ¶ 6; Ex. 5 at ¶ 6)  The Court seemed to interpret the requests the same way when, in reference to Request No. 14 and the May Documents, it asked Mr. Schneider, "How is this document [the May Document] a policy or practice?" (Def. Index, Ex. 1, att. B at

218:13-14)  Under the circumstances, LDM's good faith belief that the May Documents were not responsive to Request Nos. 14 and 16 was entirely reasonable.

Even if the May Documents were responsive to Request Nos. 14 and 16, Rule 26(e) requires supplementation only "if the additional or corrective information has not otherwise been made known to the other party during the discovery process or in writing."  Fed. R. Civ. P. 26(e)(1)(A).  Here, the existence of the May documents was known to the Plaintiffs since at least October of 2009, when they received a copy of Nebraska Beef's SSOP Program.[8]  The SSOP Program refers to the May Documents as SSOP Sanitation Operational Checklists no fewer than 16 times.  Multiple witnesses, including Mr. Bell, Ms. Cleary and Mr. Villareal testified during discovery about the existence of the May Documents.  Even publicly available FSIS regulations, of which Plaintiffs' were aware, disclosed the existence of the May Documents.  Rule 26(e) imposes no obligation to supplement discovery responses under circumstances such as this.  *See, e.g., Guzman v. Abbott Laboratories,* 59 F. Supp. 2d 747 (N.D. Ill. 1999)(holding that failure to produce medical records did not violate Rule 26(e) where identity of physicians was disclosed to the defendant and the defendant could have obtained the records through further discovery).

Interestingly, Plaintiffs do not argue that the failure to produce the May Documents in response to Plaintiffs' Request for Production Nos. 106 and 107 violates Rule 26(e).[9]  Although Plaintiffs quote these requests in the Statement of Facts section of their brief, and state that Nebraska Beef "still did not produce the [May Documents]…in response to Request No. 106 or 107," the Argument section of their brief is silent about these requests.  (*See,* Plaintiffs' Brief, at pp. 43-44).  This is perhaps explained by the fact that is missing from the Plaintiffs' Statement of

---

[8] One could even argue that the production of the SSOP Program, because it contained a description of the May documents and other documents required to be kept by the program, was "a description by category and location" of the May Documents under Rule 26(a)(1)(A)(ii).

[9] Indeed, Request for Production Nos. 106 and 107 would be completely superfluous if Request Nos. 14 and 16 could be read as broadly as Plaintiffs now contend.

Facts: Nebraska Beef objected to these requests and Plaintiffs did not challenge these objections.
Rule 26(e) therefore does not apply to Request for Production Nos. 106 and 107. Plaintiffs thus
have no basis upon which to seek Rule 37 sanctions arising out of Nebraska Beef's responses to
these requests. This did not prevent the Plaintiffs from attempting to confuse the issues by
misleadingly referring to these requests in their Statement of Facts. This is yet another example
of Plaintiffs' affinity for argument by half-truth and innuendo.

### 3. The May Documents were not requested in Carolyn Cottrell's July 9, 2009 correspondence and Plaintiffs' argument to the contrary is an intentional misrepresentation of the record

Plaintiffs argue that they "explicitly requested the production of Nebraska Beef's SSOP
documents, which include the [May Documents] and the [January Documents]" in
correspondence from Carolyn Cottrell dated July 9, 2009. (Plaintiffs' Brief, at p. 12) This
statement is utterly false.

First, and most obviously, this correspondence requested only the *SSOP Program.* This
is a very specific document. The correspondence did not request any of the SSOP supporting
documents, such as the May Documents. Plaintiffs liberally use the phrase "SSOP" to conflate
different categories of documents. This intentional imprecision creates the false impression that
Plaintiffs' requested many more documents than they actually did during discovery.

Next, the January Documents are not part of Nebraska Beef's SSOP Program. They are
made and kept for a completely different purpose by completely different people. The January
Documents thus do not even arguably fall within the purview of Plaintiffs' July 9, 2009,
correspondence.

Finally, the actual text of the July 9, 2009, correspondence dispels any doubt that
Plaintiffs were requesting only the SSOP Program itself. Plaintiffs quote this correspondence, in
part, as follows:

> The SSOP describes all procedures conducted daily, before and during operations, sufficient to prevent direct contamination or adulteration of the product...*[These are]* obviously relevant documents in this case and responsive to one or more of our document requests.

(Plaintiffs' Brief, at p. 12)(brackets in original, emphasis added)

The actual text of the July 9, 2009 correspondence describes the SSOP Program and the HACCP Plan, and makes clear that the Plaintiffs are requesting *those two documents*:

> The SSOP describes all procedures conducted daily, before and during operations, sufficient to prevent direct contamination or adulteration of the product.  The HACCP Plan must cover each product produced by that establishment whenever a hazard analysis reveals one or more food safety hazards that are reasonably likely to occur.  *Both* are obviously relevant documents in this case and responsive to one or more of our document requests.

(Pl Ex. Q)(emphasis added)

Plaintiffs have omitted the word "both" from their recitation of this correspondence with the manifest intent to mislead the Court.  They changed the record to create the impression that they asked for many documents, when, in fact, they asked for two.  Plaintiffs' July 9, 2009, correspondence requested two documents, and both documents were produced.

### 4.   The failure to produce the May Documents was substantially justified and harmless

As noted above, even if there was an obligation to produce the May Documents, Rule 37 does not permit a sanction to be imposed where the failure to produce was "substantially justified or harmless." Fed. R. Civ. P. 37(c)(1).  The failure to produce the May Documents satisfies both of these tests.

LDM was substantially justified in not producing the May Documents, either as part of Nebraska Beef's mandatory or pre-trial disclosures or in response to discovery.  Substantial justification exists "where there is an issue about which reasonable people could differ on whether a party was bound to respond to a discovery request." *Miller, supra.*  Thus, if LDM's

belief that the May Documents did not have to be produced was reasonable, there can be no sanction under Rule 37.

As stated above, LDM did not intend to use the May Documents to support Nebraska Beef's claims or defenses. They simply aren't probative to any fact at issue in the case. They add nothing to the SSOP Program, which describes Nebraska Beef's mandatory sanitation activities in detail. (Def. Index, Ex. 4, att. B) They add nothing to the testimony of, for example, Lisa Cleary or Ken Bell, who freely agree that sanitation is important, is required, and is enforced. (*See,* Pl. Index, Ex. D at 16:4-6; 92:1-6; 104:3-23; 106:21-107:2; Def. Index, Ex. 1, att. G at 135:5-12; 139:19-140:8) The only reason the May Documents were brought into Court at all was to rebut Mr. Schneider's erroneous argument about the authenticity of the January Documents. LDM was under no duty, under either Rule 26(a)(1) or 26(a)(2), to disclose the May Documents, and was therefore substantially justified in withholding them from production.

In addition, Plaintiffs were not harmed by the failure to produce the May Documents. Plaintiffs claim that, "[w]ithout these documents, Plaintiffs would be hindered in presenting a complete picture of the various cleaning and sanitation activities that employees are required to perform." (Plaintiffs' Brief, at p. 6) This is pure sophistry. The most complete picture of the various cleaning and sanitation activities that employees are required to perform is the SSOP Program itself. In addition, Plaintiffs have a wealth of evidence with which to prove the sanitation activities employees are required to perform, including the testimony of the Plaintiffs themselves.

Plaintiffs also argue that the May 4, 2011, mistrial was "a direct result of Nebraska Beef's willful discovery violations." (Plaintiffs' Brief, at p. 58) This is shockingly dishonest. As noted above, Plaintiffs false accusations of perjury and fabrication of evidence led the Court to refer this matter to the U.S. Attorney, thereby creating an irreconcilable conflict of interest

between LDM and Nebraska Beef.  But for this conflict, LDM and Nebraska Beef would have

explained the difference between the January Documents and the gang time sheets, and trial

would have proceeded.  If Plaintiffs felt they needed discovery on the May Documents, this

could have been accomplished in a day or two, and trial still could have been completed on

schedule.  Plaintiffs would have learned in this discovery what they undoubtedly already knew:

the May Documents don't provide any useful information regarding the issues in the case.[10]  To

completely overlook the Court's referral to the U.S. Attorney and the *actual reason* for the

mistrial, and instead blame the mistrial on Nebraska Beef's "willful discovery violations,"

displays a shocking lack of candor.  It hardly establishes that the Plaintiffs were harmed by the

failure to produce the May Documents.

## II.

### PLAINTIFFS' ALLEGATIONS OF PERJURY AND FABRICATION OF DOCUMENTS ARE BASELESS

As an alternative to sanctions under Rule 37(c), Plaintiffs seek the sanction of default

judgment against Nebraska Beef, and monetary sanctions against Nebraska Beef and LDM,

pursuant to the inherent authority of the Court.  Plaintiffs premise this argument on their

erroneous belief that Nebraska Beef witnesses have committed perjury and presented fabricated

evidence, and that LDM was complicit in both suborning perjured testimony and presenting

fabricated evidence.  Plaintiffs argument fails.

The Court's inherent authority to impose sanctions "is a broad and powerful tool.  As

such, it should be used sparingly." *Sentis Group, Inc. v. Shell Oil Co.,* 559 F.3d 888, 899 (8th

Cir. 2009)(*citing, Roadway Express, Inc. v. Piper,* 447 U.S. 752, 764, 100 S.Ct. 2455, 65 L. Ed.

2d 488 (1980)("Because inherent powers are shielded from direct democratic controls, they must

---

[10] This likely explains Plaintiffs' failure to request the May Documents despite actual knowledge of their existence since at least October 2009.

be exercised with restraint and discretion."))  The Eighth Circuit Court of Appeals has described the relationship between Rule 37 and the Court's inherent authority:

> In general, then, courts first should turn to specific rules tailored for the situation at hand, such as Rule 37, to justify sanctions. Then, as an alternative basis for support or in circumstances where specific rules are insufficient, *i.e.*, then "there [is] a need," it may be appropriate to invoke their inherent authority. *Society Internationale [Pour Participations Industrielles Et Commerciales, S.A. v. Rogers,* 357 U.S. 197, 207, 78 S.Ct. 1087, 2 L. Ed. 2d 1255 (1958)].... It follows from this general rule that the best practice is to keep the structured analysis for a particular rule separate from the relatively unstructured analysis associated with inherent authority.

*Sentis,* 559 F.3d at 900.

In order to impose the sanction of dismissal under the Court's inherent authority, the Court must make an explicit finding of bad faith.  *Sentis, supra.*  Plaintiffs' allegations of bad faith find no support in the record.

### A.     <u>James Timmerman Testified Truthfully</u>

Plaintiffs contend that James Timmerman committed perjury in his deposition. (Plaintiffs' Brief, at pp. 22-27)  In order to obtain sanctions on this basis, Plaintiffs must prove that these witnesses intended to perpetrate a deliberate falsehood.  *See, Wallace v. McGlothan,* 606 F.3d 410, 425-26 (7th Cir. 2010)(stating that "[p]erjury is different from confusion, mistake, or faulty memory" and denying dismissal as sanction in the absence of finding of willfulness, bad faith or fraud.)  Perjury involves giving "'false testimony concerning a matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory.'" *United States v. Collier,* 527 F.3d 695, 702 (8th Cir. 2008)(*quoting, United States v. Ziesman,* 409 F.3d 941, 956 (8th Cir. 2005)).  In the context of a motion for default judgment, Plaintiffs must prove the requisite willfulness, bad faith or fraud by clear and convincing evidence.  *Martin v. Daimler-Chrysler Corp.,* 251 F.2d 691 (8th Cir. 2001).  The testimony cited by the Plaintiffs proves nothing of the sort.

29

Plaintiffs entire perjury argument is bottomed on their failure to understand the difference between the start of the *production line* and the start of *production.*  The production line is the mechanical chain or conveyors that move throughout the day.  "Production" refers to the activity of processing animals or sides of beef.  These terms are not generally used interchangeably at Nebraska Beef.

In the Slaughter division, the chain (the "production line") is started by maintenance before the first stun of the day.  (Def. Index, Ex. 9 at ¶ 15)  This is done so that supervisors can ensure that the chain is working properly before actual production work begins.  *Id.*  The first stun of the day, and thus the beginning of production, occurs after the start of the production line. There exists no document that records the time the chain – the "production line" – is started each day.  (Def. Index, Ex. 7 at ¶ 12, Ex. 9 at ¶ 17; Ex. 10 at ¶ 9; Ex. 13 at ¶ 20)

In the fabrication department, there are conveyors that run down the middle of the production tables that are part of the production line that carries product to the employees to be processed.  These conveyors are turned on by Marcelo Montenegro at 5:30 a.m., well before the first index that begins production. There is also a chain that carries sides of beef from the cooler to the production tables.  This chain is started before the first index as well.  The first index of the day, and thus the beginning of production, occurs when the first side of beef is moved from the stationary rail to the moving prefabrication chain.  (Def. Index, Ex. 6 at ¶ 11)  There exists no document that records the time the conveyors or the chain – the "production line" – are started each day.  (Def. Index, Ex. 7 at ¶ 12; Ex. 10 at ¶ 9; Ex. 22 at ¶ 8, 10)

Viewed with this context in mind, Mr. Timmerman's testimony makes perfect sense. Plaintiffs' first example of "perjured" testimony is entirely truthful:

Q. And is there some way that Nebraska Beef records the time that the line starts?

A. Not that I know of.

(Plaintiffs' Brief, at p. 24)

Plaintiffs pluck this question and answer out of context, and then baldly assert that they were asking about the January Documents.  (Plaintiffs' Brief, at p. 51)(stating "Mr. Timmerman purportedly authenticated the [January Documents] on a daily basis between March 2004 and June 2010. (citation omitted)  When asked about the documents at his deposition, however, Mr. Timmerman flatly denied any knowledge of their existence.")  First, Mr. Timmerman was never asked about the January Documents.  Nor was he asked about whether Nebraska Beef records when production actually begins.  The words "stun," "knock," "index," or "push" appear nowhere in Mr. Timmerman's deposition.  Most importantly, *the January Documents do not record what time the production lines start.*

Also, the questions that immediately precede the testimony quoted by Plaintiffs make it perfectly clear that Mr. Timmerman was asked about the start of the mechanical production line:

Q.  Now, NB has production lines; right?

A.  Correct.

Q.  Okay.  Tell me, generally, what a production line is.

A.  It's generally – It's a – I guess, a line in our facility that – where we process either cattle or carcasses.

Q.  It's a line that moves continuously throughout the day, except for, like, during lunch; right?

A.  Correct.

Q.  And is there some way that Nebraska Beef records the time that the line starts?

A.  Not that I know of.

(Def. Index, Ex. 7 at ¶ 9)

Plaintiffs hyperbolic accusations attempt to transform this benign and completely accurate testimony into a criminal act.  Their second example of "perjury" is no more convincing:

> Q.  Is there any way that Nebraska Beef records the time that the last – either – carcass goes through the kill floor?  Let's start with that.
>
> A.  No.
>
> Q.  Okay.  Does Nebraska Beef record the time when the last piece of meat or cut of meat comes down the fabrication line?
>
> A.  No.

(Plaintiffs' Brief, at p. 25)

Mr. Timmerman reasonably interpreted these questions to ask whether Nebraska Beef records "the time the last carcass has been through all the slaughter stations and is placed in the cooler" and "the time the last meat is bagged, boxed in pack off, or otherwise sent from the fabrication department to shipping."  (Def. Index, Ex. 7 at ¶¶ 14, 16)  Nebraska Beef does not record these times.  Mr. Timmerman's testimony was entirely truthful.

Plaintiffs' next accuse Mr. Timmerman of lying under oath when he failed to identify Mr. Yokozeki in response to these questions:

> Q.  And is there some way that Nebraska Beef records the time that the line starts?
>
> A.  Not that I know of.
>
> Q.  Who would know that?
>
> A.  Either Mr. Joy – Tony, Mario or Lisa.

(Plaintiffs' Brief, at p. 26)

This allegation suffers from the same infirmity as the first.  Nebraska Beef does not record what time the line starts.  Mr. Yokozeki would have no information in this regard.  This testimony is entirely truthful.

Finally, Plaintiffs bizarrely allege that the following testimony "[c]ompounds [Mr. Timmerman's] lies" (Plantiffs' Brief, at p. 26):

Q. What are Nebraska Beef's rules regarding employee hygiene?

A. I do not know.

Q. Okay. You've never seen any policies about that?

A. I have not.

(Plaintiffs' Brief, at p. 26)

Again, this testimony is entirely truthful. Plaintiffs strain to connect these questions to the January Documents by stating (falsely) that "[t]he [January Documents] purport to list various Nebraska Beef policies and practices regarding employee hygiene and sanitation." *Id.* The January Documents do nothing of the sort. The policies and practices are described in the SSOP Program. The January Documents merely provide a checklist for Quality Assurance personnel to document their observations. Mr. Timmerman's only involvement with the January Documents was to authenticate them, which involved nothing more than making sure they were filled out. (Def. Index, Ex. 7 at ¶ 20) Mr. Timmerman did not verify the accuracy of any of the information contained in the January Documents. It does not at all follow from the simple act of verifying that the January Documents were filled out that Mr. Timmerman has knowledge of Nebraska Beef's policies regarding hygiene. He does not.

Two additional points must be made about Plaintiffs accusations against Mr. Timmerman. First, they are nothing more than an attempt to resurrect the issue of late production of the January Documents. As discussed at length above, any harm in the late production of these documents has been cured and no further sanction is warranted.

Second, they suggest a conspiracy that defies logic. Taken at face value, Plaintiffs allege that Nebraska Beef concealed the January Documents throughout discovery, lied under oath

about their existence, convinced their lawyers to ignore their code of ethics, and then disclosed their existence weeks before trial after having lied about their existence. Plaintiffs have made no effort to explain what possible advantage Nebraska Beef sought to gain by hiding documents that so clearly benefit its case.[11] Nor have they explained why Nebraska Beef would have its employees lie under oath about documents they then turned around and produced. Plaintiffs' theory makes no sense.

Plaintiffs have failed to demonstrate that Mr. Timmerman gave inaccurate testimony, much less prove by clear and convincing evidence that he testified with the willful intent to present false testimony. Their allegations of perjury should be rejected.

### B.     The January Documents Were Not Fabricated

The centerpiece of Plaintiffs' argument is their contention that the January Documents are fabrications. It is from this false accusation that their justification for the extreme remedy of default judgment flows. They rely on two principal categories of evidence to support their accusation: 1) circumstantial evidence regarding the January Documents; and; 2) alleged inconsistencies between the first knock/index times on the January Documents and the start of gang time. None of this evidence supports the Plaintiffs' accusation.

### 1.     Plaintiffs' circumstantial evidence of fraud consists of misinterpretations of deposition testimony and misrepresentations of the evidence.

In an argument that consists of little more than conclusory allegations and the liberal use of scare quotes, Plaintiffs point to circumstantial evidence to support their accusation of evidence fabrication. First, they argue that, because James Timmerman lied about the existence of the January Documents, they must be fabrications. (Plaintiffs' Brief, at p. 53) Setting aside the fact

---

[11] In a preposterous overstatement, Plaintiffs contend that Nebraska Beef's "entire case" is based upon the January Documents. (Plaintiffs' Brief, at pp. 45-46) This is far from true, but would certainly make the conspiracy Plaintiffs' suggest much less likely.

that the conclusion does not follow the premise, this argument fails for the simple reason that Mr. Timmerman did not lie about the January Documents. (*See*, Section II(A), above)

Next, Plaintiffs argue that the January Documents must be fabrications because Lisa Cleary testified that she had never seen them. (Plaintiffs' Brief, at p. 53) This argument is likewise dealt with elsewhere. (*See*, p. 15, above) Ms. Cleary had not seen the January Documents because they are not made or kept pursuant to the SSOP Program. She would thus have had no reason to see the January Documents. Plaintiffs persist in their refusal to believe that the January Documents and the May Documents are different documents created by different people for different purposes. However, their failure to understand this basic fact does not equate to bad faith on the part of Nebraska Beef or LDM.

Plaintiffs also point to the fact that the January Documents do not record any incidents of deviation from the SSOP Program as "indicia that [they] were fabricated." (Plaintiffs' Brief, at p. 54) This is, again, easily explained by the fact that documenting such incidents was not the purpose of the January Documents and the person filling out the January Documents, Mr. Yokozeki, was not attempting to document deviations from the SSOP Program. (Def. Index, Ex. 6 at ¶ 38-40)

Finally, Plaintiffs argue that the timing of the January Documents indicates that they are fraudulent. (Plaintiffs Brief, at p. 22) They state that "[t]he [January Documents] only exist from March 2004, which also happens to be the start of the class period, to shortly before Nebraska Beef produced the [January Documents] in January 2011." (Plaintiffs' Brief, at p. 22, n. 5) This statement is false, and provides another example of Plaintiffs' misrepresentation of the record.

The January Documents, like every other document in this case, were produced to the Plaintiffs starting with documents generated in March 2004 because March 2004 was the

beginning of the limitations period for the Class, not because no documents existed prior to March 2004.  (Def. Index, Ex. 5 at ¶ 13)  The production of all other daily records, including payroll spreadsheets, check registers, and gang time sheets, was similarly limited to the time period March 2004 to present.  *Id.*  The January Documents stopped being generated in June 2010 (not "shortly before" January 2010) because Mr. Randazzo advised Mr. Yokozeki that he no longer needed to record the first stun/index and last stun/index.  (Def. Index, Ex. 6 at ¶ 34; Ex. 13 at ¶ 19)  None of this suggests that the January Documents were fabricated.

Plaintiffs circumstantial "indicia of fraud" fail to support their argument that the January Documents were fabricated or that LDM was complicit in anything remotely resembling fraud.

**2.     Plaintiffs' comparison of the first stun/index times on the January Documents with the start of gang time ignores the reason for late start notices**

Plaintiffs point to "glaring" discrepancies between the January Documents and gang time sheets and late start notices as evidence that the January Documents "were fabricated and are fraudulent."  (Plaintiffs' Brief, at p. 30)  They cite 17 examples of dates where the first stun/index time recorded in the January Documents precedes the start of gang time and is inconsistent with late start notices.  (Plaintiffs' Brief, at pp. 30-36)  This, they claim, is "determinative proof" that the January Documents are fabrications.  (Plaintiffs' Brief, at p. 36)  They are wrong.  Had Plaintiffs sought explanations for these discrepancies through discovery, they would have learned the reasons why the first stun/index times on those dates appear as they do.  Instead, Plaintiffs chose to lie in wait in order to try for a dramatic moment at trial.  Plaintiffs' examples are not discrepancies at all, and the more examples they cite the more they get tangled up in the garden hose.

      **(i)**      **Nebraska Beef was engaged in Carcass Mapping on 14 of the 17 dates Plaintiffs cite**

Carcass mapping is "a systematic program designed to determine pathogen contamination patterns on beef carcasses." (Def. Index, Ex. 15 at ¶ 6)  Between 2005 and 2008, Nebraska Beef worked with Dr. Mindy Brashears, a microbiologist from Texas Tech University, to conduct research regarding Carcass Mapping. (Def. Index, Ex. 15 at ¶ 5)  In order to collect data for Carcass Mapping, the initial head stunned "is harvested by supervisory personnel *before the beginning of regular production and without the regular production personnel on the floor.*" (Def. Index, Ex. 15 at ¶ 8)(emphasis added)  This testing is done under USDA supervision. (Def. Index, Ex. 11 at ¶ 4)  Dr. Brashears' team conducted Carcass Mapping on 15 of the 17 dates Plaintiffs cite.[12]

Because FSIS inspectors are present during the time the initial animal is harvested as part of the Carcass Mapping, the January Document recorded the time the initial animal is stunned. This is consistent with the purpose of the January Documents, which was to address a dispute with USDA over time their FSIS inspectors were improperly spending at the plant outside of their scheduled time.  Hourly production employees began the actual production day after the Carcass Mapping was completed.  Thus, it is not at all surprising that in Plaintiffs' examples the time recorded as the first stun on the January Documents precedes the start of gang time.  On dates when Dr. Brashears was present and conducting Carcass Mapping, the first carcass was stunned and run through the production line *before* the start of regular production and *before* the hourly production employees were on the floor.  Indeed, the presence of Dr. Brashears and her team explains why there were late start notices on those dates to begin with.

---

[12] November 16, 2005; November 29, 2005; December 2, 2005; December 21, 2005; December 22, 2005; October 5, 2006; October 6, 2006; November 2, 2006; December 20, 2006; December 21, 2006; December 28, 2006; December 29, 2006; December 30, 2006; and, June 4, 2008.  (Def. Index, Ex. 15 at ¶ 5)

Unless Nebraska Beef has enlisted Dr. Brashears into their conspiracy, the fact that Plaintiffs' alleged discrepancies so closely track the dates when Dr. Brashears conducted Carcass Mapping supports, rather than undermines, the authenticity of the January Documents.

### (ii)   Nebraska Beef was testing repairs to the stunning delivery system on July 17, 2007

On July 16, 2007, Emile Randazzo (who was then an FSIS inspector) received a phone call from a representative of Nebraska Beef concerning a possible malfunction of the plant's livestock stunning delivery system.  (Def. Index, Ex. 13 at ¶ 7)  Nebraska Beef informed Mr. Randazzo that they were performing repairs on the system and that the next day's start time would be moved forward two hours to allow the company to test the repairs.  *Id.*

The next day, Mr. Randazzo was present in his capacity as an FSIS inspector when Nebraska Beef conducted the test of the stunning delivery system.  (Def. Index, Ex. 13 at ¶ 8)  Mr. Randazzo observed that the slaughter floor was staffed with only supervisory personnel.  *Id.*  The regular hourly production staff were not present.  *Id.*

This is entirely consistent with Nebraska Beef's practice when testing new or repaired equipment.  One or more animals are stunned and run through the production line by supervisory personnel.  The time of the first knock is recorded on the January Document because there are FSIS inspectors present.  It is therefore to be expected that the time recorded as the first knock (or the first index in the Fabrication department) occurs before the start of gang time.

### (iii)   Nebraska Beef was testing a submersion conveyor on April 24, 2008.

Nebraska Beef occasionally tests new equipment before the start of the production day. On those days, a "late start" notice is posted to inform hourly production personnel that production will begin at a later time. (Def. Index, Ex. 22 at ¶ 5) When the equipment is tested, supervisors or lead men are used to process the product.  (Def. Index, Ex. 20 at ¶ 4-6; Ex. 21 at ¶

38

4-6; Ex. 22 at ¶ 5) Supervisors are salaried employees and lead men are hourly employees who are paid for the extra time they work on late start days. The equipment testing is performed under USDA supervision and before the hourly employees arrive. (Def. Index, Ex. 22 at ¶ 6-7)

Barry Smith is a consultant who has worked with Nebraska Beef since 1999 on various plant related projects including refrigeration and mechanical issues. (Def. Index, Ex. 17 at ¶ 2) One of the projects Mr. Smith worked on was a conveyorized submersion system. (Def. Index, Ex. 17 at ¶ 3) On April 24, 2008, Mr. Smith was present when the final phase of the submersion conveyor installation occurred. (Def. Index, Ex. 17 at ¶ 4) One carcass was indexed into the Fabrication division and processed by supervisory personnel. *Id.* The January Document for that date records the time this carcass was indexed to Production. The gang time sheet reflects a later start time because the hourly production personnel did not arrive and begin actual production until after the installation and testing of the submersion conveyor system was completed.

Again, unless Mr. Smith is lying, this "discrepancy" supports the authenticity of the January Documents.

### (iv)   Nebraska Beef had a power outage on June 17, 2008 that necessitated a late start on June 18, 2008

Finally, Nebraska Beef experienced a power outage on June 17, 2008, and this necessitated a late start on June 18, 2008. (Def. Index, Ex. 16 at ¶ 4, 6) Nebraska Beef contacted its insurance agent, Fred Embry, and advised him that they may have an insurance claim from both a product loss and business interruption standpoint. (Def. Index, Ex. 16 at ¶ 5) Mr. Embry corroborates the date of the power outage and the fact of the late start the following day.

As with days when new equipment is installed, a late start notice was posted for a late start on June 18, 2008. When the late start was run, Mr. Joy and other supervisors and management staff were present to run test product through the system to be certain that the

39

electrical issue had been addressed.  (Def. Index, Ex. 22 at ¶ 8)  This occurred before the full hourly production staff arrived.  *Id.*  The January Document for that date records the time the first carcass was indexed to Production.  This carcass was processed by supervisory personnel. The gang time sheet for that day reflects that the hourly production employees did not arrive and begin actual production until after the testing had been completed.

Mr. Embry would have to be yet another co-conspirator in order for Plaintiffs' theory to be true.  Plaintiffs' "determinative proof" of fraud is a product of their imagination.

In summary, Plaintiffs' counsel convinced themselves that the January documents were fabrications from the very beginning. They accused LDM of suborning perjury within days of the production of these documents. (Def. Index, Ex. 4, att. I)  Their certainty so blinkered their thinking that, when they identified what they believed to be discrepancies between the January Documents and gang time sheets, they chose to lie in wait with this information rather than seek a fuller explanation through discovery.  Their certainty led them to ignore every description of the January Documents and of their purpose. Ultimately, it led them to accuse Nebraska Beef and LDM in open court of conspiring to present perjured testimony and fabricated evidence based upon nothing more than their own conspiracy-mindedness.

The "discrepancy" between the January Documents and the gang sheets is easily explained, as is Lisa Cleary's testimony, as is James Timmerman's testimony. Unfortunately, Plaintiffs's counsel were not interested in those explanations, and their misplaced certainty led the Court to prematurely refer this matter to the U.S. Attorney, thus necessitating LDM's withdrawal and leading to the mistrial of which Plaintiffs' now complain.  Plaintiffs' motion for sanctions should be denied.

# III.

# PLAINTIFFS ARE NOT ENTITLED TO SANCTIONS AGAINST LDM

Plaintiffs seek monetary sanctions against "Nebraska Beef and/or its former counsel, Lamson, Dugan and Murray, LLP." (Plaintiffs' Brief, at p. 3)  The foregoing discussion demonstrates why the conduct at issue is not sanctionable.  This section discusses why sanctions should not be imposed upon LDM.

### A.    Plaintiffs Are Not Entitled To Sanctions Against LDM Under Rule 11

As a preliminary matter, it should be noted that Plaintiffs, in a footnote to their brief, move this Court for an order sanctioning LDM pursuant to Fed. R. Civ. P. 11(c).  (Plaintiffs' Brief, at p. 49, n. 10)  This request should be ignored.

First, Rule 11 no longer applies to "disclosures and discovery requests, responses, objections and motions under Rules 26 through 37."  Fed. R. Civ. P. 11(d).  This provision disposes of Plaintiffs' "motion."

Also, Rule 11 requires that a motion for sanctions "be made separately from any other motion and . . . describe the specific conduct that allegedly violates Rule 11(b)."  Fed. R. Civ. P. 11(c)(2).  A request for Rule 11 sanctions made in a footnote hardly satisfies this requirement. Rule 11 outlines further procedural prerequisites that Plaintiffs have not followed:

> The motion must be served under Rule 5, but it must not be filed or be presented to the court if the challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21 days after service or within another time the court sets.

Fed. R. Civ. P. 11(c)(2)

Plaintiffs have failed to follow the procedural requirements of Rule 11.  Their "motion" should be denied.

**B.**    <u>Plaintiffs Are Not Entitled To Sanctions Against LDM Under Rule 37</u>

The federal rules allow sanctions to be imposed against either the party or its attorneys. Fed. R. Civ. P. 26(g); *Chambers v. NASCO, Inc.,* 501 U.S. 32, 51, 111 S.Ct. 2123, 115 L. Ed. 2d. 27 (1991).  Sanctions against attorneys should be awarded "only when it is clear that discovery was unjustifiably opposed principally at his instigation." *Humphreys Exterminating Co., Inc. v. Poulter,* 62 F.R.D. 392, 395 (D. Md. 1974).  Plaintiffs have made no such showing.

The arguments opposing Rule 37 sanctions against Nebraska Beef apply equally here, and will not be restated.  (*See,* Section II, above)  The Court should deny Plaintiffs motion for sanctions against LDM for the following additional reasons:

First, with respect to the May Documents, LDM had a reasonable, good faith belief that these documents were not responsive to any discovery request, and were not going to be used to support Nebraska Beef's defenses.

Second, LDM disclosed the January Documents to the Plaintiffs as soon as it learned they existed.  In fact, LDM supplemented discovery responses before it had the January Documents in its possession.  Many of the documents were in rough shape and were difficult to copy quickly. LDM personnel worked long hours to produce the January Documents as expeditiously as possible via internet drop box as they were received.

**C.**    <u>Plaintiffs Are Not Entitled To Sanctions Against LDM Under The Inherent Authority Of The Court</u>

Although Courts have inherent authority to levy sanctions on attorneys who engage in abusive litigation practices, sanctions may only be imposed under the Court's inherent authority upon a finding that the attorney acted in bad faith. *Roadway Express, Inc. v. Piper,* 447 U.S. 752, 765-66, 100 S. Ct. 2455, 65 L. Ed. 2d 488 (1980); *Qualcomm Inc. v. Broadcom Corp.,* 05CV1958-B, 2010 U.S. Dist. LEXIS 33889 (S.D. Cal., April 2, 2010).  Bad faith "includes a

broad range of willful improper conduct." *Fink v. Gomez,* 239 F.3d 989, 992 (9th Cir. 2001)  No showing of bad faith or willful improper conduct has been made here.

As argued above, Plaintiffs' principal complaint – that the January Documents are fabrications – falls apart with scrutiny.  It necessarily follows that Plaintiffs' contention that LDM "should have known" that the documents were fraudulent fails as well.  Plaintiffs have offered no evidence that LDM participated in any conspiracy to defraud the Court or the Plaintiffs, and the suggestion is offensive.

Plaintiffs' argument for sanctions under the inherent authority of the Court is based upon fantasies about perjury and fabrication of evidence.  These claims find no support in the record and imply a conspiracy that defies logic.  There has been no showing that there was perjury or fabrication of evidence, much less that LDM engaged in willful improper conduct.  In the absence of such a showing, the Court should not invoke its inherent authority to sanction LDM. *See, Qualcomm, supra* (refusing to impose sanctions on attorneys in absence of finding of bad faith).

## CONCLUSION

Plaintiffs have distorted the record beyond recognition in their effort to obtain a default judgment and monetary sanctions.  They convinced themselves that the January Documents were fabrications and have struggled mightily to fit the evidence into that misguided theory.  When the evidence didn't fit, they changed it to make it fit.  They have misquoted, taken things out of context, used different concepts interchangeably, and even changed the record in their effort to prove their conspiracy.  At the end of the day, however, the centerpiece of their argument – their "determinative proof" of fraud and deceit by Nebraska Beef and LDM – is simply the product of their stubborn failure to understand the facts and their decision to try for a dramatic moment at trial rather than conduct discovery.  Plaintiffs' motion should be overruled.

43

Respectfully Submitted:

LAMSON, DUGAN and MURRAY, LLP,


By:____/s/ William M. Lamson, Jr._____
            William M. Lamson, Jr., #12374
            William R. Settles, #19879
            Brian J. Brislen, #22226
            LAMSON, DUGAN and MURRAY, LLP
            10306 Regency Parkway Drive
            Omaha, NE 68114-3743
            Telephone:  (402) 397-7300
            Telefax:  (402) 397-7824
            wlamson@ldmlaw.com
            wsettles@ldmlaw.com
            bbrislenldmlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 6th day of July, 2011, I electronically filed the foregoing Brief with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following:

Russell D. Henkin
Jonathan D. Berger
Shanon J. Carson
James A. Wells
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA  19103

-and-

Todd Schneider
SCHNEIDER WALLACE
180 Montgomery Street, Suite 2000
San Francisco, CA  94104

-and-

Philip A. Downey
1555 Embreeville Road
P.O. Box 736
Unionville, PA  19375

-and-

44

Christopher P. Welsh
WELSH & WELSH, P.C., L.L.O.
9290 West Dodge Road, Suite 100 The Mark
Omaha, NE  68102
*ATTORNEYS FOR PLAINTIFFS*

James M. Bausch
John C. Hewitt
Trenten P. Bausch
CLINE WILLIAMS
One Pacific Place
1125 South 103rd Street, Suite 600
Omaha, NE  68124
*ATTORNEYS FOR DEFENDANTS*


/s/ William M. Lamson, Jr. _____

498967